**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SOCCER FEDERATION, INC., | |
| Plaintiff, | |
| v. | Case No. 1:16-cv-01923 |
| | Hon. Sharon Johnson Coleman |
| UNITED STATES WOMEN'S NATIONAL SOCCER TEAM PLAYERS ASSOCIATION, | |
| Defendant. | |

<u>**COMPLAINT FOR ANTICIPATORY BREACH OF CONTRACT AND FOR**</u>

<u>**DECLARATORY RELIEF**</u>

Plaintiff United States Soccer Federation, Inc. ("<u>US Soccer</u>"), by its undersigned counsel,

brings this action against Defendant United States Women's National Soccer Team Players

Association (the "<u>Players Association</u>") and states as follows:

**NATURE OF THE ACTION**

1.      US Soccer reluctantly brings this lawsuit against the Players Association because

of the recent claim by Mr. Richard Nichols, the newly-appointed Executive Director of the

Players Association, that the Players Association is entitled to repudiate the parties' current

collective bargaining agreement 11 months prior to its expiration and to "engage in actions" in

violation of a "no strike" clause in advance of the upcoming 2016 Summer Olympic Games and

the 2016 National Women's Soccer League season.

2.      On March 19, 2013, after six months of negotiations, US Soccer's representatives

and the Players Association's then-Executive Director/General Counsel of 14 years, John

Langel, reached agreement on and memorialized a collective bargaining agreement retroactive to

1

January 1, 2013. Consistent with past practice and every prior collective bargaining agreement, the parties agreed that the new collective bargaining agreement would expire at the end of the year following the next Summer Olympic Games -- December 31, 2016. The parties expressly agreed that the new collective bargaining agreement would be comprised of two documents: (i) the prior collective bargaining agreement, to the extent not otherwise supplemented or modified, which included a "no strike" clause, and (ii) a new Memorandum of Understanding reflecting the parties' agreed-upon modifications to the prior collective bargaining agreement and containing, among other provisions, substantially improved economics and additional benefits for the Women's National Team members. Indeed, Mr. Langel, the Players Association's former Executive Director who actually negotiated the current collective bargaining agreement, confirmed <u>both</u> the terms of the agreement <u>and</u> its December 31, 2016 expiration *in testimony under oath* more than a year later -- well before the present dispute materialized. *See* paragraph 37 and <u>Exhibit G</u>, *infra*.

3.      The Players Association appointed Mr. Nichols as Executive Director at the end of 2014 – nearly two years after the current collective bargaining agreement was executed.

4.      Then, on Christmas Eve 2015,

- contrary to the express agreement of the Players Association during the 2012-2013 negotiations as reflected in numerous written communications;

- contrary to the terms of the Memorandum of Understanding executed on March 19, 2013;

- contrary to the actions of both US Soccer and the Players Association throughout 2013 and 2014;

- contrary to the testimony of the Players Association's prior Executive Director who actually negotiated and signed the Memorandum of Understanding; and

- even though he played absolutely no role in the 2012-2013 collective bargaining negotiations,

Mr. Nichols unilaterally declared that the current collective bargaining agreement will terminate on February 24, 2016 (not on December 31, 2016 as agreed), and thereafter suggested that the Women's National Team members will no longer be bound by the "no strike" clause and, therefore, will be entitled to "engage in actions" unless the parties agree to a new collective bargaining agreement.

5.      And, today, February 3, 2016, at a meeting between US Soccer and Mr. Nichols and the Players Association, US Soccer directly asked Mr. Nichols to agree that the Players Association would not strike or engage in any job actions prior to December 31, 2016.  Mr. Nichols refused to provide the requested assurance at the meeting and other representatives said they would not agree to "disarm" the Players Association.

6.      Mr. Nichols' actions have put US Soccer in an untenable position: either promptly agree to the Players Association's demand for a new collective bargaining agreement on dramatically different terms than those provided by the current agreement which does not even expire until the end of 2016, or face the risk of an illegal strike or other illegal job action that could jeopardize the existence of the National Women's Soccer League and the prospects, and potentially the participation, of the Women's National Team in the 2016 Summer Olympic Games – all to the substantial detriment of US Soccer, the National Women's Soccer League, the United States Olympic Committee and the growth of girls' and women's soccer in general.

7.     Rather than accede to this threat, US Soccer instead requests that this Court require Mr. Nichols and the Players Association to honor the terms of the collective bargaining agreement reached in March 2013.[1]

## PARTIES

8.     US Soccer is a New York non-profit corporation with its principal place of business and headquarters in Chicago, Illinois.  It is recognized by the Fédération Internationale de Football Association ("FIFA"), the international governing body for the sport of soccer, as the National Association member for the United States, and by the United States Olympic Committee as the National Governing Body for the sport of soccer in the United States pursuant to the Ted Stevens Olympic and Amateur Sports Act.  US Soccer's mission is to make soccer a preeminent sport in the United States, and to grow and develop the sport at all recreational and competitive levels.  To that end, US Soccer oversees the sport as it is played by each of its constituent organizations and fields numerous national teams, including the Women's National Team.

9.     The Players Association is a labor organization representing employees in an industry affecting commerce as defined in Section 2, Subsection 5 of the National Labor Relations Act, 29 U.S.C. § 152(5), and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  The Players Association is the exclusive collective bargaining representative of all players selected to play for the Women's National Team, who are, therefore, employees of US Soccer.  The Players Association was headquartered in Philadelphia, Pennsylvania between 2000, when it was certified as the exclusive bargaining representative for

---

[1]  Of course, US Soccer will, in the meantime, bargain in good faith with the Players Association for a new collective bargaining agreement on mutually agreeable terms effective January 1, 2017.  But, wholly independent of those negotiations, US Soccer is entitled to labor peace through the end of December 2016 -- an environment it bargained for and paid for, and to which the Players Association agreed on March 19, 2013.

the Women's National Team, and November 2014.  US Soccer is informed and believes and

thereon alleges that the Players Association is now headquartered in Keller, Texas, where Mr.

Nichols, its new Executive Director, is located.  The Players Association and its representatives

regularly conduct business in the Northern District of Illinois.

## JURISDICTION AND VENUE

10.     Section 301(a) of the LMRA, 29 U.S.C. § 185(a), gives federal courts jurisdiction

to hear actions concerning violations of "contracts between an employer and a labor organization

representing employees in an industry affecting commerce."  Because the instant matter involves

the Players Association's repudiation and anticipatory breach of a collective bargaining

agreement, US Soccer brings this action under Section 301(a) of the LMRA.  *See J.W. Peters,*

*Inc. v. Bridge, Structural and Reinforcing Iron Workers Local Union 1*, 398 F.3d 976 (7th Cir.

2005).

11.     US Soccer also brings this action under 28 U.S.C. § 2201, which authorizes

federal courts having jurisdiction to declare the rights and legal relations of interested parties.

Here, US Soccer seeks a declaration that a collective bargaining agreement negotiated and

agreed to by both US Soccer and the Players Association in March 2013 does not expire until

December 31, 2016.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that this

action arises under Section 301 of the LMRA.  29 U.S.C. § 185(a).  This Court likewise has

subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that the action is between citizens of

different states and the amount in controversy significantly exceeds $75,000.

13.     This Court has personal jurisdiction over the Players Association because its

representatives engage in sufficient contacts with the State of Illinois such that the Players

Association should reasonably anticipate being haled into court there. The Players Association is a labor union with national jurisdiction representing players who are employed by an organization headquartered in Chicago, Illinois. Some of these players live in Illinois or play for professional teams located in Illinois. As the exclusive collective bargaining representative of the Women's National Team players, the Players Association regularly and frequently communicates with personnel at US Soccer's headquarters in Chicago, Illinois. These contacts include, among other things, those giving rise to the instant action – namely, the negotiations over collective bargaining agreements. And, in conjunction with the collective bargaining agreement negotiations, the Players Association agreed that, to the extent not governed by federal law, the law of Illinois would control and therefore assumed the benefits and protections of Illinois law.

14. Venue is proper in this Court because, as demonstrated above, the Players Association's duly authorized representatives represent and act for its members in the Northern District of Illinois and a substantial portion of the events at issue occurred in this District, including but not limited to the negotiations of the collective bargaining agreement at issue as well as the performance of that agreement. *See* 28 U.S.C. § 1391(b); 29 U.S.C. § 185(c); *Reed v. UAW, Local Union No. 663*, 945 F.2d 198, 201, n.3 (7th Cir. 1991) (noting that 29 U.S.C. § 185(c) "deal[s] with venue and not jurisdiction" but that "the requirements under both [29 U.S.C. § 185(c)] and the due process 'minimum contacts' standard have been held to be so similar that analysis under either would yield the same result").

## FACTUAL AND PROCEDURAL BACKGROUND

### The First and Second Collective Bargaining Agreements

15. The Players Association was certified as the exclusive bargaining representative for the Women's National Team in 2000.

16. At all times thereafter, through the end of November 2014, the Players Association was represented by its General Counsel and Acting Executive Director, John Langel of the Philadelphia-based law firm of Ballard Spahr LLP. Mr. Langel was and is a distinguished member of the legal profession, longtime head of Ballard Spahr's Labor and Employment Group and consistently rated by various publications as a leader in the area of labor and employment law.

17. US Soccer is informed and believes, and thereon alleges, that pursuant to the Constitution and By-Laws of the Players Association filed with the United States Department of Labor, as General Counsel and Acting Executive Director of the Players Association, Mr. Langel was authorized, at all times relevant to this action, to negotiate collective bargaining agreements with US Soccer and to execute such agreements, binding the Players Association and its members to the agreed-upon terms. *See* Players Association Constitution and By-Laws, Article VIII (a)-(b), attached as Exhibit A.

18. US Soccer focuses its planning efforts for the Women's National Team by quadrennium – four (4) year periods – leading to the ultimate goals of qualifying for and winning both the FIFA Women's World Cup and the Olympic Gold Medal. Each quadrennium consists generally of a two (2) year preparatory period, followed by the FIFA Women's World Cup in year three and the Summer Olympic Games in year four.

19.     Each collective bargaining agreement agreed to between US Soccer and the Players Association has consisted of two components that US Soccer, and players selected to the Women's National Team, are bound by: (i) a general agreement covering such topics as management rights, union rights, no strikes/no lockouts, and a grievance and arbitration mechanism; and (ii) a Uniform Player Agreement covering such topics as player fitness and rights to the player's image and likeness.[2]  Each collective bargaining agreement includes an attached compensation schedule which details the amounts Women's National Team players are eligible to receive for their participation in designated events and competitions including the FIFA Women's World Cup and the Olympics, each held every four (4) years.

20.     The first collective bargaining agreement between US Soccer and the Players Association was entered into in March 2001, made retroactive to February 1, 2000, and covered the period through December 31, 2004 – after the 2004 Summer Olympic Games (the "2001 CBA/UPA").  The 2001 CBA/UPA was signed by Mr. Langel on behalf of the Players Association and is attached as Exhibit B.

21.     In the Fall of 2004, prior to the expiration of the 2001 CBA/UPA, US Soccer and the Players Association commenced negotiations for a new collective bargaining agreement. The negotiations extended into 2005.

22.     US Soccer and the Players Association eventually reached agreement on a new collective bargaining agreement covering an eight year period (two 4-year women's international soccer cycles), made retroactive to the beginning of 2005 and covering the period from January 1, 2005 through December 31, 2012 (the "2005 CBA/UPA").  The 2005 CBA/UPA was also

---

[2]  Article IV of each collective bargaining agreement provides that the Uniform Player Agreement "was the product of collective bargaining between the parties, and its terms in its entirety are expressly made a part of this Agreement as if fully set forth herein."

executed by Mr. Langel on behalf of the Players Association and is attached as <u>Exhibit C.</u> The

2005 CBA/UPA provided two compensation packages for members of the Women's National

Team, one covering the first quadrennium (2005-2008) including the 2007 FIFA Women's

World Cup and the 2008 Summer Olympics, and a second, increased compensation package, for

the second quadrennium (2009-2012) including the 2011 Women's World Cup and the 2012

Summer Olympics.

23.     As did the 2001 CBA/UPA, the 2005 CBA/UPA contains, among other

provisions, a comprehensive "No Strikes, No Lockouts" clause which provides as follows:

> Neither the Players Association nor any player shall authorize,
> encourage, or engage in any strike, work stoppage, slowdown or
> other concerted interference with the activities of the Federation
> during the term of this Agreement. . . . The Players Association
> shall not support or condone, any action of any player which is not
> in accordance with this Section 6.1 and the Players Association
> shall exert reasonable efforts to induce compliance therewith.

2005 CBA/UPA, Article VI, Section 6.1.  And, of course, US Soccer is similarly barred from

"locking out" the Women's National Team during the pendency of the collective bargaining

agreement.

## The Current Collective Bargaining Agreement

24.     With the 2005 CBA/UPA set to expire by its terms on December 31, 2012, US

Soccer and the Players Association commenced negotiations for a new collective bargaining

agreement in the Fall of 2012.  These negotiations included in-person negotiating sessions in

various cities around the United States as well as telephone conversations and email

communications between the Players Association and US Soccer personnel located in Chicago

and elsewhere.

25.     The principal negotiators for the Players Association were John Langel and his colleague Ruth Uselton, also of Ballard Spahr.  The principal negotiators for US Soccer were its President, Sunil Gulati and its General Counsel, Lisa Levine.

26.     The negotiations for the new collective bargaining agreement extended beyond December 31, 2012 into March 2013.  Among the reasons for the protracted negotiations was the formation of the National Women's Soccer League (the "NWSL"), a new women's professional soccer league.

27.     Both the Players Association and US Soccer believed that the development of a sustainable women's professional league would be beneficial for the development of girls' and women's soccer in the United States.  In addition, the establishment of the NWSL would provide the Women's National Team players with a competitive environment in which to play when not participating in national team activities and to earn compensation in addition to the earnings from participation on the Women's National Team.[3]

28.     Determining the role US Soccer would play with the new NWSL and melding the role of the Players Association and the Women's National Team players with the new league complicated the negotiations and took several additional months to resolve.  In the interim, both US Soccer and the Players Association continued to abide by the terms of the 2005 CBA/UPA.

29.     On March 19, 2013, US Soccer and the Players Association reached agreement on the key issues relating to US Soccer's and the Women's National Team players' participation in the NWSL, as well as on an improved compensation and benefits package for the members of the Women's National Team.  The agreement was memorialized in a Memorandum of

---

[3]  Two prior attempts to develop and maintain a women's professional soccer league in the United States without the formal assistance of US Soccer and the Players Association had failed -- the Women's United Soccer Association (2001-2003) and Women's Professional Soccer (2009-2012).

Understanding dated March 19, 2013 (the "MOU"), signed by Mr. Langel on behalf of the Players Association and attached as Exhibit D.

30.     US Soccer is informed and believes and thereon alleges, based on its communications with Mr. Langel, that the agreement memorialized in the MOU, including the four year term of the new collective bargaining agreement covering the period from January 1, 2013 through December 31, 2016, was ratified by the members of the Players Association.

31.     Although it was contemplated by the parties that the MOU and the terms of the 2005 CBA/UPA would be eventually be combined into a single document, US Soccer and the Players Association specifically agreed that until that was accomplished the new collective bargaining agreement (the "2013 CBA/UPA") would consist of the terms contained in the 2005 CBA/UPA (including the no strike clause) as modified, altered or amended by the terms of the MOU.  Indeed, the Players Association confirmed this agreement in multiple emails to US Soccer as the negotiations for the MOU were being finalized, including on March 19, 2013, the day the MOU was executed, stating as follows:

> As we previously agreed, the general principle we are working under is that the items we have not specifically covered in the Memorandum of Understanding would remain the same as under the prior CBA, but with appropriate increases/adjustments/ changes.

See e.g., Email from Ruth Uselton to US Soccer dated March 19, 2013 attached as Exhibit E.

32.     Among other things, the 2013 CBA/UPA provided that (a) the new collective bargaining agreement would have a term of four years, expiring on December 31, 2016 ("Term of WNT Contract – 4 years.");[4] (b) in light of the agreed-upon improved compensation for the

---

[4] In virtually all of the substantive communications between US Soccer and the Players Association during the 2012-2013 negotiations, each of the parties made clear that they were negotiating for a collective bargaining agreement covering 2013 through the end of 2016.

Women's National Team, US Soccer would make payments to the Women's National Team retroactive to January 1, 2013; and (c) US Soccer would pay the Players Association a $425,000 "signing bonus." Indeed, the financial term sheet specified in the 6th bullet point on page 3 of the MOU ("Other bonuses in US Soccer's Compensation Proposal are itemized along with other financial items in the attached term sheet."), attached to the MOU was entitled "USSF WNT CBA Financial Terms" and provided detailed financial terms for the period covering 2013 through 2016 – the four year term of the 2013 CBA/UPA.

33. In addition, and as it relates to the NWSL, the 2013 CBA/UPA provides, among other things, that Women's National Team members would also play in the NWSL as employees of US Soccer and be paid an extra annual salary by US Soccer for their NWSL service. The reason for including NWSL service as part of the 2013 CBA/UPA was to help build a credible and sustainable women's professional league and to hopefully avoid the fate of its two failed predecessors. Pursuant to the 2013 CBA/UPA, Women's National Team members were given various options to "opt out" of participating in the NWSL for specific NWSL seasons by giving US Soccer notice by certain deadlines. The deadline for opting out of the 2016 NWSL season was October 5, 2015. Only one of the current Women's National Team members exercised her option, but even she ultimately decided to play in the NWSL this coming season.

34. Consistent with its historical four-year planning cycle for the Women's National Team, US Soccer would never have agreed to the terms set forth in the 2013 CBA/UPA and complied with its terms going forward but for the parties' express agreement that the new collective bargaining agreement would have a four-year term expiring on December 31, 2016 -- after the 2016 Summer Olympic Games.

35.     Accordingly, based on the terms of the new four-year agreement between US Soccer and the Players Association, US Soccer paid the Players Association the $425,000 signing bonus and paid the players on the Women's National Team the improved compensation and benefits retroactive to January 1, 2013.  In addition, US Soccer has paid several million dollars in additional payments and benefits to the players on the Women's National Team that it would never have agreed to pay absent the Players Association's agreement to the four-year term of the 2013 CBA/UPA.

36.     The Players Association acknowledged the existence of the new collective bargaining agreement as well as its four-year term both by its words and actions.  Among other things, on Schedule 14 of its Form LM-2 Annual Report of Labor Organization for 2013 filed with the United States Department of Labor Office of Labor Management Standards, attached hereto as Exhibit F, the Players Association acknowledged having received the $425,000 signing bonus directly from US Soccer in 2013 and described this amount as "Payments Under CBA."

37.     In addition, Mr. Langel, the Players Association General Counsel and Acting Executive Director at the time of execution of the 2013 CBA/UPA, testified under oath in April 2014 that the Players Association and US Soccer were then parties to a collective bargaining agreement *expiring on December 31, 2016* which was comprised of the terms set forth in the 2005 CBA/UPA as modified and supplemented by the MOU.  In connection with an arbitration proceeding between US Soccer and the United States Men's National Team Players Association (the "Men's Players Association"), Mr. Langel was called as a witness on April 29, 2014 and placed under oath.  Indeed, Mr. Langel testified, in relevant part, as follows:

> Q.     So how many collective bargaining agreements have you had?
>
>  A.     *We had 2000 to 2004, 2005 to 2012, and now 2013 till December 31st, 2016.*  We have tried to do – first agreement was

five years. Second agreement was -- first agreement was five years. *We've tried to cover both a World Cup and an Olympics. The second agreement we covered World Cup, Olympics, World Cup, Olympics. And this agreement we're covering World Cup, Olympics.*

Q.      So one is covering five years; one is covering eight years; one is covering four years?

A.      Correct.

**********

Q.      The next collective bargaining agreement that the players association executed covered the period from 2005 through the end of 2012, correct?

A.      Yes.

Q.      Okay. And then that agreement has expired, correct?

A.      Yes.

Q.      And you're now operating under a memorandum of understanding, correct?

A.      Yes.

Q.      *And as I understand it -- correct me if I'm wrong -- the memorandum of understanding has certain financial – made certain financial changes, but other than matters specifically identified in the memorandum of understanding, the terms of the expired CBA the parties have agreed will continue to control?*

A.      *Yes.*

(Emphasis supplied.) The excerpts from Mr. Langel's arbitration testimony are attached as

Exhibit G.

38.      Consistent with the understanding and agreement of both US Soccer and the

Players Association, the parties honored the terms of the 2013 CBA/UPA from and after March

19, 2013.

## The New Players Association Executive Director Unilaterally Claims, Without Basis, that the 2013 CBA/UPA Has Expired and Is No Longer Binding

39.      On November 24, 2014, Mr. Langel notified US Soccer by email that he and his

14

law firm had been replaced by Mr. Richard Nichols as the Players Association's representative. In his email, Mr. Langel listed a series of open issues to be addressed. In this email, Mr. Langel reaffirmed the existence of collective bargaining agreement between US Soccer and the Players Association consisting of the terms contained in the 2005 CBA/UPA as amended and modified by the MOU. Among other things, in his email Mr. Langel noted that, because the parties had not gotten around to combining the two documents comprising the 2013 CBA/UPA -- the 2005 CBA/UPA and the MOU -- into a single document "the parties need to edit, where applicable, the Collective Bargaining Agreement and Uniform Player Agreement consistent with the March 2013 Memorandum of Understanding." *See* Email from John Langel dated November 24, 2014, Item 9, attached hereto as <u>Exhibit H</u>.

40.     US Soccer is informed and believes, and thereon alleges, that Mr. Nichols is the current Executive Director of the Players Association.

41.     Although he played absolutely no role in the negotiations of the 2013 CBA/UPA, and notwithstanding the documented agreement of the parties, several months after he assumed the role as the Players Association Executive Director, Mr. Nichols began suggesting that there was no collective bargaining agreement between the Players Association and US Soccer and/or that any such agreement could be terminated by the Players Association at any time.

42.     Notwithstanding these intimations, both Mr. Nichols and the Players Association continued to accept the benefits of the improved compensation, benefits and working conditions provided for exclusively by the terms of the 2013 CBA/UPA.

43.     Then, on December 24, 2015, Mr. Nichols, as Executive Director/General Counsel of the Players Association, sent a letter to US Soccer stating:

Pursuant to Sections 8(b)(3) and 8(d) of the National Labor Relations Act ("NLRA"), and the codified duty to bargain collectively, this writing shall serve as the Women' National Team Players Association's ("WNTPA") requisite written notice (the "Notice"), of the WNTPA's intent to engage in action(s) that shall serve to terminate and or modify, if applicable, the;

    (a)    collective bargaining agreement, and or, in this instance,

    (b)    Memorandum of Understanding "(MOU") entered into by and between the United States Soccer Federation ("USSF"), and the WNTPA (collectively referred to herein as the "Parties") in March 2013, the terms of which have, in the alternative, served to guide and govern the operational relationship between the Parties in the absence of a collective bargaining agreement.

Further, the serving of this Notice notwithstanding, the WNTPA reserves its inherent right to challenge the USSF's claim of the existence of a collective bargaining agreement between the Parties.

*See* Letter from Richard M. Nichols dated December 23, 2015 and cover email dated December 24, 2015 attached hereto as Exhibit I (the "Purported CBA Termination Notice").

    44.    Section 8(d) of the LMRA requires a party to a collective bargaining agreement to provide the other party to the agreement with a notice 60 days in advance of the agreement's "expiration date . . . or in the event the contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification . . ." In other words, Mr. Nichols notified US Soccer that it was the position of the Players Association that it is free to terminate the 2013 CBA/UPA effective February 24, 2016 and to "engage in actions" on and after that date.

    45.    US Soccer promptly responded to Mr. Nichols' Purported CBA Termination Notice on December 28, 2015, questioning its timing and contents given that "the current CBA/UPA which was extended by the MOU does not expire until December 31, 2016." US Soccer further requested that "[i]f, however, the [Players Association] disagrees with the expiration date and intends to claim that it has the right to declare an earlier termination date,

please let [US Soccer] know." US Soccer's December 28, 2015 response to the Purported CBA

Termination Notice is attached as Exhibit J.

46.     On January 4, 2016, Mr. Nichols emailed US Soccer what he termed a "WNTPA

Collective Bargaining Agreement Proposal," but he did not respond to US Soccer's very specific

inquiry in its December 28, 2015 email. Accordingly, on January 6, 2016, US Soccer sent an

email to Mr. Nichols, attached as Exhibit K, thanking him for the proposal, and asking for a

specific response from the Players Association addressing its position on the expiration of the

2013 CBA/UPA.

47.     Mr. Nichols and the Players Association responded later that same day by email,

stating unequivocally that:

> . . . it is the position of the WNTPA that the CBA no longer exists,
> and further, that the MOU is terminable at will. . . Accordingly, it
> is simply not correct that "the current CBA does not expire until
> the end of this year," or as you put it in your earlier email, "the
> MOU does not expire until December 31, 2016." In fact, the MOU
> is absent any reference to the MOU having any expiration date or
> definite means by which the MOU can be terminated. . . Our goal
> is to determine before the start of March training camps whether
> the parties can reach an agreement, failing which the players will
> consider exercising their right to terminate the MOU.

*See* Email from Rich Nichols to US Soccer dated January 6, 2016, attached hereto as Exhibit L.

48.     In response to Mr. Nichols' request for a meeting to discuss the Players

Association January 4, 2016 proposal, US Soccer sent an email to Mr. Nichols on January 15,

2016 proposing some dates in February to meet. In addition, in an effort to avoid having to take

action against the Players Association, US Soccer wrote as follows:

> We continue to try to understand the factual basis for your letter
> dated December 23, 2015, and the statement in your January 6,
> 2016 email "that the CBA no longer exists, and further, that the
> MOU is terminable at will" – a position with which U.S. Soccer
> disagrees. We trust that you have received, and if you have not,
> that you will immediately request, the complete negotiating file
> from Mr. Langel and his firm in connection with the 2012-2013

> negotiations as well as their subsequent communications with U.S. Soccer concerning the CBA and MOU. If you believe there are documents in those files which support the Players Association's position, please provide us with copies, as those may inform our negotiations going forward. We also assume that you have spoken with Mr. Langel and his colleague Ruth Uselton who negotiated the current agreement for the Players Association, and if not that you will speak with them promptly.

*See* US Soccer's January 15, 2016 email to Mr. Nichols attached hereto as <u>Exhibit M</u>.

49.     On January 18, 2016 Mr. Nichols responded to US Soccer's email. After identifying alternative dates for a meeting, he stated as follows:

> With regard to your insistence that a CBA exists, and or that the MOU expires on December 31, 2016, I'd like to direct you to some labor case law that provides in pertinent part that, as per the current status of the MOU, the MOU is terminable "at will".
>
> Specifically, labor law clearly provides that, "[l]abor contracts of indeterminate duration or ones that do not provide a manner of termination are terminable at will." *See*, *Montgomery Mailers' Union No. 127 v. Advertiser Co.*, 827 F.2d 709, 715 (11th Cir. 1987); see also *Int'l Union of Operating Engineers, Local Union No. 542 v. Allied Erecting & Dismantling Co.*, 556 F. App'x 109, 112-13 (3d Cir. 2014).
>
> I'd also like to reiterate that unless significant progress is made in these negotiations by or before March 1st, the WNT Players will very seriously consider whether or not to exercise that right to terminate the MOU.

50.     Because the 2013 CBA/UPA has a definite term as set forth in the MOU – four years – making the case law cited inapplicable, and because Mr. Nichols and the Players Association did not even address US Soccer's request that they review the Players Association negotiating file and speak with Mr. Langel and Ms. Uselton, US Soccer responded the next morning, January 19, 2016, as follows:

> Rich:
>
> Thank you for your note. Let's plan on meeting on February 3.

We are fully cognizant of the legal issues and the case law, but do not understand the factual basis for your suggestion that the MOU is "terminable at will." In conjunction with the execution of the MOU, it was agreed by both US Soccer and the Players Association that the new CBA would consist of terms contained in the 2005-2012 CBA as modified and amended by the MOU and expiring on December 31, 2016. Indeed, the MOU makes clear on its face that it has a definite duration of four years.

In your response you make no mention of whether you have reviewed the negotiating history in the file maintained by your predecessor or whether you have spoken with John Langel and his colleague who actually negotiated the agreement. Given your position, we can only assume that you have not yet done so and, therefore, once again request that you do so promptly.

Further, while US Soccer will participate in the meeting on February 3, understand that by doing so, US Soccer is reserving all of its rights and remedies should the Players Association pursue the path you are suggesting.

*See* Mr. Nichols' January 18, 2016 email and US Soccer's response on January 19, 2016,

attached hereto as <u>Exhibit N</u>.

51.     Mr. Nichols responded to US Soccer's January 19, 2016 email later that same day

stating as follows:

Lisa,

Thank you for your response.

I am pleased that you acknowledge and understand our position.

Further, we understand and hereby acknowledge that US Soccer and the WNTPA reserve their respective legal rights and remedies in these matters.

Accordingly, please let me know the time and location of our February 3rd meeting.

Thanks,
Rich

Surprisingly, Mr. Nichols provided no factual support for his and the Players Association's position, and he failed to respond to US Soccer's urging that he review the negotiating history and speak with his predecessor, Mr. Langel, and his colleague, Ms. Uselton. *See* Mr. Nichols' January 19, 2016 email attached hereto as Exhibit O.

52.     Finally, on February 3, 2016 representatives of US Soccer and the Players Association met in New York. At the outset of that meeting, in view the substantial investment US Soccer was making in the Women's National Team and the harm that would befall US Soccer, the NWSL and the sport of soccer if the players engaged in a strike or other job action, Mr. Nichols was directly asked whether the Players Association would agree that they would not engage in such a strike or job action through the end of December 2016. Mr. Nichols refused to provide US Soccer with the assurances it requested thereby necessitating the filing of this Complaint.

53.     Both US Soccer and the Players Association agreed in March 2013 that the 2013 CBA/UPA consisted of the terms contained in the 2005 CBA/UPA as modified and supplemented by the MOU, and that the 2013 CBA/UPA had a four-year term expiring on December 31, 2016. Both US Soccer and the Players Association acted in accordance and in compliance with the four-year term of the agreement, and the Players Association and its members willingly accepted the benefits of the 2013 CBA/UPA for more than two and one-half years without even a suggestion that there was no agreement or that it could be terminated at the will of the Players Association. Notwithstanding the clear import of these facts, the new Executive Director, Mr. Nichols, now claims the right to terminate the 2013 CBA/UPA and to authorize the members of the Players Association to "engage in actions" in direct violation of the "no strike" provisions of the current agreement unless US Soccer promptly agrees to a new

collective bargaining agreement on terms dramatically different than those set forth in the 2013

CBA/UPA – even though the current agreement does not expire for eleven months.

### Need for Prompt Determination of This Dispute

54.     There is a compelling need for a prompt determination that the 2013 CBA/UPA

consists of the terms set forth in the 2005 CBA/UPA as supplemented by the MOU, is binding on

the Players Association, has an expiration date of December 31, 2016 and includes the "no

strike" prohibition.

55.     As the No. 1 ranked women's soccer team in the world, the recently crowned

2015 FIFA Women's World Cup champion, and the three-time defending Olympic Gold Medal-

winning women's soccer team, it is expected that the Women's National Team will qualify in

February (prior to the end of the 60-day notice period provided in the Purported CBA

Termination Notice) to represent the United States in the 2016 Summer Olympic Games

scheduled to begin on August 5.

56.     In order to properly prepare the team for the 2016 Summer Olympic Games in

which they will represent the United States, US Soccer has scheduled the "She Believes"

tournament for early March, which will include Women's National Team matches against the

national teams of Germany, England and France, and will conduct training camps and schedule

additional preparation matches in the late spring and early summer against the women's national

teams of other countries.  Arranging all of these events will cost US Soccer, a non-profit

corporation, a substantial sum of money.

57.     In addition, if the Women's National Team is not properly prepared for the 2016

Summer Olympic Games as a consequence of a strike or other refusal to participate in training

and/or preparation matches, erroneously believing they are not bound by the no-strike clause, the

21

performance of the Women's National Team in the Olympics will likely be significantly hampered, to the detriment of US Soccer, the United States Olympic Committee ("USOC") and the United States.

58.     Further, pursuant to the rules of the International Olympic Committee for the 2016 Summer Olympic Games, US Soccer and the USOC will be required to submit the roster for the Women's National Team in advance of the tournament.  Absent a determination concerning the expiration date of the 2013 CBA/UPA and the applicability of the no-strike clause prior to that date, the members of the Players Association could refuse to participate in the 2016 Summer Olympic Games, erroneously believing that they are not bound by the no-strike clause.  Were they to do so after the time has passed for US Soccer and the USOC to submit an alternate roster of players, US Soccer and the USOC may be unable to name a replacement team for the 2016 Summer Olympic Games, and, as a consequence, would be faced with the prospect of having to withdraw the Women's National Team from the Olympic Games, to the substantial embarrassment, and financial detriment, of US Soccer, the USOC and the United States.  US Soccer would also face the possibility of a substantial fine from FIFA along with the possibility of a suspension by FIFA of US Soccer and all of its national teams (girls, boys, men and women) from participating in subsequent FIFA competitions.[5]

59.     Finally, the NWSL was formed against the backdrop of two prior domestic women's professional soccer leagues having failed.  In order to give the NWSL a chance to succeed for the benefit of all of women's soccer, US Soccer has provided substantial support to NWSL in a variety of ways including, among others, substantial front-office support and allocating Women's National Team members to the NWSL teams and paying their salaries.

---

[5] *See* FIFA Regulations for the Olympic Football Tournaments for the Games of the XXXI Olympiad, Rio de Janiero 2016, Art. 7, §§ 6-9.

Should the Players Association engage in a strike or other job action directed at the NWSL, such action would have a dramatic negative impact on the league.

60.     Given such extreme consequences, the only alternative for US Soccer would be to accede to unreasonable negotiating demands from the Players Association to avoid such detriments.

## FIRST CLAIM FOR RELIEF

### (For Anticipatory Breach of the 2013 CBA/UPA)

61.     US Soccer incorporates paragraphs 1 through 60, above, as though fully set forth herein.

62.     On March 19, 2013, US Soccer and the Players Association entered into the 2013 CBA/UPA consisting of the terms set forth in the 2005 CBA/UPA as supplemented and modified by the MOU, retroactive to January 1, 2013.  The 2013 CBA/UPA expires on December 31, 2016, and includes, among other things, a no-strike clause which prohibits the Players Association and its members from engaging in any "strike, work stoppage, slowdown or other concerted interference with the activities of US Soccer during the term of the agreement.

63.     Notwithstanding the existence of the 2013 CBA/UPA and in express violation of its terms, the Players Association has issued the Purported CBA Termination Notice, illegally declaring the 2013 CBA/UPA terminated and threatening to violate the no-strike clause on or after February 24, 2016.

64.     Accordingly, US Soccer hereby requests a determination from this Court that a collective bargaining agreement currently exists between the Players Association and US Soccer consisting of the terms contained in the 2005 CBA/UPA as supplemented and modified by the MOU, with an expiration date of  December 31, 2016, and including, among other things, a no-

strike clause – such that the Players Association's claim that it is terminating and repudiating the 2013 CBA/UPA is a violation of that agreement. US Soccer further requests an award of monetary damages, in an amount to be proven, suffered as a direct and proximate cause of the Players Association's anticipatory breach as well as damages for any actual breach of the 2013 CBA/UPA.

## SECOND CLAIM FOR RELIEF

### (For Declaratory Relief)

65.     US Soccer incorporates paragraphs 1 through 64, above, as though fully set forth herein.

66.     A real and present controversy now exists between US Soccer, on the one hand, and the Players Association, on the other hand, with respect to the terms of the 2013 CBA/UPA and the ability of the Players Association to declare that the 2013 CBA/UPA is terminated and that neither the Players Association nor its members are bound by a no-strike clause.

67.     US Soccer believes that it entered into a 2013 CBA/UPA with the Players Association in March 2013 that (i) consists of the terms contained in the 2005 CBA/UPA as supplemented and modified by the MOU, (ii) is effective and binding for the duration of its term from January 1, 2013 through December 31, 2016, and (iii) includes, among other things, a no-strike clause. The Players Association, however, contends that (a) the collective bargaining agreement is separate from the MOU and is terminable on 60 days' notice; (b) the collective bargaining agreement will terminate 60 days after the Purported CBA Termination Notice; (c) at that time neither it nor its members will be bound by any no-strike clause and, therefore, are entitled to "engage in actions" on or after February 24, 2016; and (d) the MOU is "terminable at will."

68.     Accordingly, US Soccer hereby requests a determination of this dispute and a declaration from this Court that a collective bargaining agreement currently exists between the Players Association and US Soccer (the 2013 CBA/UPA), consisting of the terms contained in the 2005 CBA/UPA as supplemented and modified by the MOU, with an expiration date of December 31, 2016, and including, among other things, a no-strike clause.

69.     US Soccer further requests a "speedy hearing" on its claim for declaratory relief to which it is entitled pursuant to Rule 57 of the Federal Rules of Civil Procedure, particularly given the significant monetary and potentially irreparable harm that may befall US Soccer, the USOC, the NWSL and the United States should the Players Association violate the no-strike clause in the 2013 CBA/UPA resulting in the consequences described in paragraphs 54 through 60 above.

WHEREFORE, Plaintiff US Soccer respectfully requests that this Court:

(1)  determine and/or declare that a collective bargaining agreement currently exists between the Players Association and US Soccer consisting of the terms contained in the 2005 CBA/UPA as supplemented and modified by the MOU, with an expiration date of December 31, 2016 and including, among other things, a no strike clause (the 2013 CBA/UPA);

(2)  determine and/or declare that the Players Association's Purported CBA Termination Notice constitutes an anticipatory and/or actual breach of the 2013 CBA/UPA;

(3)  award US Soccer all damages suffered as a consequence of the anticipatory and any actual breach of the 2013 CBA/UPA; and

(4)  grant such further relief as the Court deems just and proper.

Dated: February 3, 2016          Respectfully submitted,

/s/ *Matthew W. Walch*
Matthew W. Walch
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700

Kathryn H. Ruemmler (*pro hac vice* application pending)
LATHAM & WATKINS LLP
555 Eleventh St. NW, Ste. 1000
Washington, DC 20004

Russell F. Sauer, Jr. (*pro hac vice* application pending)
Amy C. Quartarolo (*pro hac vice* application pending)
Michael Jaeger (*pro hac vice* application pending)
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071
(213) 485-1234

*Attorneys for Plaintiff*
*United States Soccer Federation, Inc.*

*United States Soccer Federation v.*
*United States Women's National Soccer Team Players Association*

## Index of Exhibits to Complaint

| Exhibit | Description |
|---|---|
| Exhibit A | Players Association Constitution and By-Laws |
| Exhibit B | 2001 Collective Bargaining Agreement/Uniform Player Agreement |
| Exhibit C | 2005 Collective Bargaining Agreement/Uniform Player Agreement |
| Exhibit D | Memorandum of Understanding (March 19, 2013) |
| Exhibit E | Email from Ruth Uselton to US Soccer (March 19, 2013) |
| Exhibit F | 2013 Form LM-2 Labor Organization Annual Report |
| Exhibit G | Excerpts from John Langel's Arbitration Testimony |
| Exhibit H | Email from John Langel to US Soccer (November 24, 2014) |
| Exhibit I | Purported CBA Termination Notice (December 23, 2015) |
| Exhibit J | U.S. Soccer's Response to the Purported CBA Termination Notice (December 28, 2015) |
| Exhibit K | Email from US Soccer to Rich Nichols (January 6, 2016) |
| Exhibit L | Email from Rich Nichols to US Soccer (January 6, 2016) |
| Exhibit M | Email from US Soccer to Rich Nichols (January 15, 2016) |
| Exhibit N | Email from Rich Nichols to US Soccer (January 18, 2016) and US Soccer's Response (January 19, 2016) |
| Exhibit O | Email from Rich Nichols to US Soccer (January 19, 2016) |

# EXHIBIT A



# CONSTITUTION AND BY-LAWS

## OF

## UNITED STATES WOMEN'S NATIONAL SOCCER TEAM PLAYERS ASSOCIATION

### ARTICLE I

### Name

(a)     The name of this Association shall be UNITED STATES WOMEN'S NATIONAL SOCCER TEAM PLAYERS ASSOCIATION (the "Association" or the "USWSPA").  The association may do business under other names, including but not limited to: "United States Women's Soccer National Soccer Team Players," "United States Women's Soccer Players Association," "United States Women's Soccer Players," "US Women's Soccer Players," "Women's National Team Players Association," "Women's National Team Players," "USWNSTPA," "USWSPA," and "WNTPA."

(b)     The principal office of this Association shall be located at such place as the Players Representatives may from time to time designate.

### ARTICLE II

### Purposes

The purposes of the USWSPA shall be to provide women soccer players employed by the United States Soccer Federation, Inc. (the "Federation") with an organization dedicated to the promotion and advancement of all players and of the sport of soccer, both domestically and internationally; the improvement of economic and other working conditions of

players; the betterment and maintenance of relations between players and the Federation, coaches and staffs; the furnishing of information and services to Women's National Team players; the negotiation, execution and administration of collective bargaining agreements; the resolution of player grievances, disputes and arbitrations arising under collective bargaining agreements; the representation of players in connection with common problems; the development of enterprises aimed at evolving further benefits and/or revenues for the USWSPA and its members; encouragement of cultural, civic, legislative, charitable and other activities which further the interests of the USWSPA and its members, directly or indirectly; cooperation with and assistance to other organizations having purposes or objectives in whole or in part similar to those of the USWSPA; and the performance of all other actions consistent with this Constitution and By-Laws and appropriate to implement and fulfill the purposes, rights and responsibilities of the USWSPA.

The Association may hire employees, operate a separate entity and/or contract with third parties to conduct marketing, licensing and/or any other activities on behalf of the Association and/or its members.

### ARTICLE III

### Membership

(a)     Any person who is a player or has been a player, or who has been called into any training session for the United States Women's National Soccer Team (the "Team") since June 1, 1999 shall be eligible for membership in this Association, except that any such persons who are employed in any managerial or business capacity by the Federation may remain

a member of this Association but may not be an active participant in the Association's meetings, nor be a voting member, nor act as a Player Representative.

(b)     Each member of the Association who has been on the roster of the Team for games against the national "A" team of another country four times during the preceding twelve months or, if the Team has not played seven such games in the preceding twelve months, has been on the roster of the Team for one-half of such games played shall be a voting member and shall be entitled to one vote.

(c)     The Players Representatives by a unanimous vote may grant the right to vote to a member who otherwise does not qualify as a voting member. The voting members, by a majority vote, may grant or refuse to grant the right to vote to a member who otherwise does not qualify as a voting member, including overriding a unanimous decision of the Players Representatives.

(d)     Any person eligible for membership in this Association may become a member thereof by paying to the Association annual membership dues for membership, if any are required, or on such other terms and conditions as may be established by the Association.

(e)     If any member of this Association shall not pay to the Association her annual membership dues for the current fiscal year, if any are required, such person's membership in this Association shall cease ten days after she receives written notice of her delinquency unless she cures by making payment in full within those ten days.

(f)     Any member may continue her membership after retiring from the Team or after no longer qualifying as a voting member. Such members shall have the full rights of membership of a non-voting member.

## ARTICLE IV

### Players Representatives and Executive Director

(a)     There shall be three Players Representatives of this Association and, at the discretion of the membership, there shall be one Executive Director.

(b)     Each Players Representative shall be elected from the membership of the Association and by virtue of her position as a Players Representative shall become a voting member of this Association during her term.  No Players Representative shall hold any managerial or business position with the Federation.

(c)     The Players Representatives shall be the chief governing body of this Association, and shall otherwise represent the members of this Association during the period between membership meetings, including: making reasonable business decisions; hiring employees, independent contractors, consultants, accountants and attorneys; incurring debts and expenses; authorizing payments; leasing facilities, offices and equipment; and otherwise conducting the operations of the Association.

(d)     Each Players Representative shall be elected by the voting members and shall serve for a term of one year and until her successor shall have been duly elected and qualified.  However, any Players Representative can be removed from office by a majority vote of the members.  Vacancies in any Players Representative office shall be filled by the voting members at a regular or special meeting.

(e)     The Executive Director will be appointed by a majority of the Players Representatives and shall serve for a term to be agreed upon by a majority of the Players Representatives.  The Executive Director may be removed from office by a majority of the

Players Representatives or voting members. The Executive Director need not be a member of this Association.

(f)     The Players Representatives shall preside at all meetings of the members of this Association; they shall present an annual report to the annual meeting of this Association; and they shall otherwise enforce this Constitution and By-Laws and perform all the duties incident to their office.

(g)     If she is able to attend, the Executive Director shall preside at meetings of the Players Representatives of this Association; she or any three Players Representatives are authorized to cause to be called regular and special meetings of the Players Representatives and members of this Association. The Executive Director or other individual designated by the Players Representatives is authorized to sign and execute all contracts in the name of the Association and is authorized to sign all checks, notes, drafts, or other orders for the payment of money; shall perform all duties incident to her office and shall generally supervise and control the affairs of this Association. In the event the Players Representatives do not appoint an Executive Director, this function shall be filled by the General Counsel of this Association, and the General Counsel is authorized to perform all the functions of the Executive Director during that period.

(h)     The Players Representatives or the Executive Director shall keep the minutes of the meetings of the Players Representatives and members of this Association; shall give notice of special meetings thereof; shall maintain a record of the members and other necessary books and records; shall have care and custody of the funds of this Association and shall deposit same as directed by a majority of the Players Representatives; are authorized to sign

all checks, notes, drafts or other orders for the payment of money; shall keep books of account; shall render a report with respect to the finances at the annual meeting of the members; and shall otherwise perform all duties incident to their office.

(i)     The salaries, or compensation, if any, of the Players Representatives and the Executive Director of this Association shall be fixed from time to time by the voting members of the Association.

## ARTICLE V

### Meetings and Elections

(a)     The members of the Association shall meet annually for the election of the Players Representatives and for the carrying out of other Association business.  Such meetings shall be held at an appropriate place and time for the convenience of the members, to the extent possible.  Members can vote by means of absentee ballots submitted in advance of the meeting or by granting their proxy to any other voting member who will be present at the meeting or to the Executive Director.  Such proxies may be granted orally or in writing.

(b)     Members standing for election as a Players Representative shall be nominated either by herself or by another member of the Association.  Each voting member may vote for up to three member(s), selecting from those previously nominated or writing in the name of any other member.  The three members with the largest number of votes shall be the Players Representatives.

(c)     Regular meetings of the Players Representatives shall be held at least four times per year, during a Team tournament, game, practice, other activity or other convenient time designated by two-thirds of the Players Representatives.

(d)     The annual meeting of the members shall be held at the principal office of the Association, at a location convenient to the members attending a Team tournament, game, practice, or other activity, or at such other place as may be designated by the Players Representatives or the Executive Director.  Two weeks notice of the time and place of such annual meeting shall be given, to the extent practicable, to each member of the Association.

(e)     Special meetings of the Players Representatives may be called at any time by any three Players Representatives or the Executive Director on five days notice to the Players Representatives of the time, place and purpose thereof.  Action may be taken by the Players Representatives without a meeting if such action is specifically approved in writing by three of the Players Representatives.

(f)     Special meetings of the members may be called at any time by any Players Representative or the Executive Director on two weeks notice to the members of the time, place and purpose thereof.

(g)     At any regular or special meeting of the Players Representatives or members, a majority of the Players Representatives or voting members, respectively, shall constitute a quorum.  Each Players Representative or voting member attending such meeting shall be entitled to one vote thereat plus any proxies, and action at any such meeting, except as otherwise herein prescribed, may be taken by a majority of those present and with a right to vote.

## ARTICLE VI

### Player Pool and Team Bonuses

The Association shall develop guidelines for the administration of the Player Pool, provide instruction to the Federation as to how any Team bonuses shall be distributed, and make all necessary decisions concerning any other income generated by the members of the Team as a group. Such decisions shall be made by a majority vote of those voting members present.

## ARTICLE VII

### Dues

(a)     There shall be no initiation fee for admission to membership of the Association.

(b)     There shall be no annual dues of the Association unless same are authorized by two-thirds of the voting members.

(c)     There shall be no assessments of the members of this Association unless same are authorized by two-thirds of the voting members.

(d)     The funds of the Association shall be deposited by the Executive Director or the Players Representatives as prescribed by a majority of the Players Representatives and shall be used for the purposes of the Association as hereinabove in this Constitution set forth. This Association shall not operate for profit, and any funds on hand at the close of the Association's fiscal year shall be retained by the Association or expended for fraternal or other purposes of the Association.

(e)     Reports shall be furnished to the members of the Association at least semi-annually, providing information about financial issues related to the Association and any separate entity or contracts with third parties relating to marketing and/or licensing activities on behalf of the Association and/or its members.

## ARTICLE VIII

### Collective Bargaining Agreements

(a)     The Executive Director shall be responsible for negotiations with the Federation after consultation with the members and the Players Representatives. The membership, by a determination of the majority of the voting members, can direct the Executive Director's negotiation approach with the Federation, including a specific action of which issues to address or not to address with the Federation.

(b)     All Collective Bargaining Agreements between this Association and the Federation, and any amendments or modifications thereto, shall be signed by a designated Players Representative or the Executive Director and shall require the approval of a majority of the voting members.

(c)     A strike may be commenced by members of the Association after the proposition has been submitted to the members and two-thirds of the voting members have voted to authorize a strike. A strike may be terminated by a majority vote of the voting members. The conduct and timing of a strike shall be under the direction of the Players Representatives. A member of the Association shall have the duty to provide strike services as specified by the Players Representatives.

## ARTICLE IX

### Other Contracts

Any contract other than a Collective Bargaining Agreement to which this Association may be a party, and any amendment or modification thereto, shall be signed by a designated Players Representative or the Executive Director and shall require the approval of three-fifths of the Players Representatives of the Association or a majority of the voting members.

## ARTICLE X

### Committees

The Players Representatives, shall at any time and from time to time, appoint from the members of the Association such committees as may be required to properly conduct the affairs of the Association, and shall prescribe rules and regulations governing the conduct and functions of such committees.

## ARTICLE XI

### Fiscal Year

(a)  The fiscal and membership year of the Association shall commence on January 1 and end on the following December 31.

(b)  If required by a majority vote of the Players Representatives, the books of the Association shall be audited by auditors chosen by the Players Representatives once each year after the close of the fiscal year.

## ARTICLE XII

### Ratification and Amendments

(a)     This Constitution and By-Laws shall be ratified by a majority vote of those members who have been on the roster for a Team game against the national "A" team of another country since June 1, 1999.  A member of the Association who qualifies for a ratification vote may vote in person, by absentee ballot, or by giving his proxy to another qualifying member who will be present at the ratification vote.  Such proxies may be granted orally or in writing.

(b)     This Constitution and By-Laws may be amended by vote of two-thirds of the voting members.  Such amendment may be approved at any regular or special meeting of the membership or without a meeting if specifically approved in writing by three-quarters of the voting members.

## ARTICLE XIII

### Savings Clause

If any provision of this Constitution and By-Laws shall be declared invalid or inoperative, by any competent authority of the executive, judicial or administrative branch of state or federal government, the Players Representatives shall have the authority to suspend the operation of such provision during the period of its invalidity and to substitute in its place and stead a provision which will meet the objections to its validity and which will be in accord with the intent and purpose of the invalid provision.  If any Article or Section of this Constitution and By-Laws should be held invalid by operation of law or by any tribunal of competent jurisdiction, the remainder of this Constitution and By-Laws or the application of such Article or Section to

persons or circumstances other than those as to which it has been held invalid, shall not be affected thereby.

**Ratified on March 23, 2001**

# EXHIBIT B

## PREAMBLE

This Collective Bargaining Agreement ("CBA" or "Agreement"), which is the product of bona fide, arm's length collective bargaining, is entered into on the _____ day of _____, 2001, by and between the United States Soccer Federation ("the Federation") and The Women's National Team Players' Association ("the Players Association"). The Federation and the Players Association hereafter shall be referred to collectively as "the parties."

## ARTICLE I

## RECOGNITION

The Federation recognizes the Players Association, a bona fide labor organization, as the sole and exclusive collective bargaining representative of all persons who are or may become employees of the Federation by having been selected to play as soccer players on the United States Women's National Soccer Team ("Player(s)") with regard to all terms and conditions of employment and the Players Association is duly empowered to enter into this Agreement for and on behalf of such persons.

## ARTICLE II

## DURATION

This Agreement is retroactive to and shall be effective from February 1, 2000 and shall remain in full force and effect through December 31, 2004. At least sixty (60) days prior to the termination date the parties shall enter into good faith negotiations for a successor or modified agreement.

## ARTICLE III

## MANAGEMENT RIGHTS, UNION RIGHTS

**3.1    Management Rights.**

The Federation may issue such reasonable rules and regulations not in conflict with this Agreement or any applicable state or federal law, including the Ted Stevens Olympic and Amateur Sports Act and any successor legislation, concerning when, where, how and under what circumstances it wishes to operate, suspend or discontinue its activities, and the manner and the rules by which the Players shall play soccer, and conduct themselves on and off the field (including the issuance of a Player Handbook), as it may from time to time deem best for the purpose of maintaining order, safety and/or the effective operation of the Federation, after advance notice thereof to the Players Association and the Players. The Players Association reserves the right to question the reasonableness and application of the Federation's rules or regulations through the Grievance and Arbitration procedure in Article V.

1

## 3.2    Union Rights.

The Federation promptly will provide the Players Association with copies of notices of all activities scheduled for or involving the United States Women's National Soccer Team ("Team") in order that the Players Association may, in addition to remaining informed of the various activities of the Players, exercise its right to communicate with Players about their activities in an informed manner.

The Players Association shall be permitted to schedule four (4) meetings per year with the Players at the site of Team activities, including training sessions consolidated with a match. The day and time of the meetings shall be scheduled through discussions between the representatives of the Players Association and the Team's General Manager, recognizing the right of the Players Association to hold these meetings at the activity of the Players Association's choice and the right of the Federation to have such meetings held at such times and places during that activity as the Federation believes the least disruptive to the activities and purposes of the Team. It is agreed that to the extent the Player(s) will be remaining at the site of a game long enough after a game for meeting of the Players Association to be held, the holding of a meeting post-game is understood and agreed to be the most appropriate. In return for Players Association agreeing to hold its meetings at such times and places as the Federation believes to be the least disruptive, the Federation shall attempt to procure the places for the Players Association to hold its meetings that are held while the Players are in camp at no additional cost to the Federation or the Players Association.

The Players Association shall receive eight (8) complimentary tickets to all matches in the United States and four (4) complimentary passes to any hospitality sessions immediately preceding and following the match. The Players Association shall receive four (4) complimentary passes to the events of the Federation's Soccer Weekend, if any.

## ARTICLE IV

## UNIFORM PLAYER AGREEMENT

All players shall enter into a Uniform Player Agreement with the Federation in the form annexed hereto as Exhibit A. The parties agree and acknowledge that the Uniform Player Agreement was the product of collective bargaining between the parties, and its terms in their entirety are expressly made part of this Agreement as if fully set forth herein. Notwithstanding the above the Federation may continue to use per diem contracts for players being evaluated who have never been on the roster of the Team for a game that was open to or broadcast to the public or for which a fee was charged for admission or for which the Federation was paid.

## ARTICLE V

## GRIEVANCE AND ARBITRATION PROCEDURE

5.1 **Definitions.**

    (a)    Any dispute (hereinafter referred to as a "grievance") arising after the effective date of this Collective Bargaining Agreement and involving the interpretation or application of, or compliance with, any provision of this Agreement, the 1997 Agreement, a Uniform Player Agreement or exhibit thereto, will be resolved exclusively in accordance with the procedure set forth in this Article.

    (b)    For purposes of Article V the terms "party" and "parties" shall include the Federation, the Players Association and any Player initiating a grievance or whose individual conduct is the subject of the grievance.

5.2 **Initiation.**

    (a)    A grievance may be initiated by the Federation or the Players Association.

    (b)    A grievance must be initiated within sixty (60) days from the date of the occurrence or non-occurrence of the event upon which the grievance is based, or within thirty (30) days from the date on which the facts of the matter became known or reasonably should have been known to the party(ies) initiating the grievance, or within thirty (30) days from the date on which the party(ies) initiating the grievance has standing to file such a grievance under this Agreement, whichever is later.

5.3 **Filing.**

    (a)    Subject to the provisions of Section 5.2 above, a party(ies) shall initiate a grievance by filing a written notice by certified mail or fax with the other party(ies). If a grievance is initiated by the Federation and directly concerns one or more individual Player(s), written notice shall also be given to those Players by certified mail or fax. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance.

    (b)    The adverse party(ies) served with a grievance will answer in writing by certified mail or fax within ten (10) days of receipt thereof.

    (c)    The answer will set forth admissions or denials as to the facts alleged. If the answer denies the grievance the specific grounds for denial will be set forth.

**5.4     Grievance Committee.**

(a)     If a grievance is not resolved within seven (7) days after the answer has been filed, the grievance shall be referred to a Grievance Committee (unless the parties jointly agree in writing to submit the matter directly to the Impartial Arbitrator), consisting of a representative appointed by each of the parties. Within twenty (20) days following such reference, the Grievance Committee shall meet in person or by telephone on a date and at a time and place agreed upon.

(b)     At the Grievance Committee meeting, the parties shall discuss with specificity the claims, issues and/or questions presented by the grievance and review and discuss resolution and/or settlement of the grievance.

(c)     Evidence of settlement discussions and offers shall be inadmissible before the Impartial Arbitrator.

**5.5     Arbitration.**

If the Grievance Committee fails to resolve a grievance within seven (7) days following its meeting thereon, any party, may, within fifteen (15) days elect to arbitrate the grievance, by filing a written notice by certified mail or fax with the Impartial Arbitrator and the other party(ies).

**5.6     Selection of Impartial Arbitrator.**

There will be one Impartial Arbitrator, appointed jointly by the parties to this Agreement, who shall serve for the duration of this Agreement; provided, however, that on September 1, 2001 and on each successive September 1, either of the parties to this Agreement may discharge the Impartial Arbitrator by serving written notice upon her by that date and upon the other party to this Agreement. The Impartial Arbitrator so discharged shall render decisions in all cases he or she previously heard but will hear no further cases. The parties to this Agreement shall thereupon either agree upon a successor Impartial Arbitrator or, failing agreement within thirty (30) days of the discharge of the Impartial Arbitrator, a new Impartial Arbitrator shall be selected using the method for selection of a single arbitrator in the Labor Rules of the American Arbitration Association then in effect.

The parties have jointly appointed Richard Bloch to serve as the initial Impartial Arbitrator.

**5.7     Hearing.**

The Impartial Arbitrator shall use best efforts to conduct a fair and complete hearing with the lowest possible costs. To that end, in appropriate cases hearings may be conducted by telephone conference call or individual witnesses may be permitted to testify by telephone. Notwithstanding the above, telephonic testimony shall not be permitted over

4

the objection of a party if evaluation of the witnesses' credibility is of importance to the case.

The parties shall use their best efforts to produce witnesses requested to testify at the scheduled hearing. If a witness is unavailable, the party(ies) offering the witness shall notify the other party(ies) as soon as the unavailability of the witness is known.

The record shall be closed at the end of the hearing unless the Arbitrator orders to the contrary. If post-hearing briefs are permitted in a given case, they shall be filed within ten (10) days of the close of the hearing unless the parties agree to a different filing schedule.

## 5.8     Arbitrator's Decision and Award.

The Impartial Arbitrator shall issue a written decision as soon as practicable, and in any event, within thirty (30) days of the close of the record. The decision of the Impartial Arbitrator will constitute full, final and complete disposition of the grievance, as the case may be, and will be binding upon the player(s) involved and the parties to this Agreement; provided, however, that the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of this Agreement or any Uniform Player Agreement. Furthermore, the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of any exhibit to this Agreement or any exhibit to the Uniform Player Agreement unless there is a conflict or inconsistency between the provisions of the exhibit and this Agreement or any Uniform Player Agreement, in which case the Impartial Arbitrator may conform the exhibit to this Agreement or the Uniform Player Agreement. In resolving grievances, the Impartial Arbitrator has the authority to interpret, apply and determine compliance with any provision of this Agreement, or Uniform Player Agreement or exhibit thereto and to award monetary damages and/or declaratory or injunctive relief.

## 5.9     Time Limits.

If any grievance is not processed or resolved in accordance with the prescribed time limits within any step (unless an extension of time has been mutually agreed upon in writing) the grieving party(ies) may proceed to the next step by notifying the other party of its intent in writing. This provision does not apply to the time limit for initiating a grievance set forth in § 5.2(b).

## 5.10    Costs.

Except as otherwise set forth herein, all costs of arbitration, including the fees and expenses of the Impartial Arbitrator, and any jointly requested transcript costs, will be borne equally between (1) the Federation and (2) the Players Association and any grieving player(s), except that all parties shall bear their own costs of transportation, counsel, witnesses and the like.

**5.11   Payment.**

If a monetary award is made by the Impartial Arbitrator, payments as ordered will be made within thirty (30) days of the receipt of the award.  The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the Impartial Arbitrator.

**5.12   Expedited Arbitration.**

When a party initiates a grievance, it may make an application to the Impartial Arbitrator to hear the grievance on an expedited basis.  Upon a showing of good and sufficient cause and after giving the responding party an opportunity to be heard, the Impartial Arbitrator may so direct an expedited hearing if it is determined that the circumstances so warrant, and may make all necessary modifications to the normal grievance procedures outlined in this Article V, subject to the right of the responding party to sufficient time to prepare its defense.  The specific provisions for an expedited hearing set forth in the Uniform Player Agreement shall constitute good and sufficient cause for an expedited hearing pursuant to this paragraph.

**5.13   Ex Parte Communications.**

Neither the Federation nor the Association will have ex parte contact with the Impartial Arbitrator without the express written consent of the other party.

## ARTICLE VI

## MANAGEMENT, PLAYER AND UNION RESTRICTIONS

**6.1   No Strikes, No Lockouts.**

(a)   Neither the Players Association nor any player shall authorize, encourage, or engage in any strike, work stoppage, slowdown or other concerted interference with the activities of the Federation during the term of this Agreement.  Nor shall any player decline to play or practice or in concert with any other person otherwise interfere with the activities of the Federation, or individually or in concert encourage any other player to do so because of picketing or a labor dispute involving any other labor organization.  The Players Association shall not support or condone, any action of any player which is not in accordance with this Section 6.1 and the Players Association shall exert reasonable efforts to induce compliance therewith.

(b)   The Federation shall not engage in a lockout during the term of this Agreement.

**6.2** **No Discrimination.**

Neither the Federation nor the Players Association shall discriminate against or in favor of any player because of religion, race, color, national origin, age, marital status, or membership or non-membership in or support of or non-support of any labor organization.

**6.3** **Player Selection and Participation.**

All Federation decisions concerning the participation of Players with or on the Team shall be made solely to promote and/or enhance the best interests of the Team and the Federation.

**6.4** **Complimentary Tickets.**

Any player on the roster for a match in the United States that is open to the public (including World Cup Qualifying matches) or who is called in by Federation for a training session associated with such a match shall receive six (6) complimentary tickets to that match and any hospitality event immediately preceding or following the match.

Any player on the roster for a match that is not held in the United States (including World Cup Qualifying matches) that is open to the public or who is called in by Federation for a training session associated with such a match shall receive two (2) complimentary tickets to that match and any hospitality event immediately preceding or following the match.

Any player on the World Cup Roster shall receive three (3) complimentary tickets to each World Cup game in which the United States participates and the right to purchase ten (10) additional tickets to each such game at the price paid by the Federation for the tickets.

Any player on the roster for a World Cup Qualifier who is not on the World Cup Roster shall have the right to purchase four (4) tickets to each World Cup game in which the United States participates at the price paid by the Federation for the tickets.

With the exception of the obligation to provide tickets as set forth above and any other obligation explicitly set forth in this Agreement, the Federation has no obligation to provide any benefits of any kind to the Players or their friends and families, including without limitation, airfare, hotel accommodations, meals or tickets and/or entry to any events other than those listed above.

## ARTICLE VII

## INTEGRATION, ENTIRE AGREEMENT, CHOICE OF LAW

### 7.1    Integration, Entire Agreement.

It is expressly provided that substantive bargaining discussions between the parties and their prior Collective Bargaining Agreement and Uniform Player Agreement may be offered and considered by the Impartial Arbitrator, if deemed appropriate by him or her. With that exception, it is intended that this Agreement and its exhibits shall be deemed the complete agreement between the parties and that prior drafts and writings shall be deemed merged herein and of no force or effect. Further, no understanding contained in this Agreement shall be modified, altered or amended, except by a writing signed by the party against whom enforcement is sought.

### 7.2    Choice of Law

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under and shall be governed by the internal law of the State of Illinois without regard to its conflicts of law provisions.

## ARTICLE VIII

## OTHER

### 8.1    Player Pool Bank Account and Association Bank Account.

Payments by the Federation to the Players based on performance of the Team shall be made to the Player Pool Bank Account. Payment by the Federation to the Players based on commercial activities of the Players (e.g., Group Licensing Payments) shall be made to the Association Bank Account. Administration of the Association Bank Account, allocation, distribution, and payment from the Association Bank Account, and direction and instruction to the Federation as the distribution to Players of funds from the Pool Account shall be carried out by the Players Association.

### 8.2    Players Association Commitment to Discuss Possible Cooperation with International Management Group ("IMG").

The Players Association agrees to meet with representatives of the Federation's exclusive marketing representative, International Management Group ("IMG"), to discuss in good faith ways in which IMG may be able to work with or represent the Players or the Players Association in marketing matters. The Players Association welcomes this opportunity and is willing to consider and discuss any proposal made by IMG, but anticipates that any work with IMG may have to be on a non-exclusive basis.

8

**8.3     Player Appearances**

In furtherance of the Federation and Players Association's mutual desire to promote the sport of soccer and the Players, Players Association agree that Players and Players Association will use their best efforts to ensure that Players will fulfill all Player Appearances (as defined in the Uniform Player Agreement) requested by the Federation for Federation sponsored events. Players Association does not guarantee that any particular Player will make any particular Appearance but agrees that some Player shall fulfill the Appearance. Players Association will use its best efforts to ensure that all Players have an opportunity to make Player Appearances and that no Player receives a disproportionate number of Player Appearances. Players shall be compensated for Player Appearances in the amount set forth under "Sponsor Appearance Fee" in the 2000-2004 Women's National Team Wage, Bonus, and Sponsor Appearance Fee Schedule (Exhibit A to the Uniform Player Agreement)(the "Sponsor Appearance Fee").

In exchange for Players Associations' agreement with respect to Player Appearances, Federation agrees to utilize Players in at least ten (10) appearances per calendar year starting in 2000 by Players not specified by name, paying the Players the Sponsor Appearance Fee. If Federation does not utilize Players in at least ten (10) appearances in a calendar year (starting in 2000) by Players not specified by name, for each Appearance not used Federation shall pay the "Sponsor Appearance Fee" amount into the Players Association bank account on December 31st (or the last business day) of that calendar year, to be paid to Players as directed by the Players Association.

**8.4     Access to Photographs and Footage**

The Federation agrees to make photographs and footage of the United States Women's National Soccer Team and its games available to the Players Association and the Players for uses in accordance with the terms set forth in paragraph 7 of the Uniform Player Agreement for use by Players in connection with charity or Federation sponsor events. The Federation shall not charge Players or Players Association for such uses of such photographs and/or footage, however, Players Association and/or Players shall be responsible for all third party costs associated with acquiring such photographs or footage.

**8.5     Heading and Organization.**

The headings and organization of this Agreement are solely for the convenience of the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**8.6     Time Periods.**

(a)     Unless specifically stated otherwise, the specification of any time period in this Agreement shall include any non-business days within such period, except that

any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

(b)     All time periods referred to herein shall be deemed to begin on the day immediately following the day on which the relevant event occurred.

## 8.7     Exhibits.

All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

## 8.8     Assignability.

The Federation shall retain the right to assign or license any of its rights herein to any division of the Federation or a subsidiary or similar legal entity created to perform licensing and/or marketing functions performed by the Federation or its agents as of the date hereof.  The Players Association shall retain the right to assign or license any or all of its rights herein to any affiliated legal entity created to perform licensing and/or marketing functions on behalf of the Players.

WOMEN'S NATIONAL TEAM
PLAYERS' ASSOCIATION

By: _____

Title: _A-Horney_____

Dated: 3 | 23 ____, 2001

UNITED STATES SOCCER
FEDERATION, INC.

By: _____

Title: Secretary General_____

Dated: 3 30 ____, 2001

10

March 13, 2001

John B. Langel
Ballard, Spahr, Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599

Dear John:

With respect to paragraph 6(f)(i) of the Uniform Player Agreement, the Players Association has expressed concern that there is a greater likelihood of an impermissible implied endorsement in television commercials. The Federation recognizes the Players Association's concern and agrees to work with the Players Association in good faith to eliminate any impermissible implied endorsements from television commercials produced in accordance with this provision. The Players Association understands and agrees that in some circumstances a television commercial and any assorted marketing campaign may be sufficiently clear that the sponsor only has a sponsorship relationship with the Federation and not with the five (5) or more players whose likenesses are used, so that the Players Association may approve such a use of the players' likenesses in the commercial. The Players Association will exercise good faith in reviewing and considering its approval of any such commercials.

Very truly yours,
UNITED STATES SOCCER FEDERATION, INC.

Daniel T. Flynn
Secretary General

AGREED TO AND ACCEPTED:

John B. Langel
Attorney for the
US Women's National Team Players Association

March 13, 2001

John B. Langel
Ballard, Spahr, Andrews & Ingersoll, LLP
1735 Market Street, 51ˢᵗ Floor
Philadelphia, Pennsylvania 19103-7599

Dear John:

As part of the negotiations with the Women's National Team for its Collective Bargaining Agreement and Uniform Player Agreement, the parties agreed to a number of global terms as set forth in the term sheet execute by the partes and which became effective on February 1, 2000. It was the intention of the parties that these global terms be incorporated in the Collective Bargaining Agreement and Uniform Player Agreement. To eliminate any ambiguity, the following points are reiterated here.

- U.S. Soccer shall promote its women's national team games comparable to the men's national team games
- If in any calendar year, the ratio of the aggregate compensation of women's national team players to the aggregate revenue from all women's national team games including all games in U.S. Soccer promoted women's tournaments is <u>less</u> than the ratio of the aggregate compensation of the men's national team players compensation to the aggregate revenue from all men's national team games including all games in U.S. Soccer promoted men's tournaments, then U.S. Soccer will make a lump sum payment to the women's national team player pool to make the ratios equal.
- If after calendar year 2000, U.S. Soccer enters its women's national team in a tournament for which there is prize money and that prize money exceeds the aggregate compensation to the players under this term sheet, then the parties agree to negotiate in good faith new bonus compensation for that tournament. If the parties can not reach an agreement on new bonus compensation within 30 days, then the parties agree to mediate the issue. If mediation is unsuccessful, the parties agree to binding arbitration within 30 days. Parties agree that there is no lockout/strike with respect to this issue.
- Parties agree that support and administrative assistance will be comparable to 1999 levels.

Very truly yours,
UNITED STATES SOCCER FEDERATION, INC.

Daniel T. Flynn
Secretary General

AGREED TO AND ACCEPTED:

John B. Langel
Attorney for the
US Women's National Team Players Association

March 13, 2001

John B. Langel
Ballard, Spahr, Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599

Dear John:

As part of the Collective Bargaining Agreement and Uniform Player Agreement, U.S. Soccer has authorized the Players and their Players Association to use U.S. Soccer's marks, uniforms and name in certain circumstances under certain conditions. Likewise, the Players have authorized U.S. Soccer to use the Players Likenesses in certain circumstances under certain conditions. Therefore, in the spirit of cooperation and in order to keep the respective parties as informed as possible with respect to these uses, each party agrees that is will attempt to keep the other party informed of such uses within a reasonable time after such use. This letter does not amend, alter, or modify any of the terms, conditions, and obligations contained in the Collective Bargaining Agreement and/or Uniform Player agreements.

Very truly yours,
UNITED STATES SOCCER FEDERATION, INC.

Daniel T. Flynn
Secretary General

AGREED TO AND ACCEPTED:

John B. Langel
Attorney for the
US Women's National Team Players Association

## 2000-2004 UNIFORM PLAYER AGREEMENT
## WOMEN'S NATIONAL TEAM

This Agreement is entered into on the _____ day of _____, _____ and is effective as of February 1, 2000, by and between the UNITED STATES SOCCER FEDERATION, INC. ("Federation"), a New York non-profit corporation with a place of business located at 1801 - 1811 South Prairie Avenue, Chicago, Illinois 60616 and _____ ("Player"), in consideration of the mutual promises and covenants hereinafter set forth in this Agreement as follows:

1. **Player's Duties and Responsibilities**. In consideration of the payments to be made by Federation to Player, as set forth in paragraph 3 hereof, Player shall have the following duties and responsibilities:

(a) <u>Playing Duties</u>. During the term of this Agreement, Player shall, subject to her health and fitness, be available for training with, and any matches of, the United States Women's National Soccer Team ("Team") as may be requested by Federation unless Player is excused by the Federation's General Manager for good cause. An adverse decision by the General Manager as to the existence of good cause is appealable to the Secretary General who shall make the decision in good faith, with due consideration given to, among other things, Player's schedule with Player's club. Player's duties as a player shall include maintaining a high level of competitive soccer skills and physical conditioning such that Player can compete as an elite soccer player and not using illegal or banned drugs or any other harmful substances.

(b) <u>Spokesperson Duties</u>. During the term of this Agreement, Player shall serve as a spokesperson for soccer and shall devote reasonable best efforts to promoting and developing the sport of soccer in the United States under the terms hereof while performing the Playing Duties as described in paragraph 1(a). Player's duties as a spokesperson, which will be scheduled from time to time by agreement between Federation and Player (or Player's representative or the Players Association), shall include (i) participation in certain community service projects and programs, (ii) personal non-commercial appearances, including delivering talks and/or speeches, (iii) participation in certain soccer clinics, to be agreed from time to time between Federation and Player and which do not conflict with any of the Player's commercial obligations, and (iv) participation in up to four reasonably scheduled autograph signing sessions per year for non-public, non-commercial use by charities or other non-commercial or non-public uses, involving Player signing no more than twenty-five (25) items per session. Federation shall provide Players Association with an accounting of the usage of such autographed items and the primary use shall be for charities. Federation shall reimburse Player for reasonable out-of-pocket expenses that Player incurs in connection with performing Player's duties as a spokesperson which are reasonably requested by Federation, within thirty (30) days of Player's presentation of appropriate expense vouchers.

(c) <u>Player's Time and Schedule</u>. Player shall devote whatever time is reasonably necessary and available to Player to perform Player's duties as a player and

spokesperson as set forth in paragraphs 1(a)-(b). Player's schedule and allocation of available hours shall be coordinated between Player (or Player's representative or the Players Association) and Federation.

(d)     Post-Game Hospitality. For any Team match in which Player competes, Player shall attend any post-game hospitality function where Federation sponsors are present, unless excused by the General Manager for good cause. An adverse decision by the General Manager as to the existence of good cause is appealable to the Secretary General who shall make the decision in good faith, with due consideration given to, among other things, Player's schedule with Player's club.

(e)     Conduct. Player shall comport and conduct herself, at all times, in a manner befitting Player's position as a member of the Team and spokesperson for the Federation and the sport of soccer.

(f)     Federation Rules and Handbook. Player shall comply with all rules and regulations of Federation, including without limitation, such rules and regulations as are set forth in the United States Soccer Federation National Team Player's Handbook (the "Handbook"), as may be amended from time to time by Federation in its reasonable discretion, copies of which are attached hereto as Exhibit B and expressly made a part of this Agreement as if fully set forth herein. In the event that there is a conflict or inconsistency between the provisions of this Agreement and the Handbook, the provisions of this Agreement shall control. Any amendments to the Handbook shall be consistent with the spirit of the Handbook and this Agreement. Federation represents and warrants that Federation will not grant to any sponsor a requirement that Players wear the shoes or goalie gloves of that sponsor or provide such sponsor with the right to match or better competing offers from other manufacturers.

(g)     Drug Testing. Player hereby consents to be subject to:

(i)     drug testing conducted at any time that player is at a match, practice, or training camp, or such other time or place as required for compliance with FIFA rules for Player to be eligible to participate in the FIFA World Cup or other FIFA competitions; provided, however, that such drug testing conducted at the request of Federation shall be conducted in accordance with the then existing policies and procedures of the United States Olympic Committee ("USOC") or such organization to which the USOC delegates authority for drug testing consistent with the Ted Stevens Amateur Sports Act or any successor federal legislation (collectively referred to as the "USOC program");

(ii)     drug testing conducted pursuant to any drug testing agreement between the United States, or the USOC, and one or more other countries, or the respective appropriate representatives thereof, and to the penalties set forth in any such agreement; and

2

(iii)    drug testing conducted at the request of FIFA, CONCACAF, or any other person or entity organizing a match or tournament in accordance with its rules and regulations and the penalties incident thereto.

If Player shall be subjected to any penalties for testing positive for a banned substance, for noncompliance, or for refusal to submit to a drug test in connection with (i), (ii) or (iii) above, Federation shall have the right to terminate this Agreement or Player's employment upon seven (7) days' written notice to Player.

(h)    Media Sessions and Interviews.  Player (i) shall cooperate with television, radio, newspaper, magazine, internet, and other news media representatives and participate in a reasonable number of media sessions and interviews and (ii) agrees to cooperate with the Federation to be available for such news media sessions and interviews as may be reasonably requested.  This provision applies to media sessions and interviews conducted in the venue of a match or practice site; other media sessions and interviews would be treated as spokesperson duties pursuant to the provisions of paragraph 1(b).

**2.**    **Term and Termination**.  The term of this Agreement is February 1, 2000 through December 31, 2004.  For each match, practice, training camp and for spokesperson duties performed under paragraph 1(b) during the term in which Player is requested by the Federation to participate and in which Player participates, Player will be employed for the period set forth in the itinerary for the match or practice or spokesperson duties pursuant to the terms of this Agreement and the 2000-2004 Women's National Team Wage, Bonus and Sponsor Appearance Fee Schedule attached hereto and made a part hereof as Exhibit A.  The provisions of paragraphs 5 and 6 shall survive any termination of employment or of this Agreement.

**3.**    **Compensation and Expenses**.  In consideration of Player's agreement, as described herein, to serve as a member of the Team and spokesperson and representative for the sport of soccer, as requested by the Federation, (a) Wages and Bonuses: Player shall be compensated for the day of the match and will be eligible for bonuses contingent on performance of the Team pursuant to the 2000-2004 Women's National Team Wage, Bonus and Sponsor Appearance Fee Schedule attached hereto and made a part hereof as Exhibit A; and (b) Expenses: Federation shall provide Player with air transportation and ground transportation to and from the venue of the match and to and from the venue of any other team meeting or practice required by the Federation, hotel room and meals while required by the Federation to be in the venue, and $30 per day (domestic venues)/$40 per day (international venues) for miscellaneous expenses while required by the Federation to be in the venue for practice, matches, or any other purpose.  If Player is under contract to a club located outside the United States, Federation will purchase the following types of tickets for Player's transportation from Player's location to the site of the camp or match: a business class airfare for any World Cup qualification match, business class airfare for any other match but only if Player flies in to arrive less than 72 hours in advance of the match, and otherwise coach airfare.  For other Team related travel by a Player under contract to a team located outside the United States and for other Team related travel by a domestic-based Player, Federation will make reasonable efforts to obtain upgrades for such travel as part of any sponsorship agreement in the airline travel category.  Federation will pay the wages and bonuses on the later of the following: (i) the regular semi-monthly payroll next due

3

after the match to which the wages and bonuses relate, or (ii) thirty-one days after the match to which the wages and bonuses relate, or (iii) as otherwise specified in Exhibit A hereto. All amounts set forth in this Agreement, including exhibits, are gross amounts and actual amounts paid to the Players shall be net any amounts that the Federation is required to deduct or withhold under applicable law.

4.     **Insurance**. Federation will maintain workers' compensation insurance in connection with Player's activities as a Team player and provide copies of the policies as and when reasonably required by the Player or Players Association.

5.     **Warning, Waiver and Release.**

(a)     Player acknowledges that Player is experienced at the game of soccer, and recognizes that it is an activity in which injuries can occur. Player understands and acknowledges that there are dangers of personal injury inherent in participating in soccer try-outs, training, testing, and competition, and that Player risks death and personal injury, including paralysis and dismemberment, while participating in try-outs, training, testing and competition. Player expressly and voluntarily assumes all risk vis-a-vis the Released Parties (as defined in paragraph 5(b)) of death and personal injury sustained while participating in try-outs, training, testing, and competition, including the risk of active or passive negligence and hidden, latent, or obvious defects in any of the facilities or equipment used, other than gross negligence or willful or wanton misconduct of any of the Released Parties (as defined in paragraph 5(b)).

(b)     Player, for herself and on behalf of Player's heirs, assigns, and next of kin, hereby releases, forever discharges, holds harmless, and promises not to sue the United States Soccer Federation and its officers, directors, officials, agents, and employees ("Released Parties") with respect to any and all liabilities, claims, demands, or causes of action, whether known or unknown ("Claims") arising out of any participation in any try-out, training, testing, or competition at the request of or sponsored by the United States Soccer Federation or while employed by Federation, except that which is the result of gross negligence and/or willful or wanton misconduct. PLAYER AGREES THAT THIS RELEASE INCLUDES, BUT IS NOT LIMITED TO, ALL CLAIMS ARISING OUT OF THE ACTIVE OR PASSIVE NEGLIGENCE, AND HIDDEN, LATENT, OR OBVIOUS DEFECTS IN ANY OF THE FACILITIES OR EQUIPMENT USED, OTHER THAN GROSS NEGLIGENCE OR WILLFUL OR WANTON MISCONDUCT, OF THE RELEASED PARTIES.

6.     **Names, Pictures, Likenesses**.

(a)     Definitions.

(i)     "Likeness" shall mean the image, photographs, pictures (whether still, video, motion or television), likeness, name, nickname, signature, facsimile signature, caricature, biographical information and/or voice, whether used individually or in combination(s).

4

(ii)    "Licensing Purposes" means use of Player's Likeness on merchandise that is sold at the retail level or at the wholesale level for ultimate retail sale, including on items provided as part of the purchase of another item, (e.g., promotional packaging materials such as cans or cups containing Player's Likeness where consumers do not have the ability to choose which Players' Likeness they will receive out of a group of likenesses or a trading card included with the purchase of a loaf of bread.)

(iii)    "Non-commercial Uses" means use of a Player's Likeness to advertise, promote and develop the National Teams and/or the sport of soccer or any National Team game; such promotion and development being deemed to include without limitation, sponsor premiums and other give-away items and corporate protocol gifts. Non-commercial Uses do not include use of a Player's Likeness for Licensing Purposes. For purposes of this Agreement, sponsor premiums and other give-away items shall constitute "Non-commercial uses" provided that such sponsor premiums and/or give-away items are used to promote a National Team match or the sport at or near the venue for such match and within a reasonable time of such match and are not used as part of a national advertising campaign for that sponsor.

(b)    Names, Pictures, Likenesses Created During Matches, Training or Federation Sponsored Activity. Player agrees that Federation shall have the right to take or create, or have taken or created, Likenesses of Player, including staged team photographs, at any training or matches in which the Team participates or at any Federation or Team sponsored promotional activity. Player agrees that all rights in such Likenesses shall belong to Federation and that Federation, and its assigns, agents and licensees, may use Player's Likenesses for Non-commercial Uses and as set forth below. Except as set forth below, Federation may not use or allow others to use Player's Likeness for Licensing Purposes without the agreement of Player or Player's representative.

(c)    Group License. In consideration for the licensing payments set forth in paragraph 6(e) below, Player hereby grants to Federation a license (the "Group License") to use the Player's Likeness for Licensing Purposes, in the discretion of Federation, provided that the license shall apply only to uses by Federation which contain the Likeness of a total of five (5) or more players of the Team. For "Licensing Purposes" that involve products containing individual Players' Likenesses (not in a group) where consumers do not have the ability to choose which Players' Likeness they will receive ("Individual Non-Consumer Choice Licensing"), the license shall require use of the Likenesses of at least fifteen (15) Players, with each Player's Likeness available in reasonably equal numbers. The Group License does not permit the licensing of products containing individual Players' Likenesses where consumers do have the ability to choose which Player's Likeness they will receive, without the prior consent of the Players and/or the Players Association. Federation will make reasonable efforts to ensure that merchandise sold pursuant to the Group License gives reasonably equivalent prominence among the Players whose Likenesses are used. Player and/or Players' Association agree not to enter into any exclusive licensing arrangements that by their terms prohibit the

5

Federation from entering into group licensing arrangements permitted by this Agreement without the prior written consent of the Federation and the Federation agrees not to enter into any exclusive licensing arrangement without the prior written consent of the Players Association.

(d)     No Personal Endorsement. Nothing in this Agreement shall be deemed to give the Federation the right, without the Player's prior written consent, to suggest or imply that a Player has individually endorsed a product.

(e)     Licensing Payments to Player for Group License.

(i)     For any use of Player's Likeness by Federation as set forth in paragraph 6(c), Federation will consult with the Players Association, before negotiating terms with a licensee involving use of the Group License.

(ii)     Federation will advise Player and Players Association by overnight courier or facsimile in advance of any use of Player's Likeness by Federation under paragraph 6(c). In the event that Player has good cause for requesting that Player's Likeness not be used on the particular merchandise, Player or Players Association shall advise Federation in writing within five (5) business days after Federation sends notice to Player and to Players Association. The determination of whether there is good cause for Player to be excused from the use shall be determined by the Federation in good faith, with the Federation to notify the Players Association immediately of any decision to use Player's Likeness over the objection of Player or Players Association. Prior to such decision, Federation agrees to work in good faith with Player to remove or minimize the basis for Player's objection to the particular licensed product to the extent possible. If Player's objection is that the use appears to be an impermissible "implied endorsement" by that Player and Federation and Player cannot resolve Player's objection, then the Federation and Player agree to resolve the dispute through an expedited arbitration pursuant to paragraph 12 of this Agreement before any product is sold or distributed or made available to anyone. In no event shall good cause include a request for payments in addition to those set forth in this paragraph 6(e). Good cause for Player to be excused shall include a pre-existing personal endorsement in a product category that conflicts with the sponsor or licensee. Failure of the Player or Players Association to respond within five (5) business days shall be deemed an approval.

(iii)     For each use of Player's Likeness under paragraph 6(c), Federation shall pay a total of 50 % of the net royalties paid to the Federation to the applicable Player Pool(s) to be divided on a pro rata basis between the applicable Player Pool(s). Such amounts shall be paid to the applicable Player Pool(s) at least quarterly. "Net royalties" shall mean the gross royalty paid by the licensee to the Federation or its representative less ten percent (10 %) of the gross royalty for administrative expenses. In no event shall royalties include amounts paid by Federation sponsors for sponsorship rights. If the Players Association is the originating party for the licensing arrangement, then the Players Association shall

be entitled to receive 55 % of the gross licensing royalty from that licensing arrangement, without any deduction by Federation for administrative expenses. If a Federation sponsor pays for or receives rights for Licensing Purposes in addition to sponsorship rights and Players Association challenges as unreasonable the allocation of amounts paid to Federation for sponsorship rights and the amounts paid for the rights for Licensing Purposes, the issue of the reasonableness of the allocation shall be resolved in accordance with the arbitration provisions of paragraph 12. If Players' Association is the originating party for the licensing arrangement and the licensing arrangement could have been completed under this Agreement without the Federation's participation then Federation and Player's Association will negotiate an appropriate revenue distribution to reflect the incremental value, if any, of the Federation's marks and logos and/or the Federation's participation in the licensing arrangement. If the Federation and the Players Association are unable to agree on an appropriate revenue distribution, the Players and/or Players Association may proceed without the marks and logos of the Federation if permitted by this Agreement or they may submit the revenue distribution dispute to arbitration as provided in paragraph 12 of this Agreement.

(iv)  Federation shall keep, maintain and preserve (in Federation's principal place of business) for at least two (2) years following termination or expiration of this Agreement complete and accurate records of accounts pertaining to merchandise sold and royalties paid to Federation or its representative pursuant to paragraph 6(c). Such records shall include, without limitation, invoices, correspondence, agreements, banking and financial records. Player shall have the right, one (1) time per year, to perform an audit upon the books and records of the Federation in order to calculate the net royalties paid to the Federation for the use of Player's Likeness under paragraph 6(c). Player's right of access to audit the books and records of the Federation shall be upon reasonable prior written request and any such audit shall be performed during regular business hours and in a manner which does not interfere with the normal operations and business of the Federation. The parties agree that such an audit shall be conducted by independent certified public accountant(s) mutually acceptable to the Federation and Player. In the event that such audit confirms that the amount of net royalties is within ten percent (10%) of the amount reported to the Players by Federation, Player shall pay for the reasonable costs and expenses of the audit. In the event such amount of net royalties calculated under such audit, using the same generally accepted accounting methods, differs by more than ten percent (10%) from the amount reported to Players by the Federation, the Federation shall pay for all reasonable costs and expenses of the audit. The results of the audit shall be binding upon the parties and shall be completed within a reasonable period of time.

(f)  Compensation For Non-commercial Uses. Compensation to Player or the Player Pool for use of Player's Likeness by any person or entity other than the Federation, including a division of the Federation, or subsidiary or similar legal entity of the Federation, or IMG for Non-commercial Uses will be determined as set forth below: (i) Six or More Players -- Use By Federation Sponsor. If Player's Likeness is used by a

sponsor of the Federation for any Non-commercial Use or in a sponsor's advertising or promotions, and if the advertising, promotion, or Non-commercial Use includes six or more members of any Federation national team (e.g., team poster or collage), Federation will request, but not require, the sponsor to make a contribution in an amount to be determined in the sponsor's sole and absolute discretion to the applicable Player Pool(s), provided however, with respect to any use by sponsor in a television commercial, prior to such use, Federation shall provide a copy of such television commercial to the Players Association for its approval, which such approval shall be considered in good faith. Such uses by sponsors specifically exclude any Licensing Purposes; (ii) <u>Six or More Players Licensing Purposes By NIKE</u>. If Player's Likeness is used by NIKE, the Federation's Athletic Wear sponsor, for Licensing Purposes on posters, calendars and similar sports impression products and is in a team setting (six or more members of any national team), the Federation will pay to the applicable Player Pool(s) to be divided on a pro rata basis between the applicable Player Pool(s) 50 % of any royalties from such use paid by NIKE to Federation within thirty days after payment is received by Federation, <u>except</u> that the Federation will not pay any such amounts to the Player Pool(s) if the Likenesses used by NIKE are solely those of players who have individual endorsement contracts with NIKE; (iii) <u>All Other Circumstances, Including Fewer than Six Players, Use By Sponsors (other than NIKE) For Licensing Purposes, and Use By Non-Sponsors For Any Purpose</u>. If Player's Likeness is otherwise requested by any person or entity, then the person or entity will be asked to reach agreement with the Player or Player's representative or Players Association, either directly or through the Federation, as to the amount of compensation to be paid by the sponsor or non-sponsor to the Player(s).

7. **Endorsements, Marketing and Promotions As A National Team Player**

(a) Because of Federation's concern that the public might be misled to believe that a particular product or event is endorsed or sponsored by Federation and the need of Federation to preserve its reputation and integrity as the National Governing Body for the sport of soccer in the United States, Player agrees that Player shall not:

(i) use the name or logos of the Team or the Federation for any purpose, except as provided in paragraph 7(b) and 7(d) below, and except that use of the Team name as part of the name of the Players Association and/or the name of the Players Association's business arm shall not be prohibited;

(ii) use any uniform of the Team or the Federation for any purpose other than appearing in a match as requested by the Federation unless Player shall have received the prior written consent and approval of the Federation. However, the prior written consent and approval of the Federation shall not be unreasonably withheld for any use that (a) is not for a competing sponsor in a category in which the Federation has an existing or imminent exclusive sponsor, and (b) does not involve more than seven (7) Players appearing together, so long as the agreement provides for termination of the use of the Player(s) in uniform in a reasonable time not to exceed six months in the event that the Federation enters into an exclusive sponsorship agreement with a competing sponsor in the same category. Any Player or Players seeking to use one or more Player uniforms shall make a

request in writing, with a description of the intended use of the uniform, to the Federation. The Federation shall have five (5) business days to respond to the request. Failure by the Federation to respond within five (5) business days shall be deemed an approval. The Federation shall not contact any sponsor involved about the intended use without the prior written consent of the Player, Players, and/or the Players Association. Federation may suggest an amount to be paid by the sponsor of the intended use (or by the Player or Players) for the use of the uniform(s), and the parties shall confer about the amount in good faith, but if the parties are unable to reach agreement as to compensation, that reason alone shall not constitute a basis for the Federation withholding approval, the Player(s) can proceed to wear the uniform(s) subject to all the terms and conditions of this Agreement, and any party involved can submit the issue of compensation to arbitration pursuant to paragraph 12 of this Agreement.

(iii)    make any endorsements or commercial appearances, sponsor any products, or use or consent to the use by any third party of any name, picture or likeness of Player, in which Player appears, either alone or with others, in the official Team uniform, in any attire which closely resembles or is confusingly similar to the official Team uniform, or in any attire whatsoever bearing or displaying the marks and/or logos of either Federation or the Team unless Player(s) shall have received the prior written consent and approval of Federation as specified in paragraph 7(a)(ii) above;

(iv)    except as expressly permitted under paragraph 7(c) below, make any endorsements or commercial appearances, sponsor any products, or use or consent to the use by any third party of any name, picture or likeness of Player, in which Player appears together with seven (7) or more other members of the Team in which Player and the other members, either directly or indirectly, identify themselves as members of the Team, regardless of their attire, or which may be construed as an implied endorsement by the Team or the Federation, unless Player(s) shall have received the prior written consent and approval of Federation. Except as expressly permitted under paragraph 7(c) and (d) below, Player understands and agrees that an appearance of eight (8) or more members of the Team (regardless of identification or attire) is prohibited and that Player may not, and will not, make any such appearance without the prior written consent of the Federation; or

(v)    engage in marketing efforts, alone or with others, as the Team or in her capacity as a Team player that will lead someone to believe that the Federation has endorsed a business, product or service. Nothing in this Agreement shall be deemed to give any Player or the Players Association the right, without the Federation's prior written consent, to state or imply that the Federation has endorsed a product, service, or business.

(b) Use of Description.

    (i)    Definitions.

    A.    "Description" means identifying the Player as the captain, member or as playing a particular position on the Team. "Description" shall include any of the following: "Member of the U.S. National Team", "Member, U.S. National Team", "Member of the U.S. Women's National Team", "Member, U.S. Women's National Team", "Member of the U.S. National Soccer Team", "Member, U.S. National Soccer Team", "Member of the U.S. Women's National Soccer Team" or "Member, U.S. Women's National Soccer Team", but specifically excludes the phrases "U.S. National Team", "U.S. Women's National Team", "U.S. National Soccer Team", and "U.S. Women's National Soccer Team". Nothing herein shall be interpreted as limiting Player's right (either individually or in a group setting with six or fewer other members of the Team) to describe herself/themselves by her/their position in conjunction with the descriptive phrase "US," "USA," or "United States" (e.g., "United States Defender").

    B.    "Pre-Approved Format" shall mean if the Description is (1) used in conjunction with the Player's name in a font size one-half (or smaller) the font size of the typeface of Player's name, and the area of the Player's name and the Description (defined by the perimeter of the outermost edge of the typeface of the combined name and Description) is less than 3% of the size of the page, or (2) used in conjunction with the Player's name, not as a primary feature, in a biographical context and along with the other biographical information in a font one-half (or smaller) the font size of the typeface of Player's name.

    (ii)    Use of Description by Three or Less Players. Notwithstanding anything in this Agreement to the contrary, three or less Players may use the Description (as defined above) in conjunction with the Player's Likeness for any purpose that is not likely to mislead a reasonable person to believe that Federation is endorsing a business, product or service. Player is not required to seek any advance consent from Federation if Description is used in the "Pre-Approved" format. For any other use of the Description or for any use of the Description in non-Pre-Approved format, Player must receive the advance written consent of the Federation.

    (iii)    Use of Description by More than Three and Less than Eight Players. Upon advance written consent of the Federation, a group of more than three (3) and less than eight (8) Players may use the Description in conjunction with these Players' Likenesses for any purpose that is not likely to mislead a reasonable person to believe that Federation is endorsing a business, product or service. The prior written consent and approval of the Federation shall not be unreasonably withheld for any use of the Description that (a) is not for a competing sponsor in a category in which the Federation has an existing or

imminent exclusive sponsor, and (b) does not involve more than seven (7) Players together, so long as the agreement provides for termination of the use of the Players(s) in uniform in a reasonable time not to exceed sixty (60) days in the event that the Federation enters into an exclusive sponsorship agreement with a competing sponsor in the same category, provided no new uses of the Description by Player(s) may occur after notice of Federation's Agreement with a competing sponsor has been given. Any Player or Players seeking to use the Description for more than three (3) and less than eight (8) Players shall make a request in writing, with a description of the intended use of the Description, to the Federation. The Federation shall have five (5) business days to respond to the request. Failure by the Federation to respond within five (5) business days shall be deemed an approval. The Federation shall not contact any sponsor involved about the intended use without the prior written consent to the Players and/or the Players Association. Federation may suggest an amount to be paid by the sponsor for the use of the Description and the parties shall confer about the amount in good faith, but if the parties are unable to reach agreement as to compensation, that reason alone shall not constitute a basis for the Federation withholding approval the Player(s) can proceed to use the Description subject to all the terms and conditions of this Agreement, and any party involved can submit the issue of compensation to arbitration pursuant to paragraph 12 of this Agreement.

(c)     For purposes of this paragraph, Federation agrees that Player and/or Players' Association may engage in the following marketing efforts in accordance with the terms and conditions expressly set forth herein:

(i)     Player and/or Players' Association may enter into marketing arrangements with third parties, provided that such arrangements shall not include more than two (2) of the following items: (A) any advertisements, regardless of medium, including seven (7) or less Players and/or Players' Likenesses; (B) personal appearances by one (1) or more Players for or on behalf of the third party; (C) tickets to any Federation match; and, (D) participation in any hospitality events at or around Federation matches;

(ii)     Player and/or Players' Association may arrange for and attend events at which more than seven (7) Players may be present (e.g., golf outing, private events), provided that such events are not "public events." For purposes of this paragraph, "public events" shall mean any event for which tickets are sold to the general public, the event is promoted through a national advertising campaign, regardless of medium, or the event is broadcast and/or televised regardless of medium;

(iii)     Player and/or Players' Association may enter into licensing arrangements where an individual Player's Likeness is used on separate licensed product as part of a series of licensed products in which more than seven (7) Players' Likenesses are used provided that (A) the promotion of such series of licensed products clearly reflects that it is a collection of individuals (e.g. action figures) that does not imply an endorsement by the Team or Federation; (B) the

11

promotion of such series of licensed products does not include any advertisement, regardless of medium, including more than seven (7) Players or Players' Likenesses; and, (C) the consumer has the ability to purchase any item of the series without any obligation to purchase any other item in the series.

(iv)     With respect to official memorabilia to be autographed (no facsimile signatures), more than seven (7) Players may sign an individual memorabilia item and such item shall not be deemed an implied endorsement of the Team (as set forth in paragraph 7(a)(iv) above) provided that (A) the item to be autographed is made or distributed by a Federation sponsor or licensee if the Federation has a sponsor or licensee that makes or distributes such product ("Sponsor Product"), provided sponsor is willing to provide such Sponsor Products at a price within 10% of the price otherwise available to Players for such product, (B) if Players are unable to purchase Sponsor Products under (A) above, Players may use a generic such product but may not use the product of any competing sponsor, and (C) any promotion or publicity related to the distribution of such autographed memorabilia does not include any advertisement, regardless of medium, including more than seven (7) Players and/or Players' Likenesses;

(v)     Notwithstanding anything in this Agreement to the contrary, under no circumstances may any marketing arrangement by Player(s) and/or Players' Association include advertisements, regardless of medium and/or scope of distribution, in which eight (8) or more Players and/or Players' Likenesses appear in the same advertisement (e.g., print ad or television commercial) without Federation's prior written consent.

(d)     Notwithstanding anything in this Agreement to the contrary, (i) Players may make endorsements in their personal capacity or in their capacity as a member or employee or agent of the Players Association or another entity (but not in their capacity as a representative on behalf of the Team or the Federation), and (ii) Players may be involved in any number in their personal capacities in soccer camps, books and other publications, videos, websites, or other businesses in which Players are not merely endorsers of a product or service and use the Description in conjunction therewith (no Team uniform, no logos of the Federation), which involvement shall not constitute a violation of this Agreement provided that the promotional materials for any such camp or business do not suggest or create the impression that the Team or Federation is sponsoring or endorsing the camp, book or other publication, video, website, or business and which advertisements do not include eight (8) or more Players. In any book or other publication, players may also use photographs that are in the public domain or could be used by any other author. For books and other publications, videos, and websites that do not have sponsors that are in a category in which the Federation has an existing or imminent exclusive sponsor Player(s) or Players Association can request use of the Players' uniforms in accordance with the provisions of paragraph 7, above.

(e)     No Federation Endorsement. Nothing in this Agreement shall be deemed to give the Player(s) and/or Players' Association the right, without the Federation's prior written consent, to suggest or imply that the Federation has endorsed a product.

12

8.   **Appearances**.

(a)   Player Appearances.  Player understands and agrees that as part of the Collective Bargaining Agreement, Players and Players Association have agreed to use best efforts to fulfill all reasonably requested Player Appearances (as defined herein) for Federation sponsors, upon reasonable notice by Federation, at the fixed rate of $2,500 per Appearance.  Player understands that in exchange for this agreement by the Players and Players' Association, the Federation has agreed to pay for a minimum of ten (10) Appearances by Team players per year at Federation sponsors' events.  Players Association does not guarantee that any particular Player will make any particular Appearance but agrees that some Player shall fulfill the Appearance.  Player agrees to use her best efforts to assist the Players Association in fulfilling these obligations.

(b)   Player also agrees that the Player, Player's representative, or Players Association shall cooperate with the Federation in scheduling a reasonable number of appearances and in making appearances requested by or on behalf of one of the Federation's sponsors.  Federation agrees to coordinate all such appearances with Player, Player's representative, or Players Association.  Player will not be required to make appearances for sponsors in product categories in which Player has a pre-existing conflicting personal endorsement.  When Player makes an appearance pursuant to a sponsor's request for a Team player (not specified by name), the sponsor will be required to make a payment to the Player in the amount set forth under "Sponsor Appearance Fee" in the 2000-2004 Women's National Team Wage, Bonus, and Sponsor Appearance Fee Schedule (Exhibit A hereto).  If a sponsor requests an appearance by an individual player by name to make an appearance or to deliver a direct endorsement of the company or product, then the sponsor will be directed to negotiate an appearance fee with the individual Player or Player's representative and such appearance shall be subject to a fee being agreed.  An appearance does not include (i) Player attendance at post-game hospitality by or for sponsors, (ii) news media sessions and interviews, (iii) attendance at meals, or (iv) other duties performed pursuant to paragraph 1.

9.   **Liquidated Damages**.  If (a) Player is requested to compete in a match with the Team and if Player fails to participate in the match on the ground that the terms of this Agreement should be changed in any way, or (b) Player has agreed to compete in a match and Player then fails to participate in the match for any reason (other than good cause which determination shall be made by the Federation in good faith), the parties acknowledge and agree that the Federation will suffer irreparable damages which will be difficult, if not impossible, to quantify fully.  As a result, in the event Player fails or refuses to participate as set forth in paragraph 9(a) or 9(b) above, then as liquidated damages Player shall pay to Federation an amount equal to three times the amount of the appearance fee that would have been paid to Player had Player competed in the match.  Player agrees that Federation may, at its option, deduct such amount from any payment that is next due and owing from the Federation to Player or from any payment that is next due and owing to the Player Pool.  If Player makes herself available to participate in the match sufficiently in advance of the match, notwithstanding any previous refusal or threatened refusal to participate, Federation shall not be entitled to any liquidated damages.

13

**10.** **Player Unique Skill**. Other than for the Federation or for the club to which Player's rights are assigned as set forth in Player's registration or for an all-star team in which the player is representing the club, Player agrees not to play in any soccer game on the same team as five or more members of the Team without the prior written consent of the Federation. Player further agrees that Player will not play in more than one (1) such all-star soccer game per calendar year on the same team as five (5) or members of the Team without the prior written consent of the Federation.

**11.** **Notices**. All notices under this Agreement shall be delivered by hand, facsimile transmission, overnight delivery service or registered or certified mail. Notices intended for Player shall be addressed to Player at the address contained in the Federation's personnel records, as amended from time to time, or to the Player's representative, and to the Players Association, and, if intended for the Federation, shall be addressed to the Federation at its corporate headquarters.

**12.** **Arbitration**. Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled pursuant to Article V of the Collective Bargaining Agreement entered into between Players Association and Federation on _____ __, 2001 ("Collective Bargaining Agreement"). The existence of specific references to the right to arbitrate in this Agreement should not be read to exclude the right to arbitrate when no specific reference is made. Nothing in this Agreement shall deprive the Player of any and all rights under the bylaws of the Federation.

**13.** **Miscellaneous Provisions**.

(a) **Entire Agreement**. It is expressly provided that substantive bargaining discussions between the parties may be offered and considered by the Impartial Arbitrator, if deemed appropriate by him or her. With that exception, it is intended that this Agreement, its exhibits, and the Collective Bargaining Agreement, be deemed the complete agreement between the parties and that prior drafts and writings shall be deemed merged herein and of no force and effect. Further, no understanding contained in this Agreement shall be modified, altered or amended, except by a writing signed by the party against whom enforcement is sought.

(b) **Assignment**. Neither this Agreement nor any rights or duties under this Agreement may be assigned or delegated by either party unless the other party consents thereto in writing; except, however, the Federation shall retain the right to assign its rights herein to any division, subsidiary, or similar related legal entity created to perform licensing and/or marketing functions performed by the Federation or its agents as of the date hereof. The Players Association shall retain the right to assign or license any or all of its rights herein to any affiliated legal entity created to perform licensing and/or marketing functions on behalf of the Players.

(c) **Non-Waiver**. The failure of either party to insist, in any one or more instances, on the performance of any terms or conditions of this Agreement shall not be construed as a waiver or relinquishment of any rights granted hereunder or of the future

14

performance of any such term or condition, and the obligations of the non-performing party with respect thereto shall continue in full force and effect.

(d)    Binding Effect.  Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.

(e)    Governing Law.  To the extent that federal law does not govern implementation of this Agreement, this Agreement shall be construed and interpreted under and shall be governed by the internal law of the State of Illinois.

(f)    Signatures.  This Agreement may be signed in one or more counterparts (including facsimile signatures), each of which shall be deemed to be one and the same instrument.

14.    Acceptance.  This Agreement shall be effective as of February 1, 2000 and shall become enforceable when executed by the Federation and the Players Association.


**PLAYER**                                     **UNITED STATES SOCCER**
                                               **FEDERATION, INC.**


                                               By: _____

_____                     Secretary General
        (Signature)


_____
        (Print Name)

**ATTACHMENTS TO CONTRACT:**

Exhibit A    2000-2004 Women's National Team Wage, Bonus, and Sponsor Appearance Fee
             Schedule
Exhibit B    Women's National Team Player Handbook

**Exhibit A**
**2000-2004 Women's National Team ("Team")**
**Wage, Bonus, and Sponsor Appearance Fee Schedule**

*This schedule shall remain in effect for the period February 1, 2000 through December 31, 2004.*

*Federation has no obligation to hold any matches, tournaments or events or to field a team for any match, tournament or event.*

*Bonus payments and/or appearance fees for a match shall not include any win, draw or loss by forfeiture or match cancellation where Players were not required to take to the field for the match, except for when the Federation is paid specifically for that match.*

*Payments to be made to the Team Player Pool shall be made to a Team Player Pool bank account to be administered by appropriate authorizations satisfactory to the Federation from the individuals who collectively comprise the Team, as directed in writing by the Players Association.*

*The Players Association shall receive an accounting of all payments made directly to the players under this Wage, Bonus, and Sponsor Appearance Fee Schedule. Said accounting shall include a match-by-match breakdown of the payments.*

I.      **Annual Compensation Terms**

A.      2000 Compensation.

      1.      Guaranteed Compensation

          a.      Monthly Salary.  To each non-NCAA eligible Player to which U.S. Soccer extends a contract prior to the 2000 Olympic Games, U.S. Soccer shall pay a guaranteed monthly salary of (i) $5,000 to each non-NCAA eligible player that was a full-time participant in the 1999 Residency camp or (ii) $3,500 to all other players eligible to receive compensation.  Guaranteed monthly salaries shall run for the period from February through September unless earlier terminated by U.S. Soccer.

          b.      Playing/Performance Compensation Credit.  All monies paid by U.S. Soccer as guaranteed monthly salaries shall be credited against all monies owed pursuant to Playing/Performance compensation.  U.S. Soccer agrees to pay Players playing/performance amounts in excess of guaranteed monthly salaries every other month.

          c.      Severance.
(i) Any member of the 1999 Women's World Cup roster whose contract is terminated prior to the start of the 2000 Olympics, or who is not initially extended a contract, shall receive 3 months severance at the rate of $5,000 per month.

(ii) Any player, other than a 1999 Women's World Cup roster player, who is invited and who participates in the 2000 residency period and whose contract is terminated prior to the start of the 2000 Olympics, shall receive 3 months severance at the applicable rate (i.e., $5,000 or $3,500)  per month.

(iii) No player shall be entitled to receive more than 3 months severance. Therefore, if a player receives some severance and then is extended a contract  and then released, her aggregate severance may not exceed 3 months.

          d.      "Floaters".  U.S. Soccer has the right to invite any player to participate in a training camp as a "floater" for up to two camps (of approximately one week each) before extending a contract to that player.  Any player who participates in a training camp as a "floater" and is not extended a contract at that time shall receive $500 in addition to any per diem payments.

      2.      Playing/Performance Compensation

a.  Pre-Olympic Matches
    Appearance Fee                                    $2,000 per player
    Bonus Compensation
              Friendly vs. Top 8 Opponent[1] only
                        Win                           $1,000 per player
                        Tie                           $  500 per player
    Algarve Cup  −  1st Place                         $1,500 per player
                    2nd Place                         $  750 per player
    Nike US Cup[2] −  1st Place                       $2,000 per player
    Pacific Cup   −  1st Place                        $  500 per player
    CONCACAF
    Gold Cup −      1st Place                         $1,500 per player
                    2nd Place                         $  750 per player
    DFB
    Tournament −    1st Place                         $1,500 per player
                    2nd Place                         $  750 per player
    All other
    tournaments −   1st Place                         $1,500 per player
                    2nd Place                         $  750 per player

b.  Olympic Matches
    Roster Bonus                                      $10,000 per player
    Semi-Finals                                       $100,000 player pool
    Bronze Medal                                      $50,000 player pool
    Silver Medal                                      $300,000 player pool
    Gold Medal                                        $700,000 player pool

c.  Post Olympic Victory Tour Matches
    If Gold, guaranteed 5 matches, each              $100,000 player pool
    If Silver, guaranteed 3 matches, each            $3,000 per player
    If Bronze, USSF option for 3 matches, each       $2,500 per player

    (i)   Players shall be compensated at the Gold level, if the average paid
          attendance for the Silver or Bronze Victory Tour matches exceeds
          the greater of (a) the average paid attendance for the Fall 1999
          Victory Tour matches or (b) the average paid attendance for the
          "Road to..." matches preceding the 2000 Olympic Games.

---

[1]For the year 2000, Top 8 Opponents are defined as the teams in the 2000 Olympic Games exclusive of Australia and inclusive of the U.S. Women's National Team.

[2]Or other U.S. Soccer promoted women's tournament in which U.S. Soccer receives the gate and other related revenues.

(ii)    The Victory Tour Matches set forth above are in addition to the Indoor Victory Tour matches set forth in the settlement agreement also including IMG and SFX.

(iii)    If less than 16 players from the Olympic Team roster do not participate in a Victory Tour match where compensation is paid to the player pool, then the player pool compensation shall be decreased by 1/16 for each player less than 16. If more than 20 payment-eligible players participate in a Victory Tour match where compensation is paid to the player pool, then the player pool compensation shall be increased by 1/20 for each player more than 20.

(iv)    If a player on the Olympic Team roster is physically injured in an Olympic match and is physically incapable of participating in the corresponding Victory Tour match as a result of that injury and the payments for the Victory Tour match(es) missed are based per player and not to the player pool, then such injured player shall receive a per player payment for such missed matches.

(v)    No other appearance or bonus fees apply to these games.

d.    If the U.S. Women's National Team fails to win a medal in the 2000 Olympic Games, then U.S. Soccer has the right to reopen this agreement. U.S. Soccer agrees to begin negotiations for a new contract with the Players on or before November 1, 2000.

B.    2001 Compensation.

1.    Guaranteed Compensation

a.    If there is an operating U.S. women's professional league, then there is no guaranteed salary payments. The players shall be paid on a game by game basis only for those games in which they participate.

b.    If there is not a U.S. women's professional league, or if a U.S. women's professional league has been established but it is not scheduled to compete during 2001, then the parties agree to negotiate in good faith for the limited purpose of negotiating an appropriate guaranteed monthly salary taking into consideration the number of games scheduled to be played in 2001. If no agreement is reached within 60 days, the parties agree to mediate the issue. If mediation is unsuccessful, the parties agree to binding arbitration within 30 days.

2.    Playing/Performance Compensation

a.   If the team wins the Gold Medal and there is a women's professional league operating in the United States, then the following fees apply:

| | |
|---|---|
| Appearance Fee | $2,000 per player |
| Bonus Compensation | |
|     Friendly vs. Top 9 Opponent[3] | |
|         Win | $2,000 per player |
|         Tie | $1,000 per player |
| Algarve Cup — 1st Place | $1,500 per player |
|               2nd Place | $ 750 per player |
| Nike US Cup — 1st Place | $2,000 per player |
| Pacific Cup — 1st Place | $ 750 per player |
| CONCACAF | |
| Gold Cup — 1st Place | $1,500 per player |
|            2nd Place | $ 750 per player |
| DFB | |
| Tournament — 1st Place | $1,500 per player |
|            2nd Place | $ 750 per player |
| All other | |
| tournaments — 1st Place | $1,500 per player |
|            2nd Place | $ 750 per player |

b.   If the team does not win the Gold medal and there is a women's professional league operating in the United States, then the fees in (a) above apply except that the win bonus shall be $1,500 per player and the tie bonus shall be $750 per player.

c.   If there is no women's professional league operating in the United States and the U.S. Women's National Team plays 20 or more games, then the playing/performance fees shall be the same as the pre-Olympic fees in calendar year 2000.

## C.   2002 Compensation.

### 1.   Guaranteed Compensation

Subject to B.1.b. above, there are no guaranteed salary payments for 2002. The players shall be paid on a game by game basis only for those games in which they are on the roster.

---

[3]Top 9 Opponent is defined as the 9 highest ranked women's national teams in the world exclusive of the U.S. Women's National Team.

2.    Playing/Performance Compensation

    a.    Friendlies and Tournaments. These provisions are the same as 2001.

    b.    Women's World Cup. If the FIFA Women's World Cup is played in calendar year 2002, the Women's National Team shall receive the following compensation.

| | |
|---|---|
| Roster Bonus | $10,000 per player |
| Appearance Fee (1st round only) | $2,000 per player per game |
| Semi-Finals | $100,000 player pool |
| 3rd Place | $50,000 player pool |
| 2nd Place | $330,000 player pool |
| 1st Place | $720,000 player pool |

    c.    Post Women's World Cup Victory Tour Matches

| | |
|---|---|
| If 1st Place, guaranteed 10 matches, each | $120,000 player pool |
| If 2nd Place, guaranteed 3 matches, each | $3,450 per player |
| If 3rd Place, USSF option for 3 matches, each | $2,875 per player |

        (i)    Players shall be compensated at the 1st Place level, if the average paid attendance for the 2nd Place or 3rd Place Victory Tour matches exceeds the greater of (a) the average paid attendance for the Fall 1999 Victory Tour matches, (b) the average paid attendance for the 2000 Victory Tour, or (c) the average paid attendance for the "Road to..." matches preceding the 2002 FIFA Women's World Cup.

        (ii)    In 2002, U.S. Soccer has the exclusive right to any and all Victory Tour Matches regardless of where they are played, including indoor and/or outdoors. The parties agree to discuss indoor tours as part of their negotiations with respect to marketing.

        (iii)    Assuming a 20 person World Cup roster, if less than 18 players from the World Cup Team roster do not participate in a Victory Tour match where compensation is paid to the player pool, then the player pool compensation shall be decreased by 1/18 for each player less than 18. If more than 20 payment-eligible players participate in a Victory Tour match where compensation is paid to the player pool, then the player pool compensation shall be increased by 1/20 for each player more than 20.

        (iv)    If a player on the World Cup Team roster is physically injured in a World Cup match and is physically incapable of participating in the corresponding Victory Tour match as a result of that injury and the payments for the Victory Tour match(es) missed are based per

player and not to the player pool, then such injured player shall receive a per player payment for such missed matches.

(v) No other appearance or bonus fees apply to these games.

D. 2003 Compensation.

1. Guaranteed Compensation
   Subject to B.1.b. above, there are no guaranteed salary payments. The players shall be paid on a game by game basis only for those games in which they are on the roster.

2. Playing/Performance Compensation

   a. Friendlies and Tournaments. These provisions are the same as 2002 except that (i) win and tie bonus shall apply to the Top 10 Opponents, defined as the 10 highest ranked women's national teams in the world other than the U.S. Women's National Team and (ii) appearance fee shall be $2,500 per player per game.

   b. Women's World Cup. If the FIFA Women's World Cup is played in calendar year 2003, the Women's National Team shall receive the following compensation.

   | | |
   |---|---:|
   | Roster Bonus | $10,000 per player |
   | Appearance Fee (1st round only) | $2,500 per player per game |
   | Semi-Finals | $100,000 player pool |
   | 3rd Place | $50,000 player pool |
   | 2nd Place | $330,000 player pool |
   | 1st Place | $720,000 player pool |

   c. Post Women's World Cup Victory Tour Matches

   | | |
   |---|---:|
   | If 1st Place, guaranteed 10 matches, each | $120,000 player pool |
   | If 2nd Place, guaranteed 3 matches, each | $3,450 per player |
   | If 3rd Place, USSF option for 3 matches, each | $2,875 per player |

   (i) Players shall be compensated at the 1st Place level, if the average paid attendance for the 2nd Place or 3rd Place Victory Tour matches exceeds the greater of (a) the average paid attendance for the Fall 1999 Victory Tour matches, (b) the average paid attendance for the 2000 Victory Tour, or (c) the average paid attendance for the "Road to..." matches preceding the 2003 FIFA Women's World Cup.

   (ii) In 2003, U.S. Soccer has the exclusive right to any and all Victory Tour Matches regardless of where they are played, including

indoor and/or outdoors. The parties agree to discuss indoor tours as part of their negotiations with respect to marketing.

(iii)    Assuming a 20 person World Cup roster, if less than 18 players from the World Cup Team roster do not participate in a Victory Tour match where compensation is paid to the player pool, then the player pool compensation shall be decreased by 1/18 for each player less than 18. If more than 20 payment-eligible players participate in a Victory Tour match where compensation is paid to the player pool, then the player pool compensation shall be increased by 1/20 for each player more than 20.

(iv)    If a player on the World Cup Team roster is physically injured in a World Cup match and is physically incapable of participating in the corresponding Victory Tour match as a result of that injury and the payments for the Victory Tour match(es) missed are based per player and not to the player pool, then such injured player shall receive a per player payment for such missed matches.

(v)    No other appearance or bonus fees apply to these games.

E.    2004 Compensation.

1.    Guaranteed Compensation
Subject to B.1.b. above, there are no guaranteed salary payments. The players shall be paid on a game by game basis only for those games in which they are on the roster.

2.    Playing/Performance Compensation

a.    Friendlies and Tournaments. These provisions are the same as 2003.

b.    2004 Olympic Games.

| | |
|---|---|
| Roster Bonus | $10,000 per player |
| Appearance Fee (1st round only) | $2,500 per player per game |
| Semi-Finals | $100,000 player pool |
| Bronze Medal | $50,000 player pool |
| Silver Medal | $330,000 player pool |
| Gold Medal | $720,000 player pool |

c.    Post Olympic Victory Tour Matches

| | |
|---|---|
| If Gold, guaranteed 10 matches, each | $120,000 player pool |
| If Silver, guaranteed 3 matches, each | $3,600 per player |
| If Bronze, U.S. Soccer option for 3 matches, each | $3,300 per player |

(i)    Players shall be compensated at the 1st Place level, if the average paid attendance for the 2nd Place or 3rd Place Victory Tour matches exceeds the greater of (a) the average paid attendance for the Fall 1999 Victory Tour matches, or (b) the average paid attendance for the 2000 Victory Tour, or (c) the average paid attendance for the 2002/3 Victory Tour, or (d) the average paid attendance for the "Road to..." matches preceding the 2004 Olympic Games.

(ii)    In 2004, U.S. Soccer has the <u>exclusive</u> right to any and all Victory Tour Matches regardless of where they are played, including indoor and/or outdoors. The parties agree to discuss indoor tours as part of their negotiations with respect to marketing.

(iii)    Assuming an 18 person Olympic roster, if less than 16 players from the Olympic Roster do not participate in a Victory Tour match where compensation is paid to the player pool, then the player pool compensation shall be decreased by 1/16 for each player less than 16. If more than 20 payment-eligible players participate in a Victory Tour match where compensation is paid to the player pool, then the player pool compensation shall be increased by 1/20 for each player more than 20.

(iv)    If a player on the Olympic Team roster is physically injured in an Olympic match and is physically incapable of participating in the corresponding Victory Tour match as a result of that injury and the payments for the Victory Tour match(es) missed are based per player and not to the player pool, then such injured player shall receive a per player payment for such missed matches.

(v)    No other appearance or bonus fees apply to these games.

## II.    Guaranteed Payment

Federation will pay $200,000 to the Team Player Pool immediately upon the signing of the Collective Bargaining Agreement as a guaranteed payment.

### Sponsor Appearance Fees

An individual player appearance is defined as one player appearing alone or in a group for up to three hours.  (Two players for a three hour session = two player appearances.)

Less than 3 hours = 1 appearance

3-6 hours = 2 appearances, etc.

U.S. Women's National Team Player --       One appearance $2,500

When sponsors request the appearance of a "U.S. Women's National Team Player", Players will be contacted about their availability pursuant to a list maintained by the Team Player Pool so that all Players have appearance opportunities.  Appearance fees are paid to the individual player.

Soccer clinics will be treated as individual appearances regardless of the number of players requested.  Each player will be compensated as set forth above.

# EXHIBIT C

# PREAMBLE

This Collective Bargaining Agreement ("CBA" or "Agreement"), which is the product of bona fide, arm's length collective bargaining, is entered into on the _____ _____ day of December, 2005, by and between the United States Soccer Federation ("the Federation") and The Women's National Team Players Association ("the Players Association"). The Federation and the Players Association hereafter shall be referred to collectively as "the parties."

# ARTICLE I

# RECOGNITION

The Federation recognizes the Players Association, a bona fide labor organization, as the sole and exclusive collective bargaining representative of all persons who are or may become employees of the Federation by having been selected to play as soccer players on the United States Women's National Soccer Team ("Player(s)") with regard to all terms and conditions of employment and the Players Association is duly empowered to enter into this Agreement for and on behalf of such persons.

# ARTICLE II

# DURATION

This Agreement is retroactive to and shall be effective from January 1, 2005 and shall remain in full force and effect through December 31, 2012. At least sixty (60) days prior to the termination date the parties shall enter into good faith negotiations for a successor or modified agreement.

# ARTICLE III

# MANAGEMENT RIGHTS, UNION RIGHTS

3.1    **Management Rights.**

The Federation may issue such reasonable rules and regulations not in conflict with this Agreement or any applicable state or federal law, including the Ted Stevens Olympic and Amateur Sports Act and any successor legislation, concerning when, where, how and under what circumstances it wishes to operate, suspend or discontinue its activities, and the manner and the rules by which the Players shall play soccer, and conduct themselves on and off the field (including the issuance of a Player Handbook), as it may from time to time deem best for the purpose of maintaining order, safety and/or the effective operation of the Federation, after advance notice thereof to the Players Association and the Players. The Players Association reserves the right to question the reasonableness and application of the Federation's rules or regulations through the Grievance and Arbitration procedure in Article V.

## 3.2    Union Rights.

The Federation promptly will provide the Players Association with copies of notices of all activities scheduled for or involving the United States Women's National Soccer Team ("Team") or Player(s), including the itinerary of training camps (other than practice sessions, meals, and meetings with coaches), all appearances, and other activities, promptly after the schedule for those activities has been finalized or when the Player(s) are given notice of the activities in order that the Players Association may, in addition to remaining informed of the various activities of the Players, exercise its right to communicate with Players about their activities in an informed manner. The Federation shall also provide notice to the Players Association of any fines levied against any Player, such notice to occur before such fine is actually deducted from a Player payment.

The Players Association shall be permitted to schedule meetings with the Players at the site of Team activities, including training sessions consolidated with a match. The day and time of the meetings shall be scheduled through discussions between the representatives of the Players Association and the Team's General Manager, recognizing the right of the Players Association to hold these meetings at the activity of the Players Association's choice and the right of the Federation to have such meetings held at such times and places during that activity as the Federation believes the least disruptive to the activities and purposes of the Team. In return for Players Association agreeing to hold its meetings at such times and places as the Federation believes to be the least disruptive, the Federation shall attempt to procure the places for the Players Association to hold its meetings that are held while the Players are in camp at no additional cost to the Federation or the Players Association.

The Players Association shall receive eight (8) complimentary tickets to all matches in the United States and four (4) complimentary passes to any hospitality sessions immediately preceding and following the match.

## ARTICLE IV

## UNIFORM PLAYER AGREEMENT

All players shall enter into a Uniform Player Agreement with the Federation in the form annexed hereto as Exhibit A. The parties agree and acknowledge that the Uniform Player Agreement was the product of collective bargaining between the parties, and its terms in their entirety are expressly made part of this Agreement as if fully set forth herein. Notwithstanding the above the Federation may continue to use per diem contracts for players being evaluated who have never been on the roster of the Team for a game that was open to or broadcast to the public or for which a fee was charged for admission or for which the Federation was paid.

## ARTICLE V

## GRIEVANCE AND ARBITRATION PROCEDURE

**5.1 Definitions.**

(a) Any dispute (hereinafter referred to as a "grievance") arising after the effective date of this Collective Bargaining Agreement and involving the interpretation or application of, or compliance with, any provision of this Agreement, the 2001 Agreement, a Uniform Player Agreement or exhibit thereto, will be resolved exclusively in accordance with the procedure set forth in this Article.

(b) For purposes of Article V the terms "party" and "parties" shall include the Federation, the Players Association and any Player initiating a grievance or whose individual conduct is the subject of the grievance.

**5.2 Initiation.**

(a) A grievance may be initiated by the Federation or the Players Association.

(b) A grievance must be initiated within sixty (60) days from the date of the occurrence or non-occurrence of the event upon which the grievance is based, or within thirty (30) days from the date on which the facts of the matter became known or reasonably should have been known to the party(ies) initiating the grievance, or within thirty (30) days from the date on which the party(ies) initiating the grievance has standing to file such a grievance under this Agreement, whichever is later.

**5.3 Filing.**

(a) Subject to the provisions of Section 5.2 above, a party(ies) shall initiate a grievance by filing a written notice by certified mail or fax with the other party(ies). If a grievance is initiated by the Federation and directly concerns one or more individual Player(s), written notice shall also be given to those Players by certified mail or fax. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance.

(b) The adverse party(ies) served with a grievance will answer in writing by certified mail or fax within ten (10) days of receipt thereof.

(c) The answer will set forth admissions or denials as to the facts alleged. If the answer denies the grievance the specific grounds for denial will be set forth.

**5.4    Grievance Committee.**

(a)    If a grievance is not resolved within seven (7) days after the answer has been filed, the grievance shall be referred to a Grievance Committee (unless the parties jointly agree in writing to submit the matter directly to the Impartial Arbitrator), consisting of a representative appointed by each of the parties. Within twenty (20) days following such reference, the Grievance Committee shall meet in person or by telephone on a date and at a time and place agreed upon.

(b)    At the Grievance Committee meeting, the parties shall discuss with specificity the claims, issues and/or questions presented by the grievance and review and discuss resolution and/or settlement of the grievance.

(c)    Evidence of settlement discussions and offers shall be inadmissible before the Impartial Arbitrator.

**5.5    Arbitration.**

If the Grievance Committee fails to resolve a grievance within seven (7) days following its meeting thereon, any party, may, within fifteen (15) days elect to arbitrate the grievance, by filing a written notice by certified mail or fax with the Impartial Arbitrator and the other party(ies).

**5.6    Selection of Impartial Arbitrator.**

There will be one Impartial Arbitrator, appointed jointly by the parties to this Agreement, who shall serve for the duration of this Agreement, or when an arbitration is initiated a new Impartial Arbitrator shall be selected using the method for selection of a single arbitrator in the Labor Rules of the American Arbitration Association then in effect; provided, however, that on September 1, 2006 and on each successive September 1, either of the parties to this Agreement may discharge the Impartial Arbitrator by serving written notice upon him or her by that date and upon the other party to this Agreement. The Impartial Arbitrator so discharged shall render decisions in all cases he or she previously heard but will hear no further cases. The parties to this Agreement shall thereupon either agree upon a successor Impartial Arbitrator or, failing agreement within thirty (30) days of the discharge of the Impartial Arbitrator, when an arbitration is initiated a new Impartial Arbitrator shall be selected using the method for selection of a single arbitrator in the Labor Rules of the American Arbitration Association then in effect.

5.7    **Hearing.**

The Impartial Arbitrator shall use best efforts to conduct a fair and complete hearing with the lowest possible costs. To that end, in appropriate cases hearings may be conducted by telephone conference call or individual witnesses may be permitted to testify by telephone. Notwithstanding the above, telephonic testimony shall not be permitted over the objection of a party if evaluation of the witnesses' credibility is of importance to the case.

The parties shall use their best efforts to produce witnesses requested to testify at the scheduled hearing. If a witness is unavailable, the party(ies) offering the witness shall notify the other party(ies) as soon as the unavailability of the witness is known.

The record shall be closed at the end of the hearing unless the Arbitrator orders to the contrary. If post-hearing briefs are permitted in a given case, they shall be filed within ten (10) days of the close of the hearing unless the parties agree to a different filing schedule.

5.8    **Arbitrator's Decision and Award.**

The Impartial Arbitrator shall issue a written decision as soon as practicable, and in any event, within thirty (30) days of the close of the record. The decision of the Impartial Arbitrator will constitute full, final and complete disposition of the grievance, as the case may be, and will be binding upon the player(s) involved and the parties to this Agreement; provided, however, that the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of this Agreement or any Uniform Player Agreement. Furthermore, the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of any exhibit to this Agreement or any exhibit to the Uniform Player Agreement unless there is a conflict or inconsistency between the provisions of the exhibit and this Agreement or any Uniform Player Agreement, in which case the Impartial Arbitrator may conform the exhibit to this Agreement or the Uniform Player Agreement. In resolving grievances, the Impartial Arbitrator has the authority to interpret, apply and determine compliance with any provision of this Agreement, or Uniform Player Agreement or exhibit thereto and to award monetary damages and/or declaratory or injunctive relief.

5.9    **Time Limits.**

If any grievance is not processed or resolved in accordance with the prescribed time limits within any step (unless an extension of time has been mutually agreed upon in writing) the grieving party(ies) may proceed to the next step by notifying the other party of its intent in writing. This provision does not apply to the time limit for initiating a grievance set forth in § 5.2(b).

5

**5.10   Costs.**

Except as otherwise set forth herein, all costs of arbitration, including the fees and expenses of the Impartial Arbitrator, and any jointly requested transcript costs, will be borne equally between (1) the Federation and (2) the Players Association and any grieving player(s), except that all parties shall bear their own costs of transportation, counsel, witnesses and the like.

**5.11   Payment.**

If a monetary award is made by the Impartial Arbitrator, payments as ordered will be made within thirty (30) days of the receipt of the award. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the Impartial Arbitrator.

**5.12   Expedited Arbitration.**

When a party initiates a grievance, it may make an application to the Impartial Arbitrator to hear the grievance on an expedited basis. Either party may request that a grievance be heard on an expedited basis by providing written notice of its request for an expedited hearing to the Impartial Arbitrator or the AAA, as applicable. If the opposing party does not agree to a request for an expedited hearing, the party requesting the expedited hearing will be entitled to have the Impartial Arbitrator or the arbitrator hear its request (on the papers, on a conference call, or in some other hearing format determined by the arbitrator or the Impartial Arbitrator) promptly, including within seventy-two (72) hours if the initiating party requests that schedule. Upon a showing of good and sufficient cause and after giving the responding party an opportunity to be heard, the Impartial Arbitrator may so direct an expedited hearing if it is determined that the circumstances so warrant, and may make all necessary modifications to the normal grievance procedures outlined in this Article V, subject to the right of the responding party to sufficient time to prepare its defense. The specific provisions for an expedited hearing set forth in the Uniform Player Agreement shall constitute good and sufficient cause for an expedited hearing pursuant to this paragraph.

**5.13   Ex Parte Communications.**

Neither the Federation nor the Players Association will have ex parte contact with the Impartial Arbitrator without the express written consent of the other party.

## ARTICLE VI

## MANAGEMENT, PLAYER AND UNION RESTRICTIONS

**6.1   No Strikes, No Lockouts.**

(a)      Neither the Players Association nor any player shall authorize, encourage, or

6

engage in any strike, work stoppage, slowdown or other concerted interference with the activities of the Federation during the term of this Agreement. Nor shall any player decline to play or practice or in concert with any other person otherwise interfere with the activities of the Federation, or individually or in concert encourage any other player to do so because of picketing or a labor dispute involving any other labor organization. The Players Association shall not support or condone, any action of any player which is not in accordance with this Section 6.1 and the Players Association shall exert reasonable efforts to induce compliance therewith.

(b)     The Federation shall not engage in a lockout during the term of this Agreement.

**6.2     No Discrimination.**

Neither the Federation nor the Players Association shall discriminate against or in favor of any player because of religion, race, color, national origin, age, marital status, or membership or non-membership in or support of or non-support of any labor organization.

**6.3     Player Selection and Participation.**

All Federation decisions concerning the selection and participation of Players with or on the Team shall be made solely to promote and/or enhance the best interests of the Team and the Women's National Team Program.

**6.4     Complimentary Tickets.**

Any player on the roster for a match in the United States that is open to the public (including World Cup Qualifying matches) or who is called in by Federation for a training session associated with such a match shall receive six (6) complimentary tickets to that match and any hospitality event immediately preceding or following the match.

Any player on the roster for a match that is not held in the United States (including World Cup Qualifying matches) that is open to the public or who is called in by Federation for a training session associated with such a match shall receive two (2) complimentary tickets to that match and any hospitality event immediately preceding or following the match.

Any player on the World Cup Roster shall receive three (3) complimentary tickets to each World Cup game in which the United States participates and the right to purchase ten (10) additional tickets to each such game at the price paid by the Federation for the tickets, plus any administrative or other fees authorized by FIFA that are charged by the Federation to everyone who purchases tickets from the Federation.

Any player on the roster for a World Cup Qualifier who is not on the World Cup Roster shall have the right to purchase four (4) tickets to each World Cup game in

7

which the United States participates at the price paid by the Federation for the tickets, plus any administrative or other fees authorized by FIFA that are charged by the Federation to everyone who purchases tickets from the Federation.

The Players Association shall have the right to purchase up to twelve (12) tickets to each World Cup game in which the United States participates at the price paid by the Federation for the tickets, plus any administrative or other fees authorized by FIFA that are charged by the Federation to everyone who purchases tickets from the Federation.

All tickets to the World Cup Qualifying matches and World Cup matches made available to any player and/or the Players Association pursuant to this Section 6.4 shall be subject to any and all restrictions imposed by FIFA on such tickets including, but not limited to, restrictions with respect to transfer, resale, or inclusion in promotions.

The Federation will organize a program for the Players who are named to the World Cup roster that will assist the Players' immediate families (which for this purpose shall mean a Player's parents, grandparents, siblings, children, spouses, and significant others) in traveling to the World Cup and in attending World Cup games (the "F&F Program"). The F&F Program shall be at least reasonably equivalent to the program provided in 2003, and the Federation shall be free to exercise its judgment on how best to achieve this objective. The Federation shall not be required to spend any specific amount on such F&F Program or to provide any specific support or benefits, as long as the overall program is at least reasonably equivalent to the program provided in 2003. The Federation and the Players acknowledge and understand that the precise nature of any specific F&F Program may be influenced by and dependent upon a variety of factors associated with each World Cup, including but not limited to differences in cost and circumstances, the nature of the venue(s), the quantity and quality of available facilities, security issues, and sponsor commitments. The Federation and Players also specifically acknowledge that providing a F&F Program outside the United States presents many more challenges than running a F&F Program within the United States (as was the case in 2003), and these additional challenges must be considered when determining whether a program is reasonably equivalent to the program provided in 2003. The Federation shall provide a written outline of the F&F Program to the Players in advance of the World Cup and, if requested, the Federation shall provide the Players Association a written or oral explanation of how the Federation believes the Program is at least reasonably equivalent to the program provided in 2003, including a comparison of the estimated cost of the program with the amount spent by the Federation in 2003. With the exception of the obligation to provide the F&F Program, the obligation to provide tickets as set forth above, and any other obligation explicitly set forth in this Agreement, the Federation has no obligation to provide any benefits of any kind to the Players or their friends and families, including without limitation, airfare, hotel accommodations, meals or tickets and/or entry to any events other than those listed above.

## ARTICLE VII

## INTEGRATION, ENTIRE AGREEMENT, CHOICE OF LAW

**7.1    Integration, Entire Agreement.**

It is expressly provided that substantive bargaining discussions between the parties and their prior Collective Bargaining Agreement and Uniform Player Agreement may be offered and considered by the Impartial Arbitrator, if deemed appropriate by him or her. With that exception, it is intended that this Agreement and its exhibits shall be deemed the complete agreement between the parties and that prior drafts and writings shall be deemed merged herein and of no force or effect. Further, no understanding contained in this Agreement shall be modified, altered or amended, except by a writing signed by the party against whom enforcement is sought.

**7.2    Choice of Law.**

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under and shall be governed by the internal law of the State of Illinois without regard to its conflicts of law provisions.

## ARTICLE VIII

## OTHER

**8.1    Player Pool Bank Account and Association Bank Account.**

Payments by the Federation to the Players based on performance of the Team shall be made to the Player Pool Bank Account. Payment by the Federation to the Players based on commercial activities of the Players (e.g., Group Licensing Payments) shall be made to the Association Bank Account. Administration of the Association Bank Account and allocation, distribution, and payment from the Association Bank Account shall be carried out by the Players Association. The Players Association shall be responsible for providing written direction and instruction to the Federation as to the distribution by the Federation of funds from the Pool Account to Players or any other persons

**8.2    Players Association Communications**

Federation shall provide to Players Association the opportunity to include communications from the Players Association in the Federation's "Soccer Wire," issued by the Federation's e-mail communications center. Players Association shall be limited to no more than four such communications per year. These communications must be non-commercial, including charitable activities and events and promotion of the Players Association and it activities, and shall be subject to the review and approval of the Federation, not to be unreasonably withheld. Players Association will be permitted to list its website in these communications, but only as a source for "more information" and may not otherwise promote its website in these communications.

Federation shall produce, in consultation with the Players Association, a commercial spot ("the Team Commercial"), at least thirty seconds in duration, to promote the Team. Beginning in 2007, each year, Federation shall use best efforts to arrange for inclusion of the Team Commercial in broadcasts of Women's National Team games as follows: (i) the Team Commercial shall air during that year at least as many times as the Women's Team plays games that are broadcast (i.e. if there are 5 Women's Team games broadcast in the year, the Team Commercial shall air at least 5 times that year), where those broadcasts are controlled by the Federation; and (ii) the Team Commercial shall air one or more times in at least seventy five percent (75%) of Women's Team games whose broadcast rights are controlled by the Federation. The Team Commercial must include promotion of the Women's National Team Players, but may also include promotion of the Men's National Team Players. The Team Commercial may not include promotional efforts for any commercial sponsor, and if any promotional reference is made to the Federation (for example, display of the Federation logo at the beginning or end of the commercial), reasonably equivalent promotional reference must be made to the Players Association as well.

Federation shall provide a link on its website to the Players Association on its "Women's National Team" page. The link shall be in the form of a graphic, to be provided by Players Association and subject to specifications provided by Federation (subject to change based on changes to the page), of reasonably equivalent prominence (location and size) to other links on that page.

**8.3    Player Appearances**

In furtherance of the Federation and Players Association's mutual desire to promote the sport of soccer and the Players, Players Association agree that Players and Players Association will use their best efforts to ensure that Players will fulfill all Player Appearances (as defined in the Uniform Player Agreement) requested by the Federation for Federation sponsored events. Federation will use reasonable efforts not to request appearances by an unspecified Player unless Federation has established that the Federation or sponsor requesting the appearance will not cancel the appearance depending on what Player is selected. Players Association does not guarantee that any particular Player will make any particular Appearance but agrees that some Players shall

10

fulfill the Appearance. Players Association will use its best efforts to ensure that all Players have an opportunity to make Player Appearances and that no Player receives a disproportionate number of Player Appearances. Players shall be compensated for Player Appearances in the amount set forth under "Sponsor Appearance Fee" in the 2005-2012 Women's National Team Wage, Bonus, and Sponsor Appearance Fee Schedule (Exhibit A to the Uniform Player Agreement)(the "Sponsor Appearance Fee").

In exchange for Players Association's agreement with respect to Player Appearances, Federation agrees to utilize Players in at least ten (10) appearances per calendar year starting in 2005 using Players not specified by name, paying the Players the Sponsor Appearance Fee. If Federation does not utilize Players in at least ten (10) appearances in a calendar year (starting in 2005) by Players not specified by name, for each Appearance not used Federation shall pay the "Sponsor Appearance Fee" amount into the Association Bank Account on December 31st (or the last business day) of that calendar year.

In addition to the player appearances listed above, in recognition of the Team's 2004 Olympic Gold Medal, Federation agrees to utilize Players in at least five (5) additional appearances per calendar year starting in 2005, pursuant to the same conditions as listed above, including the same obligation to pay for unused appearances by December 31st of each calendar year.

**8.4     Access to Photographs and Footage**

The Federation agrees to make photographs and footage of the United States Women's National Team and its games available to the Players Association and the Players for uses in accordance with the terms set forth in paragraph 7 of the Uniform Player Agreement for use by Players in connection with charity events. The Federation shall not charge Players or Players Association for such uses of such photographs and/or footage, however, Players Association and/or Players shall be responsible for all third party costs associated with acquiring such photographs or footage.

**8.5     Heading and Organization.**

The headings and organization of this Agreement are solely for the convenience of the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**8.6     Time Periods.**

(a)     Unless specifically stated otherwise, the specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

(b)     All time periods referred to herein shall be deemed to begin on the day immediately following the day on which the relevant event

11

occurred.

**8.7    Exhibits.**

All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**8.8    Assignability.**

The Federation shall retain the right to assign or license any of its rights herein to any division of the Federation or a subsidiary or similar legal entity created to perform licensing and/or marketing functions performed by the Federation or its agents as of the date hereof. The Players Association shall retain the right to assign or license any or all of its rights herein to any affiliated legal entity created to perform licensing and/or marketing functions on behalf of the Players.

THE WOMEN'S NATIONAL TEAM                    UNITED STATES SOCCER
PLAYERS ASSOCIATION

By: _____              By: _____

Title: _____             Title: ___CEO_____

Dated: _____, 2005                        Dated: _____, 2006

12

## 2005-2012 UNIFORM PLAYER AGREEMENT
## WOMEN'S NATIONAL TEAM

This Agreement is entered into on the _____ day of December, 2005 and is effective as of January 1, 2005, by and between the UNITED STATES SOCCER FEDERATION, INC. ("Federation"), a New York non-profit corporation with a place of business located at 1801 - 1811 South Prairie Avenue, Chicago, Illinois 60616 and _____ ("Player"), in consideration of the mutual promises and covenants hereinafter set forth in this Agreement as follows:

1.     **Player's Duties and Responsibilities.** In consideration of the payments to be made by Federation to Player, as set forth in paragraph 3 hereof, Player shall have the following duties and responsibilities:

(a)     Playing Duties. During the term of this Agreement, Player shall, subject to her health and fitness, be available for training with, and any matches of, the United States Women's National Soccer Team ("Team") as may be requested by Federation unless Player is excused by the Federation's General Manager for good cause. An adverse decision by the General Manager as to the existence of good cause is appealable to the Secretary General who shall make the decision in good faith, with due consideration given to, among other things, Player's schedule with Player's club. Player's duties as a player shall include maintaining a high level of competitive soccer skills and physical conditioning such that Player can compete as an elite soccer player and not using illegal or banned drugs or any other harmful substances.

(b)     Spokesperson Duties. During the term of this Agreement, Player shall serve as a spokesperson for soccer and shall devote reasonable best efforts to promoting and developing the sport of soccer in the United States under the terms hereof while performing the Playing Duties as described in paragraph 1(a). Player agrees to grant all reasonable requests by the Federation to promote games and to participate in a reasonable number of media interviews and other media sessions (for example, post-World Cup media appearances) that are part of these duties as provided in paragraph 1(h), provided, however, that Player shall not unreasonably be required to travel to participate in the promotion, interview, or session, and in no event shall Player be required to travel outside the metropolitan area where she is then currently located to participate in the promotion, interview, or session.  Player further agrees to participate in up to four reasonably scheduled autograph signing sessions per year for non-public, non-commercial use by charities or other non-commercial or non-public uses, involving Player signing no more than twenty-five (25) items per session. An "autograph signing session" is any time a Federation representative asks a player to autograph an item(s) for use by the Federation or for any Federation sponsor or Federation business partner (e.g., league, television company, licensee, supplier, etc.) or for the Federation to give to any charity or for the Federation to hold in its inventory for future use or donation. Federation shall provide Players Association with an accounting of the usage of such autographed items and the primary use shall be for charities. Federation shall reimburse Player for reasonable out-of-pocket expenses that Player incurs in connection with

1

performing Player's duties as a spokesperson which are reasonably requested by Federation, within thirty (30) days of Player's presentation of appropriate expense vouchers.

(c)   <u>Player's Time and Schedule.</u> Player shall devote whatever time is reasonably necessary and available to Player to perform Player's duties as a player and spokesperson as set forth in paragraphs 1(a)-(b). Player's schedule and allocation of available hours shall be coordinated between Player (or Player's representative or the Players Association, subject to condition that if coordination occurs with Player's representative, notice is also provided to Players Association) and Federation.

(d)   <u>Post-Game Hospitality.</u> For any Team match in which Player competes, Player shall attend any post-game hospitality function where Federation sponsors are present, unless excused by the General Manager for good cause. An adverse decision by the General Manager as to the existence of good cause is appealable to the Secretary General who shall make the decision in good faith, with due consideration given to, among other things, Player's schedule with Player's club.

(e)   <u>Conduct.</u> Player shall comport and conduct himself, at all times, in a manner befitting Player's position as a member of the Team and spokesperson for the Federation and the sport of soccer.

(f)   <u>Federation Rules and Handbook.</u> Player shall comply with all rules and regulations of Federation, including without limitation, such rules and regulations as are set forth in the United States Soccer Federation National Team Player's Handbook (the "Handbook"), as may be amended from time to time by Federation in its reasonable discretion, a copy of which is attached hereto as Exhibit B and expressly made a part of this Agreement as if fully set forth herein. In the event the Federation wishes to amend the Handbook, it must first send the proposed changes to the Players Association at least five business days before effecting the changes, and must receive Players Association approval, which approval may not be unreasonably withheld. If the Players Association fails to respond within five business days after receiving a proposed change, the change shall be deemed approved. In the event that there is a conflict or inconsistency between the provisions of this Agreement and the Handbook, the provisions of this Agreement shall control. Any amendments to the Handbook shall be consistent with the spirit of the Handbook and this Agreement. Federation represents and warrants that Federation will not grant to any sponsor a requirement that Players wear the shoes or goalie gloves of that sponsor or provide such sponsor with the right to match or better competing offers from other manufacturers.

(g)   <u>Drug Testing.</u> Player hereby consents to be subject to:

(i)   drug testing conducted at any time that player is at a match, practice, or training camp, or such other time or place as required for compliance with FIFA rules for Player to be eligible to participate in the FIFA World Cup or other FIFA competitions; <u>provided, however,</u> that such drug

2

testing conducted at the request of Federation shall be conducted in accordance with the then existing policies and procedures of the United States Olympic Committee ("USOC") or such organization to which the USOC delegates authority for drug testing consistent with the Ted Stevens Amateur Sports Act or any successor federal legislation (collectively referred to as the "USOC program");

(ii)     drug testing conducted pursuant to any drug testing agreement between the United States, or the USOC, and one or more other countries, or the respective appropriate representatives thereof; and to the penalties set forth in any such agreement; and

(iii)     drug testing conducted at the request of FIFA, CONCACAF, or any other person or entity organizing a match or tournament in accordance with its rules and regulations and the penalties incident thereto.

If Player shall be subjected to any penalties for testing positive for a banned substance, for noncompliance, or for refusal to submit to a drug test in connection with (i), (ii) or (iii) above, Federation shall have the right to terminate this Agreement or Player's employment upon seven (7) days' written notice to Player.

(h)     <u>Media Sessions and Interviews.</u> Player (i) shall cooperate with television, radio, newspaper, magazine, internet, and other news media representatives and participate in a reasonable number of media sessions and interviews and (ii) agrees to cooperate with the Federation to be available for such news media sessions and interviews as may be reasonably requested. This provision applies to media sessions and interviews conducted in the venue of a match or practice site; other media sessions and interviews would be treated as spokesperson duties pursuant to the provisions of paragraph 1(b).

2.     **Term and Termination.** The term of this Agreement is January 1, 2005 through December 31, 2012. For each match, practice, training camp and for spokesperson duties performed under paragraph 1(b) during the term in which Player is requested by the Federation to participate and in which Player participates, Player will be employed for the period set forth in the itinerary for the match or practice or spokesperson duties pursuant to the terms of this Agreement and the 2005-2012 Women's National Team Wage, Bonus and Sponsor Appearance Fee Schedule attached hereto and made a part hereof as Exhibit A. The provisions of paragraphs 5 and 6 shall survive any termination of employment or of this Agreement.

3.     **Compensation and Expenses.** In consideration of Player's agreement, as described herein, to serve as a member of the Team and spokesperson and representative for the sport of soccer, as requested by the Federation, (a) <u>Wages and Bonuses:</u> Player shall be compensated and will be eligible for bonuses contingent on performance of the Team pursuant to the 2005-2012 Women's National Team Wage, Bonus and Sponsor Appearance Fee Schedule attached hereto and made a part hereof as Exhibit A; and (b) <u>Expenses:</u> Federation shall provide Player with air transportation and ground transportation to and from the venue of the match and

3

to and from the venue of any other team meeting or practice required by the Federation, hotel room and meals while required by the Federation to be in the venue, and per diem payments (as set in Exhibit A) for miscellaneous expenses while required by the Federation to be in the venue for practice, matches, or any other purpose and when requested by the Federation to be anywhere else to perform any spokesperson duties, except to the extent the Player receives any compensation from an entity other than the Federation for performing such spokesperson duties, the Federation shall only be required to pay the per diem payment (or a portion thereof) to the extent that such compensation provided to Player is less than the per diem payment set forth in Exhibit A. For Team related travel by a Player, Federation will make reasonable efforts to obtain upgrades for such travel as part of any sponsorship agreement in the airline travel category, but otherwise will pay for coach airfare. Federation will pay the wages and bonuses on the later of the following: (i) the regular semi-monthly payroll next due after the match to which the wages and bonuses relate, or (ii) thirty-one days after the match to which the wages and bonuses relate, or (iii) as otherwise specified in Exhibit A hereto. All amounts set forth in this agreement, including exhibits, are gross amounts and actual amounts paid to the Players shall be net any amounts that the Federation is required to deduct or withhold under applicable law.

    **4.**     <u>**Insurance.**</u> Federation will maintain workers' compensation insurance in connection with Player's activities as a Team player and provide copies of the policies as and when reasonably requested by the Player or Players Association.

    **5.**     <u>**Warning, Waiver and Release.**</u>

    (a)     Player acknowledges that Player is experienced at the game of soccer, and recognizes that it is an activity in which injuries can occur. Player understands and acknowledges that there are dangers of personal injury inherent in participating in soccer try-outs, training, testing, and competition, and that Player risks death and personal injury, including paralysis and dismemberment, while participating in try-outs, training, testing and competition. Player expressly and voluntarily assumes all risk vis-a-vis the Released Parties (as defined in paragraph 5(b)) of death and personal injury sustained while participating in try-outs, training, testing, and competition, including the risk of active or passive negligence and hidden, latent, or obvious defects in any of the facilities or equipment used, other than gross negligence or willful or wanton misconduct of any of the Released Parties (as defined in paragraph 5(b)).

    (b)     Player, for herself and on behalf of Player's heirs, assigns, and next of kin, hereby releases, forever discharges, holds harmless, and promises not to sue the United States Soccer Federation and its officers, directors, officials, agents, and employees ("Released Parties") with respect to any and all liabilities, claims, demands, or causes of action, whether known or unknown ("Claims") arising out of any participation in any try-out, training, testing, or competition at the request of or sponsored by the United States Soccer Federation or while employed by Federation, except that which is the result of gross negligence and/or willful or wanton misconduct. PLAYER AGREES THAT THIS RELEASE INCLUDES, BUT IS NOT LIMITED TO, ALL CLAIMS ARISING OUT OF THE ACTIVE OR PASSIVE NEGLIGENCE, AND HIDDEN, LATENT, OR OBVIOUS DEFECTS IN ANY OF THE FACILITIES OR

4

EQUIPMENT USED, OTHER THAN GROSS NEGLIGENCE OR WILLFUL OR WANTON MISCONDUCT, OF THE RELEASED PARTIES.

6. **Names, Pictures, Likenesses.**

(a) <u>Definitions.</u>

(i) "Likeness" shall mean the image, photographs, pictures (whether still, video, motion or television), likeness, name, nickname, signature, facsimile signature, caricature, biographical information and/or voice, whether used individually or in combination(s).

(ii) "Licensing Purposes" means use of Player's Likeness on merchandise that is sold at the retail level or at the wholesale level for ultimate retail sale, including on items provided as part of the purchase of another item, (e.g., promotional packaging materials such as cans or cups containing Player's Likeness where consumers do not have the ability to choose which Players' Likeness they will receive out of a group of likenesses or a trading card included with the purchase of a loaf of bread.)

(iii) "Non-commercial Uses" means use of a Player's Likeness to advertise, promote and develop the National Teams and/or the sport of soccer or any National Team game; such promotion and development being deemed to include without limitation, sponsor premiums and other give-away items and corporate protocol gifts. Non-commercial Uses do not include use of a Player's Likeness for Licensing Purposes. For purposes of this Agreement, sponsor premiums and other give-away items shall constitute "Non-commercial uses" provided that such sponsor premiums and/or give-away items are used to promote a National Team match or the sport at or near the venue for such match and within a reasonable time of such match and are not used as part of a national advertising campaign for that sponsor.

(b) <u>Names, Pictures, Likenesses Created During Matches, Training or Federation Sponsored Activity.</u> Player agrees that Federation shall have the right to take or create, or have taken or created, Likenesses of Player, including staged team photographs, at any training or matches in which the Team participates or at any Federation or Team sponsored promotional activity. Player agrees that all rights in such Likenesses shall belong to Federation and that Federation, and its assigns, agents and licensees, may use Player's Likenesses for Non-commercial Uses and as set forth below. Except as set forth below, Federation may not use or allow others to use Player's Likeness for Licensing Purposes without the agreement of Player or Player's representative.

(c) <u>Group License.</u> In consideration for the licensing payments set forth in paragraph 6(e) below, Player hereby grants to Federation a license (the "Group License") to use the Player's Likeness for Licensing Purposes, in the discretion of Federation, provided that the license shall apply only to uses by Federation which

5

contain the Likeness of a total of five (5) or more players of the Team. For "Licensing Purposes" that involve products containing individual Players' Likenesses (not in a group) where consumers do not have the ability to choose which Players' Likeness they will receive ("Individual Non-Consumer Choice Licensing"), the license shall require use of the Likenesses of at least fifteen (15) Players, with each Player's Likeness available in reasonably equal numbers. The Group License does not permit the licensing of products containing individual Players' Likenesses where consumers do have the ability to choose which Player's Likeness they will receive, without the prior consent of the Players and/or the Players Association. Federation will make reasonable efforts to ensure that merchandise sold pursuant to the Group License gives reasonably equivalent prominence among the Players whose Likenesses are used. Player and/or Players' Association agree not to enter into any exclusive licensing arrangements that by their terms prohibit the Federation from entering into group licensing arrangements permitted by this Agreement without the prior written consent of the Federation and the Federation agrees not to enter into any exclusive licensing arrangement without the prior written consent of the Players Association.

(d)     <u>No Personal Endorsement.</u> Nothing in this Agreement shall be deemed to give the Federation the right, without the Player's prior written consent, to suggest or imply that a Player has individually endorsed a product.

(e)     <u>Licensing Payments to Player for Group License.</u>

(i)     For any use of Player's Likeness by Federation as set forth in paragraph 6(c), Federation will consult with the Players Association, before negotiating terms with a licensee involving use of the Group License.

(ii)     Federation will advise Player and Players Association by overnight courier, facsimile, or email where receipt is confirmed in advance of any use of Player's Likeness by Federation under paragraph 6(c). In the event that Player has good cause for requesting that Player's Likeness not be used on the particular merchandise, Player or Players Association shall advise Federation in writing within five (5) business days after Federation sends notice to Player and to Players Association. The determination of whether there is good cause for Player to be excused from the use shall be determined by the Federation in good faith, with the Federation to notify the Players Association immediately of any decision to use Player's Likeness over the objection of Player or Players Association. Prior to such decision, Federation agrees to work in good faith with Player to remove or minimize the basis for Player's objection to the particular licensed product to the extent possible. If Player's objection is that the use appears to be an impermissible "implied endorsement" by that Player and Federation and Player cannot resolve Player's objection, then the Federation and Player agree to resolve the dispute through an expedited arbitration pursuant to paragraph 12 of this Agreement before any product is sold or distributed or made available to anyone. In no event shall good cause include a request for payments

6

in addition to those set forth in this paragraph 6(e). Good cause for Player to be excused shall include a pre-existing personal endorsement in a product category that conflicts with the sponsor or licensee. Failure of the Player or Players Association to respond within five (5) business days shall be deemed an approval.

(iii)    For each use of Player's Likeness under paragraph 6(c), Federation shall pay a total of 50% of the net royalties paid to the Federation to the applicable Player Pool(s) to be divided on a pro rata basis between the applicable Player Pool(s). Such amounts shall be paid to the applicable Player Pool(s) at least quarterly. "Net royalties" shall mean the gross royalty paid by the licensee to the Federation or its representative less ten percent (10%) of the gross royalty for administrative expenses. In no event shall royalties include amounts paid by Federation sponsors for sponsorship rights. If the Players Association is the originating party for the licensing arrangement, then the Players Association shall be entitled to receive 55 % of the gross licensing royalty from that licensing arrangement, without any deduction by Federation for administrative expenses. If a Federation sponsor pays for or receives rights for Licensing Purposes in addition to sponsorship rights and Players Association challenges as unreasonable the allocation of amounts paid to Federation for sponsorship rights and the amounts paid for the rights for Licensing Purposes, the issue of the reasonableness of the allocation shall be resolved in accordance with the arbitration provisions of paragraph 12. If Players' Association is the originating party for the licensing arrangement and the licensing arrangement could have been completed under this Agreement without the Federation's participation then Federation and Player's Association will negotiate an appropriate revenue distribution to reflect the incremental value, if any, of the Federation's marks and logos and/or the Federation's participation in the licensing arrangement. If the Federation and the Players Association are unable to agree on an appropriate revenue distribution, the Players and/or Players Association may proceed without the marks and logos of the Federation if permitted by this Agreement or they may submit the revenue distribution dispute to arbitration as provided in paragraph 12 of this Agreement.

(iv)    Federation shall keep, maintain and preserve (in Federation's principal place of business) for at least two (2) years following termination or expiration of this Agreement complete and accurate records of accounts pertaining to merchandise sold and royalties paid to Federation or its representative pursuant to paragraph 6(c). Such records shall include, without limitation, invoices, correspondence, agreements, banking and financial records. Player shall have the right, one (1) time per year, to perform an audit upon the books and records of the Federation in order to calculate the net royalties paid to the Federation for the use of Player's Likeness under paragraph 6(c). Player's right of access to audit the books and records of the Federation shall be upon reasonable prior written request and any such audit shall be performed during regular business hours and in a manner which does not interfere with the normal operations and business of the Federation. The parties agree that such an audit

7

shall be conducted by independent certified public accountant(s) mutually acceptable to the Federation and Player. In the event that such audit confirms that the amount of net royalties is within ten percent (10%) of the amount reported to the Players by Federation, Player shall pay for the reasonable costs and expenses of the audit. In the event such amount of net royalties calculated under such audit, using the same generally accepted accounting methods, differs by more than ten percent (10%) from the amount reported to Players by the Federation, the Federation shall pay for all reasonable costs and expenses of the audit. The results of the audit shall be binding upon the parties and shall be completed within a reasonable period of time.

(v)     Federation shall provide to Players Association a basic form for its standard licensing agreement, to assist Players Association in soliciting new licensing arrangements. Nothing in this paragraph shall be construed to mean that Federation shall not continue to have the right to review and approve licensing arrangements, or to negotiate terms different from those contained in its basic form.

(f)     <u>Compensation For Non-commercial uses.</u> Compensation to Player or the Player Pool for use of Player's Likeness by any person or entity other than the Federation, including a division of the Federation, or subsidiary or similar legal entity of the Federation, or Federation's marketing agent for Non-commercial Uses will be determined as set forth below:

(i)     <u>Six or More Players -- Use By Federation Sponsor.</u> If Player's Likeness is used by a sponsor of the Federation for any Non-commercial Use or in a sponsor's advertising or promotions, and if the advertising, promotion, or Non-commercial Use includes six or more members of any Federation national team (e.g., team poster or collage), Federation will request, but not require, the sponsor to make a contribution in an amount to be determined in the sponsor's sole and absolute discretion to the applicable Player Pool(s), provided however, with respect to any use by sponsor in a television commercial, prior to such use, Federation shall provide a copy of such television commercial to the Players Association for its approval, which such approval shall be considered in good faith. Such uses by sponsors specifically exclude any Licensing Purposes. With respect to television commercials, the Players Association has expressed concern that there is a greater likelihood of an impermissible implied endorsement in television commercials. The Federation recognizes the Players Association's concern and agrees to work with the Players Association in good faith to eliminate any impermissible implied endorsements from television commercials produced in accordance with this provision. The Players Association understands and agrees that in some circumstances a television commercial and any assorted marketing campaign may be sufficiently clear that the sponsor only has a sponsorship relationship with the Federation and not with the five (5) or more players whose likenesses are used, so that the Players Association may approve such a use of the players' likenesses in the commercial. The Players

Association will exercise good faith in reviewing and considering its approval of any such commercials.

(ii)　　Six or More Players -- Licensing Purposes By NIKE. If Player's Likeness is used by NIKE, the Federation's Athletic Wear sponsor, for Licensing Purposes on posters, calendars and similar sports impression products and is in a team setting (six or more members of any national team), the Federation will pay to the applicable Player Pool(s) to be divided on a pro rata basis between the applicable Player Pool(s) 50% of any royalties from such use paid by NIKE to Federation within thirty days after payment is received by Federation, except that the Federation will not pay any such amounts to the Player Pool(s) if the Likenesses used by NIKE are solely those of players who have individual endorsement contracts with NIKE;

(iii)　　All Other Circumstances, Including Fewer than Six Players, Use By Sponsors (other than NIKE) For Licensing Purposes, and Use By Non-Sponsors For Any Purpose. If Player's Likeness is otherwise requested by any person or entity, then the person or entity will be asked to reach agreement with the Player or Player's representative or Players Association, either directly or through the Federation, as to the amount of compensation to be paid by the sponsor or non-sponsor to the Player(s).

(g)　　Use of Footage Including Players. Whenever Federation provides permission for use of footage (including footage from games, practices, or other film or video footage that is owned or controlled by Federation), except in those instances where the footage does not imply endorsement by Federation, the Players Association, or Player and the footage will not be broadcast or displayed such that any Player or the general public is likely to see it (for example, the footage will only be used for a presentation at a meeting), Federation shall provide advance notice to the Federation as follows:

(i)　　if the footage involves less than five (5) players, Federation shall provide Players Association with a general description of the footage, its intended use, an identification of the Player(s) involved, and the basis for Federation's reasonable belief that the Player(s) have agreed to use of this footage on an individual basis;

(ii)　　if the footage involves five (5) players or more, Federation shall provide Players Association with a copy of the footage to be used or a detailed summary of the footage and its intended use sufficient for Players Association to determine whether its use would constitute an impermissible use under the terms of this Agreement. Nothing in this paragraph shall be construed to suggest that Federation need not comply with other provisions of this agreement regarding use of Player's Likeness

7.　　**Endorsements, Marketing and Promotions As A National Team Player**

(a)　　Because of Federation's concern that the public might be misled to believe that a particular product or event is endorsed or sponsored by Federation and the need of Federation to preserve its reputation and integrity as the National Governing Body for the sport of soccer in the United States, Player agrees that Player shall not:

9

(i)      use the name or logos of the Team or the Federation for any purpose, except as provided in paragraph 7(b) and 7(d) below; and except that use of the Team name as part of the name of the Players Association and/or the name of the Players Association's business arm shall not be prohibited;

(ii)      use any uniform of the Team or the Federation for any purpose other than appearing in a match as requested by the Federation unless Player shall have received the prior written consent and approval of the Federation. However, the prior written consent and approval of the Federation shall not be unreasonably withheld for any use that (a) is not for a competing sponsor in a category in which the Federation has an existing or imminent exclusive sponsor, and (b) does not involve more than seven (7) Players appearing together, so long as the agreement provides for termination of the use of the Player(s) in uniform in a reasonable time not to exceed six months in the event that the Federation enters into an exclusive sponsorship agreement with a competing sponsor in the same category. Any Player or Players seeking to use one or more Player uniforms shall make a request in writing, with a description of the intended use of the uniform, to the Federation. The Federation shall have five (5) business days to respond to the request. Failure by the Federation to respond within five (5) business days shall be deemed an approval. The Federation shall not contact any sponsor involved about the intended use without the prior written consent of the Player, Players, and/or the Players Association. If the Federation does not approve of the use, it must provide a written statement of the reasons that the use will not be permitted, and the sole fact that the uniform is being worn by a player is not a basis for rejection.  Federation may suggest an amount to be paid by the sponsor of the intended use (or by the Player or Players) for the use of the uniform(s), and the parties shall confer about the amount in good faith, but if the parties are unable to reach agreement as to compensation, that reason alone shall not constitute a basis for the Federation withholding approval, the Player(s) can proceed to wear the uniform(s) subject to all the terms and conditions of this Agreement, and any party involved can submit the issue of compensation to arbitration pursuant to paragraph 12 of this Agreement.

(iii)      make any endorsements or commercial appearances, sponsor any products, or use or consent to the use by any third party of any name, picture or likeness of Player, in which Player appears, either alone or with others, in the official Team uniform, in any attire which closely resembles or is confusingly similar to the official Team uniform, or in any attire whatsoever bearing or displaying the marks and/or logos of either Federation or the Team unless Player(s) shall have received the prior written consent and approval of Federation as specified in paragraph 7(a)(ii) above;

(iv)      except as expressly permitted under paragraph 7(c) below, make any endorsements or commercial appearances, sponsor any products, or use or consent to the use by any third party of any name, picture or likeness of Player, in which Player appears together with seven (7) or more other members of the

10

Team in which Player and the other members, either directly or indirectly, identify themselves as members of the Team, regardless of their attire, or which maybe construed as an implied endorsement by the Team or the Federation, unless Player(s) shall have received the prior written consent and approval of Federation. Except as expressly permitted under paragraph 7(c) and (d) below, Player understands and agrees that a commercial appearance of eight (8) or more members of the Team (regardless of identification or attire) is prohibited and that Player may not, and will not, make any such appearance without the prior written consent of the Federation; or

      (v)     engage in marketing efforts, alone or with others, as the Team or in her capacity as a Team player that will lead someone to believe that the Federation has endorsed a business, product or service. Nothing in this Agreement shall be deemed to give any Player or the Players Association the right, without the Federation's prior written consent, to state or imply that the Federation has endorsed a product, service, or business.

(b)    <u>Use of Description.</u>

      (i)     Definitions.

A.    "Description" means identifying the Player as the captain, member or as playing a particular position on the Team. "Description" shall include any of the following: "Member of the U.S. National Team", "Member, U.S. National Team", "Member of the U.S. Women's National Team", "Member, U.S. Women's National Team", "Member of the U.S. National Soccer Team", "Member, U.S. National Soccer Team", "Member of the U.S. Women's National Soccer Team" or "Member, U.S. Women's National Soccer Team", but specifically excludes the phrases "U.S. National Team", "U.S. Women's National Team", "U.S. National Soccer Team", and "U.S. Women's National Soccer Team". Nothing herein shall be interpreted as limiting Player's right (either individually or in a group setting with six or fewer other members of the Team) to describe herself/themselves by her/their position in conjunction with the descriptive phrase "US," "USA," or "United States" (e.g., "United States Defender").

B.    "Pre-Approved Format" shall mean if the Description is (1) used in conjunction with the Player's name in a font size one-half (or smaller) the font size of the typeface of Player's name, and the area of the Player's name and the Description (defined by the perimeter of the outermost edge of the typeface of the combined name and Description) is less than 3% of the size of the page, or (2) used in conjunction with the Player's name, not as a primary feature, in a biographical context and along with the other biographical information in a font one-half (or smaller) the font size of the typeface of Player's name.

11

(ii)     Use of Description by Three or Less Players.  Notwithstanding anything in this Agreement to the contrary, three or less Players may use the Description (as defined above) in conjunction with the Player's Likeness for any purpose that is not likely to mislead a reasonable person to believe that Federation is endorsing a business, product or service.  Player is not required to seek any advance consent from Federation if Description is used in the "Pre-Approved" format. For any other use of the Description or for any use of the Description in non-Pre-Approved format, Player must receive the advance written consent of the Federation.

(iii)     Use of Description by More than Three and Less than Eight Players. Upon advance written consent of the Federation, a group of more than three (3) and less than eight (8) Players may use the Description in conjunction with these Players' Likenesses for any purpose that is not likely to mislead a reasonable person to believe that Federation is endorsing a business, product or service. The prior written consent and approval of the Federation shall not be unreasonably withheld for any use of the Description that (a) is not for a competing sponsor in a category in which the Federation has an existing or imminent exclusive sponsor, and (b) does not involve more than seven (7) Players together, so long as the agreement provides for termination of the use of the Player(s) in uniform in a reasonable time not to exceed sixty (60) days in the event that the Federation enters into an exclusive sponsorship agreement with a competing sponsor in the same category, provided no new uses of the Description by Player(s) may occur after notice of Federation's Agreement with a competing sponsor has been given. Any Player or Players seeking to use the Description for more than three (3) and less than eight (8) Players shall make a request in writing, with a description of the intended use of the Description, to the Federation. The Federation shall have five (5) business days to respond to the request. Failure by the Federation to respond within five (5) business days shall be deemed an approval. The Federation shall not contact any sponsor involved about the intended use without the prior written consent to the Players and/or the Players Association. Federation may suggest an amount to be paid by the sponsor for the use of the Description and the parties shall confer about the amount in good faith, but if the parties are unable to reach agreement as to compensation, that reason alone shall not constitute a basis for the Federation withholding approval the Player(s) can proceed to use the Description subject to all the terms and conditions of this Agreement, and any party involved can submit the issue of compensation to arbitration pursuant to paragraph 12 of this Agreement.

(c)     For purposes of this paragraph, Federation agrees that Player and/or Players' Association may engage in the following marketing efforts in accordance with the terms and conditions expressly set forth herein:

(i)     Player and/or Players' Association may enter into marketing arrangements with third parties, provided that such arrangements shall not include

12

more than two (2) of the following items: (A) any advertisements, regardless of medium, including seven (7) or less Players and/or Players' Likenesses; (B) personal appearances by one (1) or more Players for or on behalf of the third party; (C) tickets to any Federation match; and, (D) participation in any hospitality events at or around Federation matches;

(ii)    Player and/or Players' Association may arrange for and attend events at which more than seven (7) Players may be present (e.g., golf outing, private events), provided that such events are not "public events." For purposes of this paragraph, "public events" shall mean any event for which tickets are sold to the general public, the event is promoted through a national advertising campaign, regardless of medium, or the event is broadcast and/or televised regardless of medium;

(iii)    Player and/or Players' Association may enter into licensing arrangements where an individual Player's Likeness is used on separate licensed product as part of a series of licensed products in which more than seven (7) Players' Likenesses are used provided that (A) the promotion of such series of licensed products clearly reflects that it is a collection of individuals (e.g. action figures) that does not imply an endorsement by the Team or Federation; (B) the promotion of such series of licensed products does not include any advertisement, regardless of medium, including more than seven (7) Players or Players' Likenesses; and, (C) the consumer has the ability to purchase any item of the series without any obligation to purchase any other item in the series;

(iv)    With respect to official memorabilia to be autographed (no facsimile signatures), more than seven (7) Players may sign an individual memorabilia item and such item shall not be deemed an implied endorsement of the Team (as set forth in paragraph 7(a)(iv) above) provided that (A) the item to be autographed is made or distributed by a Federation sponsor or licensee if the Federation has a sponsor or licensee that makes or distributes such product ("Sponsor Product"), provided sponsor is willing to provide such Sponsor Products at a price within 10% of the price otherwise available to Players for such product, (B) if Players are unable to purchase Sponsor Products under (A) above, Players may use a generic such product but may not use the product of any competing sponsor, and (C) any promotion or publicity related to the distribution of such autographed memorabilia does not include any advertisement, regardless of medium, including more than seven (7) Players and/or Players' Likenesses;

(v)    Notwithstanding anything in this Agreement to the contrary, under no circumstances may any marketing arrangement by Player(s) and/or Players' Association include advertisements, regardless of medium and/or scope of distribution, in which eight (8) or more Players and/or Players' Likenesses appear in the same advertisement (e.g., print ad or television commercial) without Federation's prior written consent.

13

(d)     Notwithstanding anything in this Agreement to the contrary, (i) Players may make endorsements in their personal capacity or in their capacity as a member or employee or agent of the Players Association or another entity (but not in their capacity as a representative on behalf of the Team or the Federation), and (ii) Players may be involved in any number in their personal capacities in soccer camps, books and other publications, videos, websites, or other businesses in which Players are not merely endorsers of a product or service and use the Description in conjunction therewith (no Team uniform, no logos of the Federation), which involvement shall not constitute a violation of this agreement provided that the promotional materials for any such camp or business do not suggest or create the impression that the Team or Federation is sponsoring or endorsing the camp, book or other publication, video, website, or business and which advertisements do not include eight (8) or more Players. In any book or other publication, players may also use photographs that are in the public domain or could be used by any other author. For books and other publications, videos, and websites that do not have sponsors that are in a category in which the Federation has an existing or imminent exclusive sponsor Player(s) or Players Association can request use of the Players' uniforms in accordance with the provisions of paragraph 7, above.

(e) No Federation Endorsement. Nothing in this Agreement shall be deemed to give the Player(s) and/or Players' Association the right, without the Federation's prior written consent, to suggest or imply that the Federation has endorsed a product.

## 8.     **Appearances.**

(a)     Player Appearances. Player understands and agrees that as part of the Collective Bargaining Agreement, Players and Players Association have agreed to use best efforts to fulfill all reasonably requested Player Appearances (as defined herein) for Federation sponsors, upon reasonable notice by Federation, at the fixed rate of $2,500 per Appearance. Player understands that in exchange for this agreement by the Players and Players' Association, the Federation has agreed to pay for a minimum of ten (10) Appearances by Team players per year at Federation sponsors' events. Players Association does not guarantee that any particular Player will make any particular Appearance but agrees that some Player shall fulfill the Appearance. Player agrees to use her best efforts to assist the Players Association in fulfilling these obligations.

(b)     Player also agrees that the Player, Player's representative, or Players Association shall cooperate with the Federation in scheduling a reasonable number of appearances and in making appearances requested by or on behalf of one of the Federation's sponsors. Federation agrees to coordinate all such appearances with Player, Player's representative, or Players Association. Player will not be required to make appearances for sponsors in product categories in which Player has a pre-existing conflicting personal endorsement. When Player makes an appearance pursuant to a sponsor's request for a Team player (not specified by name), the sponsor will be required to make a payment to the Player in the amount set forth under "Sponsor Appearance Fee" in the 2005-2012 Women's National Team Wage, Bonus, and Sponsor

Appearance Fee Schedule (Exhibit A hereto). If a sponsor requests an appearance by an individual player by name to make an appearance or to deliver a direct endorsement of the company or product, then the sponsor will be directed to negotiate an appearance fee with the individual Player or Player's representative and such appearance shall be subject to a fee being agreed. An appearance does not include (i) Player attendance at post-game hospitality by or for sponsors, (ii) news media sessions and interviews, (iii) attendance at meals, or (iv) other duties performed pursuant to paragraph 1.

9.     **Liquidated Damages.**   If (a) Player is requested to compete in a match with the Team and if Player fails to participate in the match on the ground that the terms of this Agreement should be changed in any way, or (b) Player has agreed to compete in a match and Player then fails to participate in the match for any reason (other than good cause which determination shall be made by the Federation in good faith), the parties acknowledge and agree that the Federation will suffer irreparable damages which will be difficult, if not impossible, to quantify fully. As a result, in the event Player fails or refuses to participate as set forth in paragraph 9(a) or 9(b) above, then as liquidated damages Player shall pay to Federation an amount equal to three times the amount of the appearance fee that would have been paid to Player had Player competed in the match. Player agrees that Federation may, at its option, deduct such amount from any payment that is next due and owing from the Federation to Player or from any payment that is next due and owing to the Player Pool. If Player makes herself available to participate in the match sufficiently in advance of the match, notwithstanding any previous refusal or threatened refusal to participate, Federation shall not be entitled to any liquidated damages.

10.     **Player Unique Skill.**   Other than for the Federation or for the club to which Player's rights are assigned as set forth in Player's registration or for an all-star team in which the player is representing the club, Player agrees not to play in any soccer game on the same team as five or more members of the Team without the prior written consent of the Federation. Player further agrees that Player will not play in more than one (1) such all-star soccer game per calendar year on the same team as five (5) or members of the Team without the prior written consent of the Federation.

11.     **Notices.**   All notices under this Agreement shall be delivered by hand, facsimile transmission, overnight delivery service or registered or certified mail. Notices intended for Player shall be addressed to Player at the address contained in the Federation's personnel records, as amended from time to time, or to the Player's representative, and to the Players Association, and, if intended for the Federation, shall be addressed to the Federation at its corporate headquarters.

12.     **Arbitration.**   Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled pursuant to Article V of the Collective Bargaining Agreement entered into between Players Association and Federation in December 2005 ("Collective Bargaining Agreement"). The existence of specific references to the right to arbitrate in this Agreement should not be read to exclude the right to arbitrate when no specific reference is made. Nothing in this Agreement shall deprive the Player of any and all rights under the bylaws of the Federation.

13. **Miscellaneous Provisions.**

(a) <u>Entire Agreement.</u> It is expressly provided that substantive bargaining discussions between the parties may be offered and considered by the Impartial Arbitrator, if deemed appropriate by him or her. With that exception, it is intended that this Agreement, its exhibits, and the Collective Bargaining Agreement, be deemed the complete agreement between the parties and that prior drafts and writings shall be deemed merged herein and of no force and effect. Further, no understanding contained in this Agreement shall be modified, altered or amended, except by a writing signed by the party against whom enforcement is sought.

(b) <u>Assignment.</u> Neither this Agreement nor any rights or duties under this Agreement may be assigned or delegated by either party unless the other party consents thereto in writing; except, however, the Federation shall retain the right to assign its rights herein to any division, subsidiary, or similar related legal entity created to perform licensing and/or marketing functions performed by the Federation or its agents as of the date hereof. The Players Association shall retain the right to assign or license any or all of its rights herein to any affiliated legal entity created to perform licensing and/or marketing functions on behalf of the Players.

(c) <u>Non-Waiver.</u> The failure of either party to insist, in any one or more instances, on the performance of any terms or conditions of this Agreement shall not be construed as a waiver or relinquishment of any rights granted hereunder or of the future performance of any such term or condition, and the obligations of the non-performing party with respect thereto shall continue in full force and effect.

(d) <u>Binding Effect.</u> Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.

(e) <u>Governing Law.</u> To the extent that federal law does not govern implementation of this Agreement, this Agreement shall be construed and interpreted under and shall be governed by the internal law of the State of Illinois.

(f) <u>Signatures.</u> This Agreement may be signed in one or more counterparts (including facsimile signatures), each of which shall be deemed to be one and the same instrument.

14.    **Acceptance.**  This Agreement shall be effective as of January 1, 2005 and shall become enforceable when executed by the Federation and the Players Association.

**PLAYER**                                      **UNITED STATES**
                                                **SOCCER FEDERATION, INC.**


_____           By:_____
      (Signature)                                  Secretary General


_____
      (Print Name)


## ATTACHMENTS TO CONTRACT:

Exhibit A     2005-2012 Women's National Team Wage, Bonus, and Sponsor Appearance
              Fee Schedule
Exhibit B     Women's National Team Player Handbook

**Exhibit A**
**2005-2012 Women's National Team ("Team")**
**Wage, Bonus, and Sponsor Appearance Fee Schedule**

*This schedule shall remain in effect for the period January 1, 2005 through December 31, 2012.*

*Federation has no obligation to hold any matches, tournaments or events or to field a team for any match, tournament or event.*

*Bonus payments and/or appearance fees for a match shall not include any win, draw or loss by forfeiture or match cancellation where Players were nor required to take to the field for the match, except for when the Federation is paid specifically for that match.*

*Payments to be made to the Team Player Pool shall be made to a Team Player Pool bank account to be administered by appropriate authorizations satisfactory to the Federation from the individuals who collectively comprise the Team, as directed in writing by the Players Association.*

*The Players Association shall receive an accounting of all payments made directly to the players under this Wage, Bonus, and Sponsor Appearance Fee Schedule. Said accounting shall include a match-by-match breakdown of the payments.*

*Amounts paid by tournament organizers, promoters, or sponsors as prize money or participation fees belong to the Federation and may be shared with the Team Player Pool in the sole discretion of the Federation.*

1

## 2005-2008 COMPENSATION

I. **Compensation**

    A.    Each year of this Agreement, the Federation shall pay a full-time salary to at least fourteen (14) Players identified as "Tier I" Players, and at least six (6) additional players identified as either "Tier I" or "Tier II" Players.

    B.    The Federation may also pay a full-time salary to additional Players beyond the twenty identified in section I.A. above. The Federation may identify up to four (4) of these additional Players as "Tier III" Players.

    C.    Federation may also invite in non-salaried Players to training camps or to participate in friendly matches and identify these players as "Floater Players." In a residency year, the Federation may not call in a Player as a Floater Player more than two (2) times in a calendar year (after two "call-ins," Federation must make the Player a salaried Player if it wishes to call in Player again). In a non-residency year, the Federation may not invite a Player as a Floater Player more than four (4) times in a calendar year. When Federation calls a Player in as a Floater Player, it must use best efforts to provide Player with notice as to how long Player will be in camp. Once a Floater Player has been asked to participate for a total of 42 days in a calendar year (not including non-training travel days to and from training camp or matches, but including days of a call-in that Federation first requests but then unilaterally chooses not to use for reasons other than injury to player), the Federation may not invite that Player for any additional training camps or matches during that year unless Federation makes that Player a salaried Player. The Federation may not identify more than eight (8) Players at any one time as Floater Players.

    D.    For the year 2005, various Players received compensation related to match appearances and bonuses. In addition to those amounts already received, specific Players shall receive, upon execution of this agreement and the Collective Bargaining Agreement, an additional payment as set forth in Exhibit A.I.

    E.    For the years 2006, 2007, and 2008, each Tier I Player identified for that year shall receive a salary of seventy thousand dollars ($70,000).

    F.    For the years 2006, 2007, and 2008, each Tier II Player identified for that year shall receive a salary of fifty thousand dollars ($50,000).

    G.    For the years 2006, 2007, and 2008, each Tier III Player identified for that year shall receive a salary of thirty thousand dollars ($30,000).

    H.    The salaries listed in this Agreement are for the full year. Should a Player be signed to a contract for less than a full year, that Player shall only receive the appropriate pro-rated amount of the full salary. Similarly, should a Player be shifted from one Tier to another during a year, that Player shall only be paid that portion of the yearly salary attributable to that Tier for the time she is officially part of that Tier, unless otherwise provided in this Agreement.

    I.    For the years 2006, 2007, and 2008, each Floater Player shall receive a per

2

diem, hotel accommodations, and $250 per week for the time that Player is in training camp or with the team for a match, and Federation shall also provide housing and meals for the Player during this time period. Should the Floater Player be named for a friendly game roster, the Player shall receive a $1,000 appearance fee (and shall also be eligible for the match win bonus listed in II.B. below, but only if that Floater Player actually played in the match); provided, however, that this provision shall only apply for up to two matches for each Floater Player, and after two games Floater Player shall be compensated for any additional matches as set forth in I.J. below.

J.    Should a Player decline the opportunity to join the Team as a salaried Player, or should a Floater Player be named to a game roster beyond the two friendly matches permitted in section I above, if that Player is named to a game roster with the Team she shall receive an appearance fee of $3,000, and shall be eligible for the match win bonus listed in II.B. below.

K.    For the year 2006, at least twenty (20) Players shall be notified no later than December 15, 2005 (or execution of the Collective Bargaining Agreement, whichever is later) that they are being offered a spot as a salaried Player. Each Player so notified shall, subject to passing a physical examination, begin the year at the Tier II salary level. No later than July 1, 2006, the Federation shall identify at least 14 of these salaried Players as Tier I Players, and shall then pay them retroactively for the difference between the amount they earned in 2006 as a Tier II Player and the Tier I salary they would have earned.

> *Thus, by way of example only, if Player X earns $25,000 (one half the Tier II salary) for the first six months of 2006, and is identified on July 1, 2006 as a Tier I Player, that Player shall have her salary increased for the remainder of 2006 to the Tier I level and shall also receive a payment of $10,000 (the difference between one half the Tier I salary ($35,000) and the $25,000 she actually received).*

L.    Unless provided otherwise in this Agreement or by mutual agreement of the Federation and Players Association, by September 15 of each year, the Federation shall notify each salaried Player of its intention to either renew or terminate her status as a salaried Player. Any renewal shall be subject to that Player passing a physical examination at the beginning of the year.

M.    For the years 2007 and 2008, Federation shall identify no later than the preceding December 15 (i.e., for 2007, by December 15, 2006) at least fourteen (14) Players identified as "Tier I" Players, and at least six (6) additional players identified as either "Tier I" or "Tier II" Players. However, any Player who is named to the roster (not including alternates unless they are subsequently named to the roster as a replacement) for Women's World Cup qualifying matches in 2006 shall begin 2007 as a Tier I Player; and any Player who is named to the roster (not including alternates) for the Women's World Cup in 2007 shall begin 2008 as a Tier I Player.

N.    For the years 2007 and 2008, on July 1 of each year, the Federation shall be entitled to move Players from one Tier to another (for example, from Tier I to Tier II, or vice versa), subject to the limitations in this agreement as to minimum

number of Players per Tier.

O. Federation shall be entitled to terminate any salaried Player at any time, subject to that Player's right to severance as follows:

    1. If, over the preceding 12 months, that Player has been under contract with the Federation for at least nine (9) months, has relocated for purposes of attending residency upon the request of the Federation, or has had her contract renewed for a new year, the Player shall be entitled to a severance payment of three (3) months salary, at the salary rate paid to that Player at time of termination.

    2. In a year with no residency program, if a Player is not otherwise entitled to a severance payment of 3 months pursuant to subsection 1 above, the Player shall be entitled to a severance payment of two (2) months salary (if she has been under contract with the Federation for at least six (6) months) or one month's salary (if she has been under contract with the Federation for less than six (6) months), at the salary rate paid to that Player at time of termination.

    3. In a year with a residency program, if Player is not otherwise entitled to a severance payment of 3 months pursuant to subsection 1 above, the Player shall not be entitled to any severance payment.

It is expressly understood that if a Player is properly notified that the Federation does not intend to renew her status as a salaried Player for the next year, Player shall not be entitled to any additional severance payment beyond the salary paid to her for the remaining term of her yearly contract. It is also expressly understood that a salaried Player who voluntarily terminates her contract with the Federation, either by quitting the team or otherwise breaching the terms of this Agreement, shall not be entitled to a severance payment.

## II. **Additional Terms**

A. Salaried Players will participate in a residency program each year, as determined by the Federation, not to exceed a total of six consecutive months.

B. Salaried Players will participate in Women's National Team matches each year, as requested by the head coach, the total of which may not exceed ninety two (92) matches over the term from 2005 through 2008. Players shall not be entitled to any appearance fee for these matches, but each Player that appears on the game roster for a Women's National Team match (excluding World Cup, World Cup qualifying, Olympics, and Olympics qualifying matches) shall receive a win bonus of one thousand dollars ($1,000).

C. Federation will provide health insurance, including vision, for each salaried Player.

D. Players are strictly forbidden, without express consent of the Federation, from engaging in activities during the time they are under contract with the Federation that may involve a significant risk of personal injury, including (i) sports endangering her health or safety (including but not limited to professional boxing, professional wrestling, motorcycling, moped-riding, auto racing, sky-diving, and hang gliding); (ii) any competitive game (i.e. other than a casual

4

pickup game) or exhibition of soccer; and (iii) any game or exhibition of basketball, football, baseball, hockey, lacrosse, or other athletic sport. Should injury result from breach of this clause, Federation shall be entitled to terminate that Player's contract immediately, with no further contractual rights or remedies due to the Player. Nothing herein shall be intended to require Player to obtain written consent in order to participate in, as an amateur, the sport of golf, tennis, handball, swimming, hiking, softball, or volleyball.

E.  Except for cases involving an injury related to dangerous activities as outlined in II.D. above, or for other good cause, Federation may not terminate a contract with a Player while that Player is unable to render services due to an injury or illness. Any payment obligation of the Federation shall be decreased by any workers' compensation benefits or other injury payment received by Player, which, to the extent permitted by law, Player assigns to the Federation up to the full amount of that Player's salary owed by Federation. Any injury payment received by Player after her contract with the Federation has expired or has been terminated shall not be utilized as a credit against workers' compensation benefits due to the Player, and Player shall be entitled to the full amount of any workers' compensation benefit due to the Player once the contract has expired or has been terminated. Federation shall be entitled to have a Federation-appointed doctor examine Player to evaluate Player's ability to render services. For purposes of this agreement, injuries incurred by a Player who is training on her own in a way consistent with recommendations by the head coach shall be considered to be within the scope of her employment with the Federation.

F.  Should a salaried Player become pregnant and, as a result of such pregnancy, be medically unable to comply fully with her obligations under this agreement, Federation shall continue to pay Player at fifty percent (50%) of her salary throughout the term of her contract; provided, however, that Player must continue to comply with her obligations under this agreement and train with the Team to the extent she is medically cleared to do so. Whether a Player is expected to attend residency with the Team while pregnant shall be determined on a case-by-case basis, with deference given to the medical condition of the Player, the timing of the pregnancy, and other similar factors.

G.  During the Term of this Agreement, Player shall play competitive soccer exclusively for the Federation unless she receives explicit written consent to do otherwise by the Federation. Should Player voluntarily terminate her agreement with the Federation for any reason, she shall not be permitted to play competitive soccer for a professional team for a period of six months after such termination without the express written consent of the Federation.

H.  Federation will provide to each salaried Player a housing allowance of one thousand two hundred dollars ($1,200) for each month the Player is in residency for the years 2006-2008. Federation will provide to each salaried Player a housing allowance of one thousand three hundred dollars ($1,300) for each month the Player is in residency for the years 2009-2012. In the event that a Player in a housing arrangement with other players is released from the Team, the Federation will pay up to $1,200 (or $1,300 in the years 2009-2012) to cover the unmet rental obligation.

5

I.     During residency, where Player travels with the Team to the location of a match and Player is allowed time off after the match, if Player provides appropriate advance notice, she shall be permitted to arrange a "triangular" flight (flying from residency to the match to a third location before returning to residency) and Federation shall pay for the flight. Player may exercise this right to a triangular flight up to three (3) times per year.

J.     For Player's travel to and from residency, Federation shall pay for the cost of this travel. Should Player choose to drive to and from residency instead, Federation shall reimburse Player for the cost of one round-trip ticket to/from residency or the cost of mileage, tolls and related expenses for the player (whichever is less). Federation shall also pay for one (1) round trip ticket for each Player to fly home or to another destination on a break from training.

K.     Federation shall reimburse Player $500 for the costs of relocating to residency.

L.     Should Player need time to look for housing for residency, Federation shall provide up to four nights at a hotel so that Player may explore housing options in the area.

M.     Federation shall provide up to five (5) vehicles for use by Players during residency. Federation will make best efforts to provide two additional vehicles for the players' use at no additional cost to the Federation.

N.     Federation shall pay the cost of having one nanny attend each trip of the Team, including the cost of airfare, hotel room, and a fee of $18 per child per day. Should more than one Player require child care and should those Players be unable to agree on one nanny, the Federation will assist the Players in the selection, including recommendation of a nanny.

O.     Federation will provide one meal on each training day that includes training in both the morning and afternoon, while the Players are in residency.

## III.   <u>World Cup and Olympics</u>

A.     Each Player on the tournament roster for World Cup or Olympics qualifying matches shall, if the Team qualifies for the applicable tournament, receive a qualifying bonus of ten thousand dollars ($10,000).

B.     Each Player named to the World Cup or Olympics tournament roster shall receive a roster bonus of ten thousand dollars ($10,000) (for each occurrence).

C.     Each Player named to the World Cup or Olympics tournament roster shall receive a medal bonus if the Team finishes in the top three at the applicable tournament as follows (for each occurrence):
1. Gold Medal/1st Place: Each Player on tournament roster shall receive $50,000
2. Silver Medal/2nd Place: Each Player on tournament roster shall receive $20,000
3. Bronze Medal/3rd Place: Each Player on tournament roster shall receive $10,000

D.     Should the Team win a Gold Medal/1st Place in a World Cup or Olympics, Federation shall pay to Player Pool a total of $1,200,000. In return, Players who were named to the applicable tournament roster shall be obligated to participate in up to ten games of a "Victory Tour." Salaried Players must attend and participate in all Victory

6

Tour games unless given express permission by the Federation. Should more than two Players from the roster be unavailable to participate in a Victory Tour game because they are college players back at school, the player pool compensation shall be decreased by a share of one half of 1/(number of players on roster – 2) for each additional college player (beyond the first two) unavailable, and shall also be decreased by a full share of 1/(number of players on roster – 2) for each salaried Player who refuses to participate for reasons not permitted under this agreement. Thus, by way of example only, if 18 players are on the World Cup roster, and 5 are college players who do not participate in the Victory Tour, the Victory Tour payment will be reduced by ½ of 1/16 for each of the 3 players (beyond the first 2) who do not participate, which is ½ of 3/16, or 3/32. Any salaried Player who is unable to play for medical reasons or who is given express permission by the Federation to miss a game shall not cause a reduction in payment due to her failure to participate in that match.

E.     Should the Team win a Silver Medal/2nd Place in a World Cup or Olympics, Federation shall pay to each Player from the applicable World Cup or Olympic roster three thousand six hundred dollars ($3,600). In return, those Players shall be obligated to participate in up to three games of a "Victory Tour." Should a Player not participate in one or more of these games (except for reasons due to injury), Federation shall be not be obligated to make any Victory Tour payment to that Player.

F.     Should the Team win a Bronze Medal/3rd Place in a World Cup or Olympics, Federation shall pay to each Player on the applicable tournament roster three thousand three hundred thirty three dollars ($3,333). In return, those Players shall be obligated to participate in up to three games of a "Victory Tour." Should a Player not participate in one or more of these games (except for reasons due to injury), Federation shall not be obligated to make any Victory Tour payment to that Player.

## IV.    Guaranteed Payment

Federation will pay $300,000 to the Association bank account immediately upon the signing of the Collective Bargaining Agreement as a guaranteed payment. Federation will pay an additional $300,000 to the Association bank account as a guaranteed payment on January 1, 2009.

## V.    Sponsor Appearance Fees

An individual player appearance is defined as one player appearing alone or in a group for up to three hours. (Two players for a three hour session = two player appearances.) An appearance includes any time players appear anywhere on behalf of or to benefit a Federation sponsor or its business, when requested by the Federation and when not part of "Team Activities." For the purposes of this Article V, Team Activities shall mean activities scheduled for the team by the Federation while the Team is together training and not designed to benefit a Federation sponsor or such sponsor's business, although a Federation sponsor may have some limited involvement in such Team Activities which may include, for example, the financing of the activity and/or attending the activity.

Less than 3 hours = 1 appearance

3-6 hours = 2 appearances, etc.

U.S. Women's National Team Player -- One appearance $2,500

When sponsors request the appearance of a "U.S. Women's National Team Player", Players will be contacted about their availability pursuant to a list maintained by the Team Player Pool so that all Players have appearance opportunities. Appearance fees are paid to the individual player.

Soccer clinics and all other group appearances will be treated as individual appearances regardless of the number of players requested. Each player will be compensated as set forth above.

## VI.    Per Diem Payments

As set forth in Section 3 of the Uniform Player Agreement, Players shall receive per diem payments for each day they are required by the Federation to be in the venue for practice, matches, or any other purpose.  These per diem payments shall be the greater of (a) the per diem amount paid by the Federation to players on the Men's National Team at that time and (b) the following amounts:

> For the period from the date of execution of this Agreement through December 31, 2008: $40 for domestic venues/ $50 for international venues
> For the period beginning January 1, 2009 through December 31, 2012: $45 for domestic venues/ $55 for international venues

## 2009 – 2012 COMPENSATION

## VII.    Percentage Increase for 2007-2010

Except as specifically provided elsewhere, compensation levels for 2009 through 2012 of this agreement shall be based upon a percentage increase on compensation levels listed above for 2005 through 2008, sections I, II, and III (and not to include sections IV through VI) as follows:

> A.      Should the team not win a medal in either the World Cup or Olympics over the period from 2005 through 2008, all compensation shall be increased for the period from 2009-2012 by twenty percent (20%).
> B.      Should the Team win a medal in either/both of the World Cup and Olympics, where neither medal is Gold, all compensation shall increase by a base of twenty percent (20%) plus an additional percentage as follows:
> > 1.   For each Bronze Medal: increase of one percent (1%) above and beyond 20% increase.
> > 2.   For each Silver Medal: increase of two percent (2%) above and beyond 20% increase.

8

C.     Should the Team win any of the following combinations of medals in the World Cup and Olympics during 2005-2008, all compensation shall increase for the period from 2009-2012 as follows:

    1.  One Gold Medal; increase of 23%
    2.  One Gold and one Bronze; increase of 25%
    3.  One Gold and one Silver; increase of 26%
    4.  Two Golds; increase of 27%

D.     Notwithstanding language to the contrary in this Agreement, for the year 2009, if 2009 is a non-residency year, the salaries for all Tier I and Tier II Players shall be sixty thousand dollars ($60,000). Additionally, each Player shall receive appearance fees and win bonuses for each match she plays in excess of eighteen (18). If 2009 is a residency year, salaries will be set consistent with Section VII.A-C above.

## VIII.   Compensation Adjustment if Women's League Formed

If during the Term, a new Women's Professional League is formed that qualifies as a First Division league pursuant to Federation professional league standards, the salary payments due from Federation to salaried Players shall be as follows:

A.     For the years 2005 through 2008, Tier I salary shall be $50,000, Tier II salary shall be $35,000, and Tier III salary shall be $25,000.

B.     For the year 2009, Tier I and II salaries shall be $60,000, and Tier III salary shall be $25,000, as increased pursuant to Section VII above.

C.     For the years 2010 through 2012, salaries shall be those listed in Section VIII.A. above, as increased pursuant to Section VII above.

## IX.   Additional Payment if Compensation Ratios Change

If in any calendar year, the ratio of aggregate compensation of women's national team players to the aggregate revenue from all women's national team games (including all games in U.S. Soccer promoted women's tournaments) is <u>less</u> than the ratio of the aggregate compensation of the men's national team players compensation to the aggregate revenue from all men's national team games (including all games in U.S. Soccer promoted men's tournaments), then U.S. Soccer will make a lump sum payment to the women's national team player pool to make the ratios equal.

# EXHIBIT D

**Ballard Spahr**
LLP

**MEMORANDUM**

| | |
|---|---|
| TO | United States Soccer Federation |
| FROM | Women's National Team Players' Association |
| DATE | March 19, 2013 |
| RE | Memorandum of Understanding |

--------------------------------------------------------------------------------

**WNT Financial Terms:**

- **Number of Players under Contract** – At all times there will be 24 WNT Players under contract (included within the 24 are injured Players, Players on maternity leave, and Players receiving severance payments).

- **One contract** – There will be one contract for WNT players covering both the WNT and the NWSL so that WNT Players will not need to enter into a contract with the NWSL. The parties will work in good faith to come to an agreement on the WNT Players' marketing and spokesperson duties related to the NWSL.

- **Tiers** – At all times there must be a minimum of 18 Tier 1 contracts. US Soccer retains the same ability to terminate contracted players, subject to the new severance provisions. With the exception noted below for 2013, US Soccer retains the same ability to move players from one tier to another as of July 1 each year, based on performance but at all times there will be no less than 18 Tier 1 players. Except as provided below, there may be no more than a maximum of 4 Tier 3 contracts. Any decision to tier a player at Tier 3 should be based on ability. The only time there may be more than 4 Tier 3 contracts is if the total number of players under contract (including players receiving severance payments, if any) exceeds 24.

3/19/13

3/19/13

- **WNT Salaries** – Salaries will increase 15%, but there will be no increase on a yearly basis:
    - $72,000 for Tier 1
    - $51,000 for Tier 2
    - $36,000 for Tier 3

- **Salary if there is no league** – If there is no league salary (i.e., if there is no league during any year of the quad) the salary increase for the WNT will increase by 15% over the "no league" salary under the last quad:
    - $101,000 for Tier 1
    - $72,000 for Tier 2
    - $43,000 for Tier 3

- **"No League" Salary** – The "no league" salary listed above will be offered: (i) if there is no league, or (ii) if US Soccer has "pulled out" of the league (we will work in good faith to come to an agreement on how to define whether US Soccer has "pulled out" of the league). If either of the two scenarios occurs, players will receive the "no league" salary regardless whether they choose to play for a club in Europe or in the US, so long as they meet their WNT commitments.

- **Tier 1 Salaries in 2013** - Any player on the last Olympic and/or World Cup roster will be a Tier 1 player in 2013, if she is offered a contract in 2013. (Anyone currently on the team has a contract.) These players may not be moved **down a tier in 2013, so long as they have a contract.**

- **Tier 1 Salaries in 2015** – Any player on the World Cup roster in 2015 will be a Tier 1 player (effective the following pay period upon being named to the roster), if offered a contract.

- **Tier 1 Salaries in 2016** - Any player on the 2015 World Cup roster will begin 2016 at Tier 1, if she is offered a contract. In addition, any player on the Olympic roster in 2016 will be a Tier 1 player (effective the following pay period upon being named to the roster), if offered a contract.

- **Alternates** – Alternates on an Olympic or World Cup roster will be no less than Tier 2, and will start the subsequent year at least at Tier 2, if offered a contract for the subsequent year.

- **Floaters** – Floaters will receive $500/week for floater pay. The same roster payments under the prior CBA will apply, plus an 8% increase, except that the larger roster payment will not apply until the Floater is named to a 4th roster (rather the 3rd roster). There will be 30 floater days in the first year of the quad,

and 25 days in each other year of the quad. Floater days will be on a 12 month rolling basis. Floater days will include travel and off days when with the team.

- **Ticket Revenue** – Payment of $1.20 per/ticket sold to US Soccer-promoted home friendlies—under the same terms as the agreement with the men.

- **Win bonuses** – An 8% increase on the friendly win bonus, amounting to $1,350.

- **World Cup and Olympic Silver placement bonus** – A 30% increase to $32,500/player.

- **Victory Tour Gold bonus** – A 20% increase to $1,800,000 paid to the player pool.

- **4th Place Finish at World Cup or Olympics** – A $10,000 bonus if the team takes 4th Place in the World Cup or Olympics.

- **Other bonuses in US Soccer's Compensation Proposal are itemized along with other financial items in the attached term sheet.**

- **Meal money** –Meal money will be provided to WNT Players during any WNT event, including games, camps, practice, residency, etc. for times when team meals are not provided. This shall include travel days to and from the event.

- **WNT Chef** – US Soccer will address this issue with the Players on a case by case basis, taking into consideration such varying factors as the country hosting the tournament, the existing infrastructure in place, team chemistry and other criteria deemed to be important by the Coach.

- **Severance** – If US Soccer chooses to terminate a Player, she will receive three months' severance pay (the Player's services will not be required during those 3 months). Three months' severance will be applied at any time moving forward with the current contracted Players (this includes Keelin Winters, Stephanie Cox, and Heather Mitts).

- **Date of Contract Release Notice** – Because Players will receive 3 months' severance (as noted above), we will not need a date of contract release notice.

- **Players in Europe** – WNT Players based in Europe who are unable to participate in WNT programming on any other dates than what is currently provided for in the FIFA regulations shall not miss an agreed upon "disproportionate number of days." If a "disproportionate number of days" are missed, then the Player may receive a pro-rata reduction in salary for the time missed, but the Player's salary would never be less than 75% of the full salary as long as all FIFA release dates are met. The parties will discuss in good faith the reasonableness of the 75% figure if US Soccer "pulls out" of the NWSL and returns to a residency type program that requires the WNT players to spend more time with the WNT. WNT

Players able to meet all of the release obligations for National Team duty, including additional days required by the Coach, will receive the full WNT salary. US Soccer does not believe this will be an issue for this year if the language in the Players' overseas contracts is as reviewed with the effected Players. The parties agree to work in good faith to define "disproportionate"—some examples are: (i) missing 5 days out of a 10-day camp surrounding a FIFA date; and (ii) missing FIFA dates. Until "disproportionate" is defined, no player will be docked pay.

- **Injury Protection** – Injured Players will receive 100% of their WNT and NWSL salary for the shorter of the length of the injury or one year from the date of the injury. Upon an injured WNT Player's return to the WNT, she will come back on 100% of the salary of the tier she was at prior to the injury for at least three months following her return.

- **Pregnancy** – Upon a Player's return, she will come back on 100% of the salary of the tier she was at prior to the pregnancy for at least three months. While the Player is on maternity leave she will receive 50% of her salary and her NWSL salary.

- **Victory Tour** – There will be a minimum of 10 Victory Tour games for Gold, and 3 for Silver/Bronze. All games in the same calendar year following a Bronze, Silver or Gold medal will be treated as Victory Tour games. However, consistent with what the parties have done in the past, the Parties understand and agree that, for logistical and/or FIFA-related reasons, the Victory Tour may rollover into the next calendar year. Players will be paid the Victory Tour payments even if games are not scheduled, and players must play in the ratios that existed in the prior CBA.

- **Recoupment payments** – US Soccer will not seek recoupment payments for the months of January 2013 and February 2013 from any of the 27 Players under the prior contract upon the signing of the new CBA.

- **Retroactive payments** – US Soccer will make retroactive payments for the months of January 2013, February 2013, and March 2013 to the 27 Players under the prior contract whose salaries improve upon the signing of the new CBA.

- **Insurance** - Health insurance (including vision) and dental insurance will be provided.

- **Term of WNT Contract** – 4 years

- **Sponsor Appearance Fee** – $3,000

- **Sponsor Appearances** – US Soccer may but is not required to request an additional 5 sponsor appearances by Players per year. The same provisions regarding travel shall apply to travel for sponsor appearances.

- **Marketing** - This issue remains to be discussed. US Soccer and the PA will continue to work in good faith to come to an agreement on US Soccer's rights to

4

3/19/13

3/19/13

use a Player's likeness with the understanding that no usage may promote a Player's endorsement of a US Soccer sponsor.

**Lifestyles:**

- **Day Care/Nanny Service –**

    - **WNT** – US Soccer will continue to provide the same benefits as under the last CBA regarding childcare for WNT Players on National Team duty, with the daily allowance per child increasing from $18 to $25.

    - **NWSL** – The NWSL will not provide day care/nanny service. However, US Soccer will discuss/arrange for this service with appropriate teams and work something out when three WNT players need it (e.g. Christie Rampone in NJ, and potentially Stephanie Cox and Amy Rodriguez when they are back).

- **Travel** – US Soccer will provide premium economy/economy plus seats when available; will provide aisle seats or window seats (per the Player's preference); and will provide direct flights when available. When a direct flight is not available, US Soccer will provide the fastest non-direct flight available. US Soccer will provide up to 2 triangular flights per year (for a Player's personal reasons, but not for Players' personal sponsor-fulfillment); these may be domestic or international flights. Players must notify the National Team General Manger of their requested flight itinerary within a reasonable amount of time of being called into the relevant camp. Under rules to be agreed upon, Players may leave from one city and return to another. Individual tickets must be upgradable so that a Player may use her own status/miles to upgrade if she chooses. Players must **have the option to opt out of group tickets, upon reasonable notice, if they plan to** use miles/status to obtain an upgrade. All of the aforementioned conditions (no middle seats, premium economy/economy plus seats) still apply when US Soccer is booking flights through group ticketing and when booking for US Soccer sponsor appearances. US Soccer will provide alternative travel arrangements when, for example, reasonable car service, rental car, or other transportation is most convenient for a Player.

    Travel for the Olympics will be business class or charter, unless, by its own rules applied to all national teams, the USOC prohibits it. Travel for the World Cup/Qualifiers that exceeds 3 hours will be business class or charter.

    In no event will a US Soccer staff member (other than the Head Coach) receive a more premium seat than a Player on the same flight.

- **Relocation Expenses** -- Relocation expenses will be provided up to $625 per Player each year and when traded with receipts. All other terms of relocation that existed under the prior CBA for residency apply (for example J, K, and L under "Additional Terms" of Exhibit A to the CBA).

3/19/13

3/19/13

- **Tickets** – WNT tickets will be treated the same as under the prior CBA. Regarding the NWSL, Players will receive 4 tickets for home matches and 2 tickets for away games which is what all other NWSL players will receive.

- **Per Diem While in League** – NWSL per diem for WNT Players, which is the same as what their teammates in the NWSL will have, is: $10 for breakfast, $15 for lunch, and $20 for dinner if the team chooses not to provide a team meal.

- **Limit on Number of Closed-Door Games** – Before US Soccer plans more than 4 closed-door games in any one year of the quad, it will meet with Player representatives to discuss the decision and will provide a reasonable explanation to the Players.

- **Agreed upon number of games and tournaments** – There will be no agreed upon required number of games and tournaments.

- **Salaried Players will receive a set amount of break time** – US Soccer will provide a reasonable allocation of break time outside of FIFA dates and critical preparation weeks leading up to events. The Players and the Head Coach will meet to discuss the schedule and the break time.

- **Training camps outside of residency** – Before US Soccer plans more than 2 training camps not tied to games in any one year of the quad, it will meet with Player representatives to discuss the decision and will provide a reasonable explanation to the Players.

- **Vehicles provided for the exclusive use of the Players during ALL camps/residency/and competitions** – When the team is outside of a city, US Soccer will provide 5 vans. When the team is in a city, the number of vans provided will be discussed with the Players in advance and resolved in good faith. If the Players and US Soccer cannot reach an agreement, 5 vans will be provided.

- **Trainers/PTs/Massage Therapists** – US Soccer will provide 2 trainers and 2 massage therapists at all National Team camps and games; at least one 1 of the trainers will be a registered Physical Therapist. The Players will have input into the staff hired. One full-time PT will act as a liaison between the Players, doctors, coaching staff, and US Soccer to ensure that technical and medical decisions can be made in the best interests of player health.



**League:**

- **Defined criteria for League** – Division 1

- **League salaries for the current 27 WNT Players (inclusive of housing)** –

  2013: $50,000

  2014: $52,000

  2015: $54,000

  2016: $56,000

  If over the course of the quad, any of the 27 current WNT Players loses her WNT contract, but then regains it, she will receive this NWSL salary if she plays in the NWSL while under contract with the WNT. This salary is limited to the current 27 WNT Players because they are being viewed as the founding Players.

- **League salaries for new salaried Players to the WNT (inclusive of housing)** - "New" refers to any WNT Players who are not a part of the current 27 Players.

  2013: $40,000

  2014: $42,000

  2015: $44,000

  2016: $46,000

- **League salary in year 2 for a Player released by the WNT whose option is exercised for the second year** – In year 2, if the league wants to keep the option of retaining a Player released by the WNT, the League must make a qualified offer at the higher of (i) 65% of her NWSL compensation (salary plus housing), or (ii) at the highest paid non-WNT player (plus housing) in the League. The League must determine within 3 weeks of the conclusion of the relevant Team's season (but no later than August 31) whether it will make a qualified offer for a Player that is not given a WNT contract (understanding that this occurs before any decisions are made with respect to the Players' WNT contracts for the next year). The Team's qualified offer must include the maximum housing given to any non-WNT player. The Player who has been released from the WNT is free to play in Europe without a transfer fee.

- **Most Favored Player Status** – The parties will work in good faith to reach an agreement on a most-favored-player clause so that no non-WNT Player receives compensation (salary plus housing) greater than a WNT Player. In addition, a clause will be agreed upon whereby WNT Player salaries in the NWSL will increase proportionately to salaries (plus housing) paid to the highest-paid non-WNT players in the NWSL. The intent of such a clause will be to ensure that



non-WNT player salary increases do not unreasonably outpace increases to WNT Players' salaries upon the success and growth of the NWSL.

- **NWSL payment schedule** – US Soccer will pay WNT Players their full NWSL salary during the season (versus over a 12-month calendar year).

- **Free Agency/Trades** – There will be no free agency unless free agency is created within the league. However, US Soccer (including the Head Coach) commits to meeting with any Players to address their NWSL situation and will make its best efforts to coordinate a trade, if US Soccer and the Player agree that a trade is in order. Included in that discussion would be whether it is appropriate for the Player to be playing in the NWSL in light of injuries (consider Abby's situation before the World Cup and Michelle Akers' 1999 situation).

- **Term NWSL Contract Upon Release from WNT** – If a WNT Player is released from her WNT contract, she remains on her contract with the NWSL for the remainder of that year.

- **Term of Teams' Rights to Players** – WNT Players have the option of choosing either of the two scenarios below (the player must inform her team by August 31, 2013 whether she intends to pursue Europe in year 2):

  (i)   opt to play in Europe in 2014, and return to the NWSL in years 2015 and 2016 (if there is still a viable league); or

  (ii)  commit to play in the NWSL in 2013 and 2014, and have the ability to opt to play in Europe in 2015 and/or 2016.

- **Quality of the NWSL** – After each year of the NWSL, US Soccer will sit down with the leadership of the PA and the Head Coach to discuss the quality of the NWSL.

Agreed to on behalf of U.S. Soccer:

_____

Dan Flynn
CEO/Secretary General

_____

John B. Langel
Attorney, WNTPA



USSF WNT CBA Financial Terms

| | | WNT CBA Financial Terms 2013-2017 | | | | |
|---|---|---|---|---|---|---|
| | | 2013-2016 Players | 2013-2016 Base Comp | % Change | 2013-2016 League | 2013-2016 Total | % Change |
| **Salaried Players** | | | | | | | |
| League | Tier 1 | 18 | $ 72,000 | 15.2% | $ 50,000 | $ 122,000 | |
| | Tier 2 | 2 | $ 51,000 | 16.6% | $ 50,000 | $ 101,000 | |
| | Tier 3 | 4 | $ 36,000 | 15.2% | $ 50,000 | $ 86,000 | |
| | | **24** | **$ 64,250** | **19.2%** | **$ 50,000** | **$ 114,250** | |
| No League | Tier 1 | 18 | $ 101,000 | 15.4% | $ - | $ 101,000 | 15.4% |
| | Tier 2 | 2 | $ 72,000 | 15.2% | $ - | $ 72,000 | 15.2% |
| | Tier 3 | 4 | $ 43,000 | 14.7% | $ - | $ 43,000 | 14.7% |
| | | **24** | **$ 88,917** | **18.6%** | **$ -** | **$ 88,917** | **18.6%** |
| Win Bonus | | | | | | $ 1,350 | 8.0% |
| **Per Diem** | Domestic | | | | | $ 50 | 11.1% |
| | Int'l | | | | | $ 60 | 9.1% |
| **Floaters** | Per week | | | | | $ 500 | 60.0% |
| | Matches 1-3 | | | | | $ 1,350 | 8.0% |
| | Match 4 + | | | | | $ 4,050 | 8.0% |
| | Win Bonus | | | | | $ 1,350 | 8.0% |
| **World Cup** | Qualifying Bonus | | | | | $ 15,000 | 20.0% |
| | Tournament Roster | | | | | $ 15,000 | 20.0% |
| Placement: | | | | | | | |
| | Gold | | | | | $ 75,000 | 20.0% |
| | Silver | | | | | $ 32,500 | 30.0% |
| | Bronze | | | | | $ 20,000 | 60.0% |
| | 4th | | | | | $ 10,000 | new |
| Victory Tour: | | | | | | | |
| | Gold | | | | | $ 1,800,000 | 20.0% |
| | Silver - per player (3 games) | | | | | $ 6,750 | 50.0% |
| | Bronze - per player (3 games) | | | | | $ 6,250 | 50.0% |
| **Olympics** | Qualifying Bonus | | | | | $ 15,000 | 20.0% |
| | Tournament Roster | | | | | $ 15,000 | 20.0% |
| Placement: | | | | | | | |
| | First | | | | | $ 75,000 | 20.0% |
| | Second | | | | | $ 32,500 | 30.0% |
| | Third | | | | | $ 20,000 | 60.0% |
| | 4th | | | | | $ 10,000 | new |
| Victory Tour: | | | | | | | |
| | First | | | | | $ 1,800,000 | 20.0% |
| | Second - per player | | | | | $ 6,750 | 50.0% |
| | Third - per player | | | | | $ 6,250 | 50.0% |
| Signing Bonus | | | | | | $ 425,000 | 41.7% |

Confidential

4/1/2013

# EXHIBIT E

**Guevara, Octavio (LA WL)**

| | |
|---|---|
| **From:** | Uselton, Ruth S. (Phila) <UseltonR@ballardspahr.com> |
| **Sent:** | Tuesday, March 19, 2013 9:25 AM |
| **To:** | Sunil Gulati |
| **Cc:** | Lisa Levine; Dan Flynn; Langel, John B. (Phila) |
| **Subject:** | WNT Memorandum of Understanding |
| **Attachments:** | March 2013 - WNT Financial Terms Sheet.PDF; REDLINE MOU.pdf; Memorandum of Understanding DMEAST_16492082(6).DOCX |

Sunil,

Attached for your review is the Memorandum of Understanding (with a redline comparison to the version we sent to you yesterday) and the financial terms sheet.

As we discussed on our call this morning, there are a few additional issues we agreed upon:

- We removed the "Transfer Fees" bullet, because WNT Players have the option to play in Europe in year 2 ("Option 1") or in years 3 and/or 4 ("Option 2"), so by definition there would be no transfer fee applied if they choose to play in Europe in the years they have an option to do so.
- We will need to discuss the issue of NWSL expansion and come to an agreement that allows WNT players to have input into the process. As John said, the allocation choices would have been different with teams in other cities. The Players are only asking to be consulted regarding the process.
- There will be no trades before June 15 absent Player approval.

As we have previously agreed, the general principle we are working under is that items we have not specifically covered in the Memorandum of Understanding would remain the same as under the prior CBA, but with appropriate increases/adjustments/changes. We will address the specifics when we get to drafting the new CBA.

**Ruth S. Uselton**
Ballard Spahr LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103
Direct: 215.864.8633
Fax: 215.864.8999
useltonr@ballardspahr.com | www.ballardspahr.com

| | 2013-2016 Players | 2013-2016 Base Comp | % Change | 2013-2016 League | 2013-2016 Total | % Change |
|---|---|---|---|---|---|---|
| **Salaried Players** | | | | | | |
| League          Tier 1 | 18 | $ 72,000 | 15.2% | $ 50,000 | $ 122,000 | |
| Tier 2 | 2 | $ 51,000 | 16.6% | $ 50,000 | $ 101,000 | |
| Tier 3 | 4 | $ 36,000 | 15.2% | $ 50,000 | $ 86,000 | |
| | 24 | $ 60,750 | 19.0% | $ 50,000 | $ 110,750 | |
| No League          Tier 1 | 18 | $ 101,000 | 15.4% | $ - | $ 101,000 | 15.4% |
| Tier 2 | 2 | $ 72,000 | 15.2% | $ - | $ 72,000 | 15.2% |
| Tier 3 | 4 | $ 43,000 | 14.7% | $ - | $ 43,000 | 14.7% |
| | 24 | $ 84,083 | 18.7% | $ - | $ 84,083 | 18.7% |
| **Win Bonus** | | | | | $ 1,350 | 8.0% |
| Per Diem     Domestic | | | | | $ 50 | 11.1% |
| Int'l | | Equal to MNT Per Diems | | | $ 60 | 9.1% |
| Floaters     Per week | | | | | $ 500 | 60.0% |
| World Cup     Qualifying Bonus | | | | | $ 15,000 | 20.0% |
| Tournament Roster | | | | | $ 15,000 | 20.0% |
| Placement: | | | | | | |
| Gold | | | | | $ 75,000 | 20.0% |
| Silver | | | | | $ 32,500 | 30.0% |
| Bronze | | | | | $ 20,000 | 60.0% |
| 4th | | | | | $ 10,000 | new |
| Victory Tour: | | | | | | |
| Gold | | | | | $ 1,800,000 | 20.0% |
| Silver - per player (3 games) | | | | | $ 6,750 | 50.0% |
| Bronze - per player (3 games) | | | | | $ 6,250 | 50.0% |
| Olympics     Qualifying Bonus | | | | | $ 15,000 | 20.0% |
| Tournament Roster | | | | | $ 15,000 | 20.0% |
| Placement: | | | | | | |
| First | | | | | $ 75,000 | 20.0% |
| Second | | | | | $ 32,500 | 30.0% |
| Third | | | | | $ 20,000 | 60.0% |
| 4th | | | | | $ 10,000 | new |
| Victory Tour: | | | | | | |
| First | | | | | $ 1,800,000 | 20.0% |
| Second - per player | | | | | $ 6,750 | 50.0% |
| Third - per player | | | | | $ 6,250 | 50.0% |
| Signing Bonus | | | | | $ 425,000 | 41.7% |

**Ballard Spahr**
LLP

**MEMORANDUM**

| | |
|---|---|
| TO | United States Soccer Federation |
| FROM | Women's National Team Players' Association |
| DATE | March ~~18,~~19, 2013 |
| RE | Memorandum of Understanding |

------------------------------------------------------------------------

**WNT Financial Terms:**

- **Number of Players under Contract** – At all times there will be 24 WNT Players under contract (included within the 24 are injured Players, Players on maternity leave, and Players receiving severance payments).

- **One contract** – There will be one contract for WNT players covering both the WNT and the NWSL so that WNT Players will not need to enter into a contract with the NWSL. The parties will work in good faith to come to an agreement on the WNT Players' marketing and spokesperson duties related to the NWSL.

- **Tiers** – At all times there must be a minimum of 18 Tier 1 contracts. US Soccer retains the same ability to terminate contracted players, subject to the new severance provisions. With the exception noted below for 2013, US Soccer retains the same ability to move players from one tier to another as of July 1 each year, based on performance but at all times there will be no less than 18 Tier 1 players. Except as provided below, there may be no more than a maximum of 4 Tier 3 contracts. Any decision to tier a player at Tier 3 should be based on ability. The only time there may be more than 4 Tier 3 contracts is if the total number of players under contract (including players receiving severance payments, if any) exceeds 24.

- **WNT Salaries** – Salaries will increase 15%, but there will be no increase on a yearly basis:

  - $72,000 for Tier 1

  - $51,000 for Tier 2

  - $36,000 for Tier 3

- **Salary if there is no league** – If there is no league salary (i.e., if there is no league during any year of the quad) the salary increase for the WNT will increase by 15% over the "no league" salary under the last quad:

  - $101,000 for Tier 1

  - $72,000 for Tier 2

  - $43,000 for Tier 3

- **"No League" Salary** – The "no league" salary listed above will be offered: (i) if there is no league, or (ii) if US Soccer has "pulled out" of the league (we will work in good faith to come to an agreement on how to define whether US Soccer has "pulled out" of the league). If either of the two scenarios occurs, players will receive the "no league" salary regardless whether they choose to play for a club in Europe or in the US, so long as they meet their WNT commitments.

- **Tier 1 Salaries in 2013** - Any player on the last Olympic and/or World Cup roster will be a Tier 1 player in 2013, if she is offered a contract in 2013. (Anyone currently on the team has a contract.) These players may not be moved down a tier in 2013, so long as they have a contract.

- **Tier 1 Salaries in 2015** – Any player on the World Cup roster in 2015 will be a Tier 1 player (effective the following pay period upon being named to the roster), if offered a contract.

- **Tier 1 Salaries in 2016** - Any player on the 2015 World Cup roster will begin 2016 at Tier 1, if she is offered a contract. In addition, any player on the Olympic roster in 2016 will be a Tier 1 player (effective the following pay period upon being named to the roster), if offered a contract.

- **Alternates** – Alternates on an Olympic or World Cup roster will be no less than Tier 2, and will start the subsequent year at least at Tier 2, if offered a contract for the subsequent year.

- **Floaters** – Floaters will receive $500/week for floater pay. The same roster payments under the prior CBA will apply, plus a 15an 8% increase, except that the larger roster payment will not apply until the Floater is named to a 4th roster (rather the 3rd roster). There will be 30 floater days in the first year of the quad, and 25

2

days in each other year of the quad. Floater days will be on a 12 month rolling basis. Floater days will include travel and off days when with the team.

- **Ticket Revenue** – Payment of $1.20 per/ticket sold to US Soccer-promoted home friendlies—under the same terms as the agreement with the men.

- **Win bonuses** – An 8% increase on the friendly win bonus, amounting to $1,350.

- **World Cup and Olympic Silver placement bonus** – A 30% increase to $32,500/player.

- **Victory Tour Gold bonus** – A 20% increase to $1,800,000 paid to the player pool.

- **4th Place Finish at World Cup or Olympics** – A $10,000 bonus if the team takes 4th Place in the World Cup or Olympics.

- **Other bonuses in US Soccer's Compensation Proposal are itemized along with other financial items in the attached term sheet.**

- **Meal money** –Meal money will be provided to WNT Players during any WNT event, including games, camps, practice, residency, etc. for times when team meals are not provided. This shall include travel days to and from the event.

- **WNT Chef** – US Soccer will address this issue with the Players on a case by case basis, taking into consideration such varying factors as the country hosting the tournament, the existing infrastructure in place, team chemistry and other criteria deemed to be important by the Coach.

- **Severance** – If US Soccer chooses to terminate a Player, she will receive three months' severance pay (the Player's services will not be required during those 3 months). Three months' severance will be applied at any time moving forward with the current contracted Players (this includes Keelin Winters, Stephanie Cox, and Heather Mitts).

- **Date of Contract Release Notice** – Because Players will receive 3 months' severance (as noted above), we will not need a date of contract release notice.

- **Players in Europe** – WNT Players based in Europe who are unable to participate in WNT programming on any other dates than what is currently provided for in the FIFA regulations shall not miss an agreed upon "disproportionate number of days." If a "disproportionate number of days" are missed, then the Player may receive a pro-rata reduction in salary for the time missed, but the Player's salary would never be less than 75% of the full salary in any year a viable NWSL exists and as long as all FIFA release dates are met. The parties will discuss in good faith the reasonableness of the 75% figure if the NWSL is no longer viable and US Soccer returns to a residency type program that requires the WNT players to spend more time with the WNT. WNT Players able to meet all of the release obligations for

3

National Team duty, including additional days required by the Coach, will receive the full WNT salary. US Soccer does not believe this will be an issue for this year if the language in the Players' overseas contracts is as reviewed with the effected Players. The parties agree to work in good faith to define "disproportionate"—some examples are: (i) missing 5 days out of a 10-day camp surrounding a FIFA date; and (ii) missing FIFA dates. Until "disproportionate" is defined, no player will be docked pay.

- **Injury Protection** – Injured Players will receive 100% of their WNT and NWSL salary for the shorter of the length of the injury or one year from the date of the injury. Upon an injured WNT Player's return to the WNT, she will come back on 100% of the salary of the tier she was at prior to the injury for at least three months following her return.

- **Pregnancy** – Upon a Player's return, she will come back on 100% of the salary of the tier she was at prior to the pregnancy for at least three months. While the Player is on maternity leave she will receive 50% of her salary and her NWSL salary.

- **Victory Tour** – There will be a minimum of 10 Victory Tour games for Gold, and 3 for Silver/Bronze. All games in the same calendar year following a Bronze, Silver or Gold medal will be treated as Victory Tour games. However, consistent with what the parties have done in the past, the Parties understand and agree that, for logistical and/or FIFA-related reasons, the Victory Tour may rollover into the next calendar year. Players will be paid the ~~victory tour~~Victory Tour payments even if games are not scheduled, and players must play in the ratios that existed in the prior CBA.

- **Recoupment payments** – US Soccer will not seek recoupment payments for the months of January 2013 and February 2013 from any of the 27 Players under the prior contract upon the signing of the new CBA.

- **Retroactive payments** – US Soccer will make retroactive payments for the months of January 2013, February 2013, and March 2013 to the 27 Players under the prior contract whose salaries improve upon the signing of the new CBA.

- **Insurance** - Health insurance (including vision) and dental insurance will be provided.

- **Term of WNT Contract** – 4 years

- **Sponsor Appearance Fee** – $3,000

- **Sponsor Appearances** – US Soccer may but is not required to request an additional 5 sponsor appearances by Players per year. The same provisions regarding travel shall apply to travel for sponsor appearances.

- **Marketing** - This issue remains to be discussed. US Soccer and the PA will continue to work in good faith to come to an agreement on US Soccer's rights to

use a Player's likeness with the understanding that no usage may promote a Player's endorsement of a US Soccer sponsor.

**Lifestyles:**

- **Day Care/Nanny Service –**

  - **WNT** – US Soccer will continue to provide the same benefits as under the last CBA regarding childcare for WNT Players on National Team duty, with the daily allowance per child increasing from $18 to $25.

  - **NWSL** – The NWSL will not provide day care/nanny service. However, US Soccer will discuss/arrange for this service with appropriate teams and work something out when three WNT players need it (e.g. Christie Rampone in NJ, and potentially Stephanie Cox and Amy Rodriguez when they are back).

- **Travel** – US Soccer will provide premium economy/economy plus seats when available; will provide aisle seats or window seats (per the Player's preference); and will provide direct flights when available. When a direct flight is not available, US Soccer will provide the fastest non-direct flight available. US Soccer will provide up to 2 triangular flights per year (for a Player's personal reasons, but not for Players' personal sponsor-fulfillment); these may be domestic or international flights. Players must notify the National Team General Manger of their requested flight itinerary within a reasonable amount of time of being called into the relevant camp. Under rules to be agreed upon, Players may leave from one city and return to another. Individual tickets must be upgradable so that a Player may use her own status/miles to upgrade if she chooses. Players must have the option to opt out of group tickets, upon reasonable notice, if they plan to use miles/status to obtain an upgrade. All of the aforementioned conditions (no middle seats, premium economy/economy plus seats) still apply when US Soccer is booking flights through group ticketing and when booking for US Soccer sponsor appearances. US Soccer will provide alternative travel arrangements when, for example, reasonable car service, rental car, or other transportation is most convenient for a Player.

  Travel for the Olympics will be business class or charter, unless, by its own rules applied to all national teams, the USOC prohibits it. Travel for the World Cup/Qualifiers that exceeds 3 hours will be business class or charter.

  In no event will a US Soccer staff member (other than the Head Coach) receive a more premium seat than a Player on the same flight.

- **Relocation Expenses** – Relocation expenses will be provided up to $625 per Player each year and when traded with receipts. All other terms of relocation that existed under the prior CBA for residency apply (for example J, K, and L under "Additional Terms" of Exhibit A to the CBA).

- **Tickets** – WNT tickets will be treated the same as under the prior CBA. Regarding the NWSL, Players will receive 4 tickets for home matches and 2 tickets for away games which is what all other NWSL players will receive.

- **Per Diem While in League** – NWSL per diem for WNT Players, which is the same as what their teammates in the NWSL will have, is: $10 for breakfast, $15 for lunch, and $20 for dinner if the team chooses not to provide a team meal.

- **Limit on Number of Closed-Door Games** – Before US Soccer plans more than 4 closed-door games in any one year of the quad, it will meet with Player representatives to discuss the decision and will provide a reasonable explanation to the Players.

- **Agreed upon number of games and tournaments** – There will be no agreed upon required number of games and tournaments.

- **Salaried Players will receive a set amount of break time** – US Soccer will provide a reasonable allocation of break time outside of FIFA dates and critical preparation weeks leading up to events. The Players and the Head Coach will meet to discuss the schedule and the break time.

- **Training camps outside of residency** – Before US Soccer plans more than 2 training camps not tied to games in any one year of the quad, it will meet with Player representatives to discuss the decision and will provide a reasonable explanation to the Players.

- **Vehicles provided for the exclusive use of the Players during ALL camps/residency/and competitions** – When the team is outside of a city, US Soccer will provide 5 vans. When the team is in a city, the number of vans provided will be discussed with the Players in advance and resolved in good faith. If the Players and US Soccer cannot reach an agreement, 5 vans will be provided.

- **Trainers/PTs/Massage Therapists** – US Soccer will provide 2 trainers and 2 massage therapists at all National Team camps and games; at least one 1 of the trainers will be a registered Physical Therapist. The Players will have input into the staff hired. One full-time PT will act as a liaison between the Players, doctors, coaching staff, and US Soccer to ensure that technical and medical decisions can be made in the best interests of player health.

**League:**

- **Defined criteria for League** – Division 1

- **League salaries for the current 27 WNT Players (inclusive of housing)** –

   2013: $50,000

   2014: $52,000

   2015: $54,000

   2016: $56,000

   If over the course of the quad, any of the 27 current WNT Players loses her WNT contract, but then regains it, she will receive this NWSL salary if she plays in the NWSL while under contract with the WNT. This salary is limited to the current 27 WNT Players because they are being viewed as the founding Players.

- **League salaries for new salaried Players to the WNT (inclusive of housing)** - "New" refers to any WNT Players who are not a part of the current 27 Players.

   2013: $40,000

   2014: $42,000

   2015: $44,000

   2016: $46,000

- **League salary in year 2 for a Player released by the WNT whose option is exercised for the second year** – In year 2, if the league wants to keep the option of retaining a Player released by the WNT, the League must make a qualified offer at the higher of (i) 65% of her NWSL compensation (salary plus housing), or (ii) at the highest paid non-WNT player (plus housing) in the League. The League must determine within 3 weeks of the conclusion of the relevant Team's season (but no later than August 31) whether it will make a qualified offer for a Player that is not given a WNT contract (understanding that this occurs before any decisions are made with respect to the Players' WNT contracts for the next year). The Team's qualified offer must include the maximum housing given to any non-WNT player. The Player who has been released from the WNT is free to play in Europe without a transfer fee.

- **Most Favored Player Status** – The parties will work in good faith to reach an agreement on a most-favored-player clause so that no non-WNT Player receives compensation (salary plus housing) greater than a WNT Player. In addition, all WNT Players will receive the greater of their annual increase or the increase given to the highest paid non-WNT player.a clause will be agreed upon whereby WNT Player salaries in the NWSL will increase proportionately to salaries (plus housing)

7

<u>paid to the highest-paid non-WNT players in the NWSL. The intent of such a clause will be to ensure that non-WNT player salary increases do not unreasonably outpace increases to WNT Players' salaries upon the success and growth of the NWSL.</u>

- **NWSL payment schedule** – US Soccer will pay WNT Players their full NWSL salary during the season (versus over a 12-month calendar year).

- **Free Agency/Trades** – There will be no free agency unless free agency is created within the league. However, US Soccer (including the Head Coach) commits to meeting with any Players to address their NWSL situation and will make its best efforts to coordinate a trade, if US Soccer and the Player agree that a trade is in order. Included in that discussion would be whether it is appropriate for the Player to be playing in the NWSL in light of injuries (consider Abby's situation before the World Cup and Michelle Akers' 1999 situation).

- ~~**Transfer Fees** – There will be no transfer fees in any year in which a WNT player has the option to not play in the NWSL.~~

- **Term NWSL Contract Upon Release from WNT** – If a WNT Player is released from her WNT contract, she remains on her contract with the NWSL for the remainder of that year.

- **Term of Teams' Rights to Players** – WNT Players have the option of choosing either of the two scenarios below (the player must inform her team by August 31, 2013 whether she intends to pursue Europe in year 2):

  (i) opt to play in Europe in 2014, and return to the NWSL in years 2015 and 2016 (if there is still a viable league); or

  (ii) commit to play in the NWSL in 2013 and 2014, and have the ability to opt to play in Europe in 2015 and/or 2016.

- **Quality of the NWSL** – After each year of the NWSL, US Soccer will sit down with the leadership of the PA and the Head Coach to discuss the quality of the NWSL.

DMEAST #16492082 v46

Document comparison by Workshare Compare on Tuesday, March 19, 2013
11:54:08 AM

| Input: | |
|---|---|
| Document 1 ID | file://H:\Blocks\USWNT\MOU\Memorandum of Understanding DMEAST_16492082(4).DOCX |
| Description | Memorandum of Understanding DMEAST_16492082(4) |
| Document 2 ID | file://H:\Blocks\USWNT\MOU\16492082_6.DOCX.docx |
| Description | 16492082_6.DOCX |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 16 |
| Deletions | 7 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 23 |

# Ballard Spahr
**LLP**

**MEMORANDUM**

| | |
|---|---|
| **TO** | United States Soccer Federation |
| **FROM** | Women's National Team Players' Association |
| **DATE** | March 19, 2013 |
| **RE** | Memorandum of Understanding |

------------------------------------------------------------------------------------------

**WNT Financial Terms:**

- **Number of Players under Contract** – At all times there will be 24 WNT Players under contract (included within the 24 are injured Players, Players on maternity leave, and Players receiving severance payments).

- **One contract** – There will be one contract for WNT players covering both the WNT and the NWSL so that WNT Players will not need to enter into a contract with the NWSL. The parties will work in good faith to come to an agreement on the WNT Players' marketing and spokesperson duties related to the NWSL.

- **Tiers** – At all times there must be a minimum of 18 Tier 1 contracts. US Soccer retains the same ability to terminate contracted players, subject to the new severance provisions. With the exception noted below for 2013, US Soccer retains the same ability to move players from one tier to another as of July 1 each year, based on performance but at all times there will be no less than 18 Tier 1 players. Except as provided below, there may be no more than a maximum of 4 Tier 3 contracts. Any decision to tier a player at Tier 3 should be based on ability. The only time there may be more than 4 Tier 3 contracts is if the total number of players under contract (including players receiving severance payments, if any) exceeds 24.

- **WNT Salaries** – Salaries will increase 15%, but there will be no increase on a yearly basis:

  - $72,000 for Tier 1

  - $51,000 for Tier 2

  - $36,000 for Tier 3

- **Salary if there is no league** – If there is no league salary (i.e., if there is no league during any year of the quad) the salary increase for the WNT will increase by 15% over the "no league" salary under the last quad:

  - $101,000 for Tier 1

  - $72,000 for Tier 2

  - $43,000 for Tier 3

- **"No League" Salary** – The "no league" salary listed above will be offered: (i) if there is no league, or (ii) if US Soccer has "pulled out" of the league (we will work in good faith to come to an agreement on how to define whether US Soccer has "pulled out" of the league). If either of the two scenarios occurs, players will receive the "no league" salary regardless whether they choose to play for a club in Europe or in the US, so long as they meet their WNT commitments.

- **Tier 1 Salaries in 2013** - Any player on the last Olympic and/or World Cup roster will be a Tier 1 player in 2013, if she is offered a contract in 2013. (Anyone currently on the team has a contract.) These players may not be moved down a tier in 2013, so long as they have a contract.

- **Tier 1 Salaries in 2015** – Any player on the World Cup roster in 2015 will be a Tier 1 player (effective the following pay period upon being named to the roster), if offered a contract.

- **Tier 1 Salaries in 2016** - Any player on the 2015 World Cup roster will begin 2016 at Tier 1, if she is offered a contract. In addition, any player on the Olympic roster in 2016 will be a Tier 1 player (effective the following pay period upon being named to the roster), if offered a contract.

- **Alternates** – Alternates on an Olympic or World Cup roster will be no less than Tier 2, and will start the subsequent year at least at Tier 2, if offered a contract for the subsequent year.

- **Floaters** – Floaters will receive $500/week for floater pay. The same roster payments under the prior CBA will apply, plus an 8% increase, except that the larger roster payment will not apply until the Floater is named to a 4th roster (rather the 3rd roster). There will be 30 floater days in the first year of the quad,

2

and 25 days in each other year of the quad. Floater days will be on a 12 month rolling basis. Floater days will include travel and off days when with the team.

- **Ticket Revenue** – Payment of $1.20 per/ticket sold to US Soccer-promoted home friendlies—under the same terms as the agreement with the men.

- **Win bonuses** – An 8% increase on the friendly win bonus, amounting to $1,350.

- **World Cup and Olympic Silver placement bonus** – A 30% increase to $32,500/player.

- **Victory Tour Gold bonus** – A 20% increase to $1,800,000 paid to the player pool.

- **4th Place Finish at World Cup or Olympics** – A $10,000 bonus if the team takes 4th Place in the World Cup or Olympics.

- **Other bonuses in US Soccer's Compensation Proposal are itemized along with other financial items in the attached term sheet.**

- **Meal money** –Meal money will be provided to WNT Players during any WNT event, including games, camps, practice, residency, etc. for times when team meals are not provided. This shall include travel days to and from the event.

- **WNT Chef** – US Soccer will address this issue with the Players on a case by case basis, taking into consideration such varying factors as the country hosting the tournament, the existing infrastructure in place, team chemistry and other criteria deemed to be important by the Coach.

- **Severance** – If US Soccer chooses to terminate a Player, she will receive three months' severance pay (the Player's services will not be required during those 3 months). Three months' severance will be applied at any time moving forward with the current contracted Players (this includes Keelin Winters, Stephanie Cox, and Heather Mitts).

- **Date of Contract Release Notice** – Because Players will receive 3 months' severance (as noted above), we will not need a date of contract release notice.

- **Players in Europe** – WNT Players based in Europe who are unable to participate in WNT programming on any other dates than what is currently provided for in the FIFA regulations shall not miss an agreed upon "disproportionate number of days." If a "disproportionate number of days" is missed, then the Player may receive a pro-rata reduction in salary for the time missed, but the Player's salary would never be less than 75% of the full salary in any year a viable NWSL exists and as long as all FIFA release dates are met. The parties will discuss in good faith the reasonableness of the 75% figure if the NWSL is no longer viable and US Soccer returns to a residency type program that requires the WNT players to

spend more time with the WNT. WNT Players able to meet all of the release obligations for National Team duty, including additional days required by the Coach, will receive the full WNT salary. US Soccer does not believe this will be an issue for this year if the language in the Players' overseas contracts is as reviewed with the effected Players. The parties agree to work in good faith to define "disproportionate"—some examples are: (i) missing 5 days out of a 10-day camp surrounding a FIFA date; and (ii) missing FIFA dates. Until "disproportionate" is defined, no player will be docked pay.

- **Injury Protection** – Injured Players will receive 100% of their WNT and NWSL salary for the shorter of the length of the injury or one year from the date of the injury. Upon an injured WNT Player's return to the WNT, she will come back on 100% of the salary of the tier she was at prior to the injury for at least three months following her return.

- **Pregnancy** – Upon a Player's return, she will come back on 100% of the salary of the tier she was at prior to the pregnancy for at least three months. While the Player is on maternity leave she will receive 50% of her salary and her NWSL salary.

- **Victory Tour** – There will be a minimum of 10 Victory Tour games for Gold, and 3 for Silver/Bronze. All games in the same calendar year following a Bronze, Silver or Gold medal will be treated as Victory Tour games. However, consistent with what the parties have done in the past, the Parties understand and agree that, for logistical and/or FIFA-related reasons, the Victory Tour may rollover into the next calendar year. Players will be paid the Victory Tour payments even if games are not scheduled, and players must play in the ratios that existed in the prior CBA.

- **Recoupment payments** – US Soccer will not seek recoupment payments for the months of January 2013 and February 2013 from any of the 27 Players under the prior contract upon the signing of the new CBA.

- **Retroactive payments** – US Soccer will make retroactive payments for the months of January 2013, February 2013, and March 2013 to the 27 Players under the prior contract whose salaries improve upon the signing of the new CBA.

- **Insurance -** Health insurance (including vision) and dental insurance will be provided.

- **Term of WNT Contract** – 4 years

- **Sponsor Appearance Fee** – $3,000

- **Sponsor Appearances** – US Soccer may but is not required to request an additional 5 sponsor appearances by Players per year. The same provisions regarding travel shall apply to travel for sponsor appearances.

- **Marketing** - This issue remains to be discussed. US Soccer and the PA will continue to work in good faith to come to an agreement on US Soccer's rights to use a Player's likeness with the understanding that no usage may promote a Player's endorsement of a US Soccer sponsor.

**Lifestyles:**

- **Day Care/Nanny Service –**

  - **WNT** – US Soccer will continue to provide the same benefits as under the last CBA regarding childcare for WNT Players on National Team duty, with the daily allowance per child increasing from $18 to $25.

  - **NWSL** – The NWSL will not provide day care/nanny service. However, US Soccer will discuss/arrange for this service with appropriate teams and work something out when three WNT players need it (e.g. Christie Rampone in NJ, and potentially Stephanie Cox and Amy Rodriguez when they are back).

- **Travel** – US Soccer will provide premium economy/economy plus seats when available; will provide aisle seats or window seats (per the Player's preference); and will provide direct flights when available. When a direct flight is not available, US Soccer will provide the fastest non-direct flight available. US Soccer will provide up to 2 triangular flights per year (for a Player's personal reasons, but not for Players' personal sponsor-fulfillment); these may be domestic or international flights. Players must notify the National Team General Manger of their requested flight itinerary within a reasonable amount of time of being called into the relevant camp. Under rules to be agreed upon, Players may leave from one city and return to another. Individual tickets must be upgradable so that a Player may use her own status/miles to upgrade if she chooses. Players must have the option to opt out of group tickets, upon reasonable notice, if they plan to use miles/status to obtain an upgrade. All of the aforementioned conditions (no middle seats, premium economy/economy plus seats) still apply when US Soccer is booking flights through group ticketing and when booking for US Soccer sponsor appearances. US Soccer will provide alternative travel arrangements when, for example, reasonable car service, rental car, or other transportation is most convenient for a Player.

  Travel for the Olympics will be business class or charter, unless, by its own rules applied to all national teams, the USOC prohibits it. Travel for the World Cup/Qualifiers that exceeds 3 hours will be business class or charter.

  In no event will a US Soccer staff member (other than the Head Coach) receive a more premium seat than a Player on the same flight.

- **Relocation Expenses** – Relocation expenses will be provided up to $625 per Player each year and when traded with receipts. All other terms of relocation that

existed under the prior CBA for residency apply (for example J, K, and L under "Additional Terms" of Exhibit A to the CBA).

- **Tickets** – WNT tickets will be treated the same as under the prior CBA. Regarding the NWSL, Players will receive 4 tickets for home matches and 2 tickets for away games which is what all other NWSL players will receive.

- **Per Diem While in League** – NWSL per diem for WNT Players, which is the same as what their teammates in the NWSL will have, is: $10 for breakfast, $15 for lunch, and $20 for dinner if the team chooses not to provide a team meal.

- **Limit on Number of Closed-Door Games** – Before US Soccer plans more than 4 closed-door games in any one year of the quad, it will meet with Player representatives to discuss the decision and will provide a reasonable explanation to the Players.

- **Agreed upon number of games and tournaments** – There will be no agreed upon required number of games and tournaments.

- **Salaried Players will receive a set amount of break time** – US Soccer will provide a reasonable allocation of break time outside of FIFA dates and critical preparation weeks leading up to events. The Players and the Head Coach will meet to discuss the schedule and the break time.

- **Training camps outside of residency** – Before US Soccer plans more than 2 training camps not tied to games in any one year of the quad, it will meet with Player representatives to discuss the decision and will provide a reasonable explanation to the Players.

- **Vehicles provided for the exclusive use of the Players during ALL camps/residency/and competitions** – When the team is outside of a city, US Soccer will provide 5 vans. When the team is in a city, the number of vans provided will be discussed with the Players in advance and resolved in good faith. If the Players and US Soccer cannot reach an agreement, 5 vans will be provided.

- **Trainers/PTs/Massage Therapists** – US Soccer will provide 2 trainers and 2 massage therapists at all National Team camps and games; at least one 1 of the trainers will be a registered Physical Therapist. The Players will have input into the staff hired. One full-time PT will act as a liaison between the Players, doctors, coaching staff, and US Soccer to ensure that technical and medical decisions can be made in the best interests of player health.

6

**League:**

- **Defined criteria for League** – Division 1

- **League salaries for the current 27 WNT Players (inclusive of housing)** –

  2013: $50,000

  2014: $52,000

  2015: $54,000

  2016: $56,000

  If over the course of the quad, any of the 27 current WNT Players loses her WNT contract, but then regains it, she will receive this NWSL salary if she plays in the NWSL while under contract with the WNT. This salary is limited to the current 27 WNT Players because they are being viewed as the founding Players.

- **League salaries for new salaried Players to the WNT (inclusive of housing)** - "New" refers to any WNT Players who are not a part of the current 27 Players.

  2013: $40,000

  2014: $42,000

  2015: $44,000

  2016: $46,000

- **League salary in year 2 for a Player released by the WNT whose option is exercised for the second year** – In year 2, if the league wants to keep the option of retaining a Player released by the WNT, the League must make a qualified offer at the higher of (i) 65% of her NWSL compensation (salary plus housing), or (ii) at the highest paid non-WNT player (plus housing) in the League. The League must determine within 3 weeks of the conclusion of the relevant Team's season (but no later than August 31) whether it will make a qualified offer for a Player that is not given a WNT contract (understanding that this occurs before any decisions are made with respect to the Players' WNT contracts for the next year). The Team's qualified offer must include the maximum housing given to any non-WNT player. The Player who has been released from the WNT is free to play in Europe without a transfer fee.

- **Most Favored Player Status** – The parties will work in good faith to reach an agreement on a most-favored-player clause so that no non-WNT Player receives

7

compensation (salary plus housing) greater than a WNT Player. In addition, a clause will be agreed upon whereby WNT Player salaries in the NWSL will increase proportionately to salaries (plus housing) paid to the highest-paid non-WNT players in the NWSL. The intent of such a clause will be to ensure that non-WNT player salary increases do not unreasonably outpace increases to WNT Players' salaries upon the success and growth of the NWSL.

- **NWSL payment schedule** – US Soccer will pay WNT Players their full NWSL salary during the season (versus over a 12-month calendar year).

- **Free Agency/Trades** – There will be no free agency unless free agency is created within the league. However, US Soccer (including the Head Coach) commits to meeting with any Players to address their NWSL situation and will make its best efforts to coordinate a trade, if US Soccer and the Player agree that a trade is in order. Included in that discussion would be whether it is appropriate for the Player to be playing in the NWSL in light of injuries (consider Abby's situation before the World Cup and Michelle Akers' 1999 situation).

- **Term NWSL Contract Upon Release from WNT** – If a WNT Player is released from her WNT contract, she remains on her contract with the NWSL for the remainder of that year.

- **Term of Teams' Rights to Players** – WNT Players have the option of choosing either of the two scenarios below (the player must inform her team by August 31, 2013 whether she intends to pursue Europe in year 2):

  (i) opt to play in Europe in 2014, and return to the NWSL in years 2015 and 2016 (if there is still a viable league); or

  (ii) commit to play in the NWSL in 2013 and 2014, and have the ability to opt to play in Europe in 2015 and/or 2016.

- **Quality of the NWSL** – After each year of the NWSL, US Soccer will sit down with the leadership of the PA and the Head Coach to discuss the quality of the NWSL.

8

# EXHIBIT F

Return

FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT

| | |
|---|---|
| U.S. Department of Labor<br>Office of Labor-Management Standards<br>Washington, DC 20210 | Form Approved<br>Office of Management and Budget |

| MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR MORE IN TOTAL ANNUAL RECEIPTS AND LABOR ORGANIZATIONS IN TRUSTEESHIP | No. 1245-0003<br>Expires: 08-31-2016 |
|---|---|

This report is manadatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

| READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT. | | | |
|---|---|---|---|
| For Official Use Only | 1. FILE NUMBER<br>542-192 | 2. PERIOD COVERED<br>From          01/01/2013<br>Through      12/31/2013 | 3. (a) AMENDED - Is this an amended report:                                      No<br>(b) HARDSHIP - Filed under the hardship procedures:              No<br>(c) TERMINAL - This is a terminal report:                              No |

| 4. AFFILIATION OR ORGANIZATION NAME<br>U S WOMENS NATIONAL SOCCER | 8. MAILING ADDRESS (Type or print in capital letters) |
|---|---|
| 5. DESIGNATION (Local, Lodge, etc.)　　6. DESIGNATION NBR | First Name<br>JOHN B.　　　　　　Last Name<br>LANGEL |
| 7. UNIT NAME (if any)<br>TEAM PLAYERS ASSOCIATION | P.O Box - Building and Room Number |
| | Number and Street<br>1735 MARKET STREET 51ST FLOOR |
| 9. Are your organization's records kept at its mailing address?　　Yes | City<br>PHILADELPHIA |
| | State<br>PA　　　　　　ZIP Code + 4<br>191037599 |

| Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.) |
|---|
| 70. SIGNED:   Christie Rampone                          PRESIDENT    71. SIGNED:   Shannon Boxx                                  TREASURER<br>Date:  Mar 25, 2014    Telephone Number:   215-864-8227      Date:  Mar 24, 2014    Telephone Number:   215-864-8227 |

Form LM-2 (Revised 2010)

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 151 of 217 PageID #:383

ITEMS 10 THROUGH 21

10. During the reporting period did the labor organization create or participate in the administration of a trust or a fund or organization, as defined in the instructions, which provides benefits for members or beneficiaries?   No

11(a). During the reporting period did the labor organization have a political action committee (PAC) fund?   No

11(b). During the reporting period did the labor organization have a subsidiary organization as defined in Section X of these Instructions?   No

12. During the reporting period did the labor organization have an audit or review of its books and records by an outside accountant or by a parent body auditor/representative?   No

13. During the reporting period did the labor organization discover any loss or shortage of funds or other assets? (Answer "Yes" even if there has been repayment or recovery.)   No

14. What is the maximum amount recoverable under the labor organization's fidelity bond for a loss caused by any officer, employee or agent of the labor organization who handled union funds?   $5,000,000

15. During the reporting period did the labor organization acquire or dispose of any assets in a manner other than purchase or sale?   No

16. Were any of the labor organization's assets pledged as security or encumbered in any way at the end of the reporting period?   No

17. Did the labor organization have any contingent liabilities at the end of the reporting period?   No

18. During the reporting period did the labor organization have any changes in its constitution or bylaws, other than rates of dues and fees, or in practices/procedures listed in the instructions?   No

19. What is the date of the labor organization's next regular election of officers?   04/2014

Form LM-2 (Revised 2010)

20. How many members did the labor organization have at the end of the reporting period?   29

21. What are the labor organization's rates of dues and fees?

| Rates of Dues and Fees | | | | | |
|---|---|---|---|---|---|
| Dues/Fees | Amount | | Unit | Minimum | Maximum |
| (a) Regular Dues/Fees | 0 | per | 0 | 0 | 0 |
| (b) Working Dues/Fees | 0 | per | 0 | 0 | 0 |
| (c) Initiation Fees | 0 | per | 0 | 0 | 0 |
| (d) Transfer Fees | 0 | per | 0 | 0 | 0 |
| (e) Work Permits | 0 | per | 0 | 0 | 0 |

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 152 of 217 PageID #:384

DOL Form Report (Disclosure)

STATEMENT A - ASSETS AND LIABILITIES

FILE NUMBER: 542-192

| ASSETS | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|
| 22. Cash | | $40,809 | $76,837 |
| 23. Accounts Receivable | 1 | $0 | $0 |
| 24. Loans Receivable | 2 | $0 | |
| 25. U.S. Treasury Securities | | $0 | $0 |
| 26. Investments | 5 | $0 | |
| 27. Fixed Assets | 6 | $0 | |
| 28. Other Assets | 7 | $0 | |
| 29. TOTAL ASSETS | | $40,809 | $76,837 |

| LIABILITIES | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|
| 30. Accounts Payable | 8 | $0 | |
| 31. Loans Payable | 9 | $0 | |
| 32. Mortgages Payable | | $0 | $0 |
| 33. Other Liabilities | 10 | $0 | |
| 34. TOTAL LIABILITIES | | $0 | $0 |

| | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|
| 35. NET ASSETS | $40,809 | $76,837 |

Form LM-2 (Revised 2010)

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 153 of 217 PageID #:385

DOL Form Report (Disclosure)

STATEMENT B - RECEIPTS AND DISBURSEMENTS

FILE NUMBER: 542-192

| CASH RECEIPTS | SCH | AMOUNT | CASH DISBURSEMENTS | SCH | AMOUNT |
|---|---|---|---|---|---|
| 36. Dues and Agency Fees | | $0 | 50. Representational Activities | 15 | $0 |
| 37. Per Capita Tax | | $0 | 51. Political Activities and Lobbying | 16 | $0 |
| 38. Fees, Fines, Assessments, Work Permits | | $0 | 52. Contributions, Gifts, and Grants | 17 | $0 |
| 39. Sale of Supplies | | $0 | 53. General Overhead | 18 | $83,625 |
| 40. Interest | | $0 | 54. Union Administration | 19 | $454,318 |
| 41. Dividends | | $0 | 55. Benefits | 20 | |
| 42. Rents | | $0 | 56. Per Capita Tax | | $0 |
| 43. Sale of Investments and Fixed Assets | 3 | | 57. Strike Benefits | | $0 |
| 44. Loans Obtained | 9 | | 58. Fees, Fines, Assessments, etc. | | $0 |
| 45. Repayments of Loans Made | 2 | | 59. Supplies for Resale | | $0 |
| 46. On Behalf of Affiliates for Transmittal to Them | | $0 | 60. Purchase of Investments and Fixed Assets | 4 | |
| 47. From Members for Disbursement on Their Behalf | | $0 | 61. Loans Made | 2 | |
| | | | 62. Repayment of Loans Obtained | 9 | |
| 48. Other Receipts | 14 | $573,971 | 63. To Affiliates of Funds Collected on Their Behalf | | $0 |
| 49. TOTAL RECEIPTS | | $573,971 | 64. On Behalf of Individual Members | | $0 |
| | | | 65. Direct Taxes | | $0 |
| | | | | | |
| | | | 66. Subtotal | | $537,943 |
| | | | 67. Withholding Taxes and Payroll Deductions | | |
| | | | 67a. Total Withheld | $0 | |
| | | | 67b. Less Total Disbursed | $0 | |
| | | | 67c. Total Withheld But Not Disbursed | | |
| | | | 68. TOTAL DISBURSEMENTS | | $537,943 |

Form LM-2 (Revised 2010)

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 154 of 217 PageID #:386

SCHEDULE 1 - ACCOUNTS RECEIVABLE AGING SCHEDULE

FILE NUMBER: 542-192

| Entity or Individual Name (A) | Total Account Receivable (B) | 90-180 Days Past Due (C) | 180+ Days Past Due (D) | Liquidated Account Receivable (E) |
|---|---|---|---|---|
| Total of all itemized accounts receivable | $0 | $0 | $0 | $0 |
| Totals from all other accounts receivable | | | | |
| **Totals**(Total of Column (B) will be automatically entered in Item 23, Column(B)) | $0 | $0 | $0 | $0 |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

SCHEDULE 2 - LOANS RECEIVABLE

FILE NUMBER: 542-192

| List below loans to officers, employees, or members which at any time during the reporting period exceeded $250 and list all loans to business enterprises regarless of amount. (A) | Loans Outstanding at Start of Period (B) | Loans Made During Period (C) | Repayments Received During Period | | Loans Outstanding at End of Period (E) |
|---|---|---|---|---|---|
| | | | Cash (D)(1) | Other Than Cash (D)(2) | |
| Total of loans not listed above | | | | | |
| Total of all lines above | $0 | $0 | $0 | $0 | $0 |
| Totals will be automatically entered in... | Item 24 Column (A) | Item 61 | Item 45 | Item 69 with Explanation | Item 24 Column (B) |

Form LM-2 (Revised 2010)

SCHEDULE 3 - SALE OF INVESTMENTS AND FIXED ASSETS

FILE NUMBER: 542-192

| Description (if land or buildings give location)<br>(A) | Cost<br>(B) | Book Value<br>(C) | Gross Sales Price<br>(D) | Amount Received<br>(E) |
|---|---|---|---|---|
| Total of all lines above | $0 | $0 | $0 | $0 |
| | | | Less Reinvestments | |
| (The total from Net Sales Line will be automatically entered in Item 43) | | | Net Sales | |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

SCHEDULE 4 - PURCHASE OF INVESTMENTS AND FIXED ASSETS

FILE NUMBER: 542-192

| Description (if land or buildings, give location)<br>(A) | Cost<br>(B) | Book Value<br>(C) | Cash Paid<br>(D) |
|---|---|---|---|
| Total of all lines above | $0 | $0 | $0 |
| | | Less Reinvestments | |
| (The total from Net Purchases Line will be automatically entered in Item 60.) | | Net Purchases | |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

SCHEDULE 5 - INVESTMENTS

FILE NUMBER: 542-192

| Description (A) | Amount (B) |
|---|---|
| Marketable Securities | |
| A. Total Cost | |
| B. Total Book Value | |
| C. List each marketable security which has a book value over $5,000 and exceeds 5% of Line B. | |
| Other Investments | |
| D. Total Cost | |
| E. Total Book Value | |
| F. List each other investment which has a book value over $5,000 and exceeds 5% of Line E. Also, list each subsidiary for which separate reports are attached. | |
| G. Total of Lines B and E (Total will be automatically entered in Item 26, Column(B)) | $0 |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

SCHEDULE 6 - FIXED ASSETS

FILE NUMBER: 542-192

| Description (A) | Cost or Other Basis (B) | Total Depreciation or Amount Expensed (C) | Book Value (D) | Value (E) |
|---|---|---|---|---|
| A. Land (give location) | $0 | | $0 | $0 |
| B. Buildings (give location) | $0 | $0 | $0 | $0 |
| C. Automobiles and Other Vehicles | | | | |
| D. Office Furniture and Equipment | | | | |
| E. Other Fixed Assets | | | | |
| F. Totals of Lines A through E (Column(D) Total will be automatically entered in Item 27, Column(B)) | $0 | $0 | $0 | $0 |

Form LM-2 (Revised 2003)

DOL Form Report (Disclosure)

SCHEDULE 7 - OTHER ASSETS

FILE NUMBER: 542-192

| Description (A) | Book Value (B) |
|---|---|
| **Total** (Total will be automatically entered in Item 28, Column(B)) | $0 |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

Page 12 of 28

SCHEDULE 8 - ACCOUNTS PAYABLE AGING SCHEDULE

FILE NUMBER: 542-192

| Entity or Individual Name<br>(A) | Total Account<br>Payable<br>(B) | 90-180 Days<br>Past Due<br>(C) | 180+ Days Past<br>Due<br>(D) | Liquidated Account<br>Payable<br>(E) |
|---|---|---|---|---|
| Total for all itemized accounts payable | $0 | $0 | $0 | $0 |
| Total from all other accounts payable | $0 | $0 | $0 | $0 |
| **Totals** (Total for Column(B) will be automatically entered in Item 30, Column(D)) | $0 | $0 | $0 | $0 |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

Page 13 of 28

SCHEDULE 9 - LOANS PAYABLE

FILE NUMBER: 542-192

| Source of Loans Payable at Any Time During the Reporting Period (A) | Loans Owed at Start of Period (B) | Loans Obtained During Period (C) | Repayment During Period Cash (D)(1) | Repayment During Period Other Than Cash (D)(2) | Loans Owed at End of Period (E) |
|---|---|---|---|---|---|
| Total Loans Payable | $0 | $0 | $0 | $0 | $0 |
| Totals will be automatically entered in... | Item 31 Column (C) | Item 44 | Item 62 | Item 69 with Explanation | Item 31 Column (D) |

Form LM-2 (Revised 2010)

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 163 of 217 PageID #:395

SCHEDULE 10 - OTHER LIABILITIES

FILE NUMBER: 542-192

| Description<br>(A) | Amount at End of Period<br>(B) |
|---|---|
| **Total Other Liabilities** (Total will be automatically entered in Item 33, Column(D)) | $0 |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

SCHEDULE 11 - ALL OFFICERS AND DISBURSEMENTS TO OFFICERS

FILE NUMBER: 542-192

| | (A) Name | (B) Title | (C) Status | | (D) Gross Salary Disbursements (before any deductions) | (E) Allowances Disbursed | (F) Disbursements for Official Business | | (G) Other Disbursements not reported in (D) through (F) | | (H) TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A B C | RAMPONE, CHRISTIE PRESIDENT C | | | | $0 | $0 | $0 | | $0 | | $0 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | |
| A B C | WAMBACH, ABBY VICE PRESIDENT C | | | | $0 | $0 | $0 | | $0 | | $0 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | |
| A B C | BOXX, SHANNON TREASURER C | | | | $0 | $0 | $0 | | $0 | | $0 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | |
| Total Officer Disbursements | | | | | $0 | $0 | $0 | | $0 | | $0 |
| Less Deductions | | | | | | | | | | | |
| Net Disbursements | | | | | | | | | | | $0 |

Form LM-2 (Revised 2010)

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 165 of 217 PageID #:397

SCHEDULE 12 - DISBURSEMENTS TO EMPLOYEES

FILE NUMBER: 542-192

| | Schedule 15 Representational Activities | Schedule 16 Political Activities and Lobbying | Schedule 17 Contributions | Schedule 18 General Overhead | Schedule 19 Administration | |
|---|---|---|---|---|---|---|
| Total Employee Disbursements | | $0 | $0 | $0 | $0 | $0 |
| Less Deductions | | | | | | |
| Net Disbursements | | | | | | $0 |

Form LM-2 (Revised 2010)

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 166 of 217 PageID #:398

DOL Form Report (Disclosure)

SCHEDULE 13 - MEMBERSHIP STATUS

FILE NUMBER: 542-192

| Category of Membership<br>(A) | Number<br>(B) | Voting Eligibility<br>(C) |
|---|---|---|
| ALL MEMBERS OF THE USWNST PLAYER'S ASSOCIATION | 29 | Yes |
| **Members** (Total of all lines above) | 29 | |
| Agency Fee Payers* | 0 | |
| Total Members/Fee Payers | 29 | |
| *Agency Fee Payers are not considered members of the labor organization. | | |

Form LM-2 (Revised 2010)

https://olms.dol-esa.gov/query/orgReport.do

12/28/2015

DOL Form Report (Disclosure)

Page 18 of 28

DETAILED SUMMARY PAGE - SCHEDULES 14 THROUGH 19

FILE NUMBER: 542-192

| SCHEDULE 14   OTHER RECEIPTS | |
|---|---|
| 1. Named Payer Itemized Receipts | $573,971 |
| 2. Named Payer Non-itemized Receipts | $0 |
| 3. All Other Receipts | |
| 4. Total Receipts | $573,971 |
| | |
| | |

| SCHEDULE 17   CONTRIBUTIONS, GIFTS & GRANTS | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | |
| 6. Total Disbursements | $0 |

| SCHEDULE 15   REPRESENTATIONAL ACTIVITIES | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | |
| 6. Total Disbursements | $0 |

| SCHEDULE 18   GENERAL OVERHEAD | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $83,625 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | |
| 6. Total Disbursements | $83,625 |

| SCHEDULE 16   POLITICAL ACTIVITIES AND LOBBYING | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | |
| 6. Total Disbursement | $0 |

| SCHEDULE 19   UNION ADMINISTRATION | |
|---|---|
| 1. Named Payee Itemized Disbursements | $454,318 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | |
| 6. Total Disbursements | $454,318 |

Form LM-2 (Revised 2010)

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 168 of 217 PageID #:400

SCHEDULE 14 - OTHER RECEIPTS

FILE NUMBER: 542-192

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| United States Soccer Federation Inc. | Payments Under CBA | 03/06/2013 | $34,919 |
| | Payments Under CBA | 04/23/2013 | $425,000 |
| 1801 S. Prairie Ave. | Payments Under CBA | 08/30/2013 | $70,950 |
| Chicago | Payments Under CBA | 11/12/2013 | $13,102 |
| IL | Payments Under CBA | 12/24/2013 | $30,000 |
| 60616 | | | |
| Type or Classification (B) | Total Itemized Transactions with this Payee/Payer | | $573,971 |
| | Total Non-Itemized Transactions with this Payee/Payer | | $0 |
| National Governing Body for US Soccer | Total of All Transactions with this Payee/Payer for This Schedule | | $573,971 |

Form LM-2 (Revised 2010)

SCHEDULE 15 - REPRESENTATIONAL ACTIVITIES

FILE NUMBER: 542-192

There was no data found for this schedule.

SCHEDULE 16 - POLITICAL ACTIVITIES AND LOBBYING

FILE NUMBER 542-192

There was no data found for this schedule.

SCHEDULE 17 - CONTRIBUTIONS, GIFTS & GRANTS

FILE NUMBER: 542-192

There was no data found for this schedule.

SCHEDULE 18 - GENERAL OVERHEAD

FILE NUMBER: 542-192

| Name and Address (A) | | | |
|---|---|---|---|
| Alexandra Kreiger | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $2,966 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $2,966 |
| Type or Classification (B) | | | |
| Member | | | |
| Name and Address (A) | | | |
| Alexandra Patricia Morgan | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $4,129 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $4,129 |
| Type or Classification (B) | | | |
| Member | | | |
| Name and Address (A) | | | |
| Ashlyn M Harris | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $425 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $425 |
| Type or Classification (B) | | | |
| Member | | | |
| Name and Address (A) | | | |
| Carli Lloyd | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $4,761 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $4,761 |
| Type or Classification (B) | | | |
| Member | | | |
| Name and Address (A) | | | |
| Christen Press | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $3,243 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $3,243 |
| Type or Classification (B) | | | |
| Member | | | |
| Name and Address (A) | | | |

| Christie Rampone | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $4,761 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $4,761 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Erika Tumrak | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $873 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $873 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Heather Feeley | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $425 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $425 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Heather O'Reilly Werry | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $4,761 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $4,761 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Hope Solo | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $3,916 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $3,916 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Jillian Loyden | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $3,243 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $3,243 |
| ssification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Keelin Winters | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $425 |

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 170 of 217 PageID #:402

| 98021 | Total of All Transactions with this Payee/Payer for This Schedule | | | $425 |
|---|---|---|---|---|
| Type or Classification (B) | | | | |
| Member | | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Kelley O'Hara | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $3,243 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $3,243 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Kristen Mewis | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $3,208 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $3,208 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Lauren Cheney | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $4,761 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $4,761 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Leigh A Robinson | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $873 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $873 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Lori A Lindsey | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $1,057 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $1,057 |
| Type or Classification (B) | | | |
| Member | | | |

| Name and Address (A) | | | |
|---|---|---|---|
| Mary A Wambach | | | |
| | Purpose (C) | Date (D) | Amount (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $4,761 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $4,761 |
| Type or Classification (B) | | | |
| Member | | | |
| Name and Address | | | |

| (A) | Purpose | Date | Amount |
|-----|---------|------|--------|
| Megan Rapinoe | (C) | (D) | (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $2,398 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $2,398 |

| Type or Classification |
|------------------------|
| (B) |
| Member |

| Name and Address |
|------------------|
| (A) |
| Meghan Klingenberg |

| | Purpose | Date | Amount |
|-----|---------|------|--------|
| | (C) | (D) | (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $1,341 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $1,341 |

| Type or Classification |
|------------------------|
| (B) |
| Member |

| Name and Address |
|------------------|
| (A) |
| Nicole Barnhart |

| | Purpose | Date | Amount |
|-----|---------|------|--------|
| | (C) | (D) | (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $3,208 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $3,208 |

| Type or Classification |
|------------------------|
| (B) |
| Member |

| Name and Address |
|------------------|
| (A) |
| Rachel Buehler Van Hollebeke |

| | Purpose | Date | Amount |
|-----|---------|------|--------|
| | (C) | (D) | (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $2,995 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $2,995 |

| Type or Classification |
|------------------------|
| (B) |
| Member |

| Name and Address |
|------------------|
| (A) |
| Rebecca Sauerbrunn |

| | Purpose | Date | Amount |
|-----|---------|------|--------|
| | (C) | (D) | (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $4,129 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $4,129 |

| Type or Classification |
|------------------------|
| (B) |
| Member |

| Name and Address |
|------------------|
| (A) |
| Shannon L Boxx |

| | Purpose | Date | Amount |
|-----|---------|------|--------|
| | (C) | (D) | (E) |
| | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $1,902 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $1,902 |

| Type or Classification |
|------------------------|
| (B) |
| Member |

| Name and Address |
|------------------|
| (A) |
| Sydney Leroux |

| | Purpose | Date | Amount |
|-----|---------|------|--------|
| | (C) | (D) | (E) |
| | Total Itemized Transactions with this Payee/Payer | | |

| | | Total Non-Itemized Transactions with this Payee/Payer | | | $4,761 |
| | | Total of All Transactions with this Payee/Payer for This Schedule | | | $4,761 |
| Type or Classification (B) | | | | | |
| Member | | | | | |
| Name and Address (A) | | | | | |
| Tobin Heath | | | | | |
| | | Purpose (C) | Date (D) | | Amount (E) |
| | | Total Itemized Transactions with this Payee/Payer | | | |
| | | Total Non-Itemized Transactions with this Payee/Payer | | | $3,888 |
| | | Total of All Transactions with this Payee/Payer for This Schedule | | | $3,888 |
| Type or Classification (B) | | | | | |
| Member | | | | | |
| Name and Address (A) | | | | | |
| Whitney Engen | | | | | |
| | | Purpose (C) | Date (D) | | Amount (E) |
| | | Total Itemized Transactions with this Payee/Payer | | | |
| | | Total Non-Itemized Transactions with this Payee/Payer | | | $3,043 |
| | | Total of All Transactions with this Payee/Payer for This Schedule | | | $3,043 |
| Type or Classification (B) | | | | | |
| Member | | | | | |
| Name and Address (A) | | | | | |
| Yael Averbuch | | | | | |
| | | Purpose (C) | Date (D) | | Amount (E) |
| | | Total Itemized Transactions with this Payee/Payer | | | |
| | | Total Non-Itemized Transactions with this Payee/Payer | | | $4,129 |
| | | Total of All Transactions with this Payee/Payer for This Schedule | | | $4,129 |
| Type or Classification (B) | | | | | |
| Member | | | | | |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

SCHEDULE 19 - UNION ADMINISTRATION

FILE NUMBER: 542-192

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Ballard Spahr LLP | Professional Fees/Costs | 04/15/2013 | $29,323 |
| | Professional Fees/Costs | 04/23/2013 | $363,332 |
| 1735 Market Street, 51st Fl | Professional Fees/Costs | 11/26/2013 | $45,280 |
| Philadelphia | Professional Fees/Costs | 12/23/2013 | $13,188 |
| PA | Professional Fees/Costs | 12/31/2013 | $3,195 |
| 19103 | | | |
| | Total Itemized Transactions with this Payee/Payer | | $454,318 |
| Type or Classification (B) | Total Non-Itemized Transactions with this Payee/Payer | | |
| Law Firm | Total of All Transactions with this Payee/Payer for This Schedule | | $454,318 |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)                                    Page 26 of 28

SCHEDULE 20 - BENEFITS                                          FILE NUMBER: 542-192

| Description (A) | To Whom Paid (B) | Amount (C) |
|---|---|---|
| Total of all lines above (Total will be automatically entered in Item 55.) | | $0 |

Form LM-2 (Revised 2010)

DOL Form Report (Disclosure)

**69. ADDITIONAL INFORMATION SUMMARY**

FILE NUMBER: 542-192

Schedule 13, Row1:ALL MEMBERS OF THE U.S. WOMEN'S NATIONAL SOCCER TEAM PLAYER'S ASSOCIATION
Form LM-2 (Revised 2010)

# EXHIBIT G

Page 522

SOCCER ARBITRATION VOL II

AMERICAN ARBITRATION ASSOCIATION

Matter No. 51-20-1300-1152

---

UNITED STATES SOCCER FEDERATION, INC

V

NATIONAL TEAM PLAYERS ASSOCIATION

---

TRANSCRIPT OF PROCEEDINGS

WASHINGTON, D.C.

Tuesday, April 29, 2014

Job No. 73567

PAGES 522 - 898

REPORTED BY:  Kathy Savich, RPR, CLR

Page 699

1           SOCCER ARBITRATION VOL II

2          A F T E R N O O N   S E S S I O N

3                    THE ARBITRATOR:  Back on the

4          record.

5     Whereupon,

6                    JOHN LANGEL,

7     called as a witness, after having been first

8     sworn by the arbitrator, testified as

9     follows:

10                   THE ARBITRATOR:  Please state

11         your name and spell your name for the

12         record, and your position.

13                   THE WITNESS:  John, J-o-h-n, B,

14         Langel, L-a-n-g-e-l.  I'm a partner at

15         the law firm of Ballard Spahr.  I am

16         the head of its litigation department.

17                   THE ARBITRATOR:  Thank you.

18                   DIRECT EXAMINATION

19    BY MR. LEVINSTEIN:

20         Q.    Good afternoon, Mr. Langel.

21         A.    Good afternoon.

22         Q.    Would you describe your

23    educational background.

24         A.    I went to Marietta College,

25    graduated in 1970.  I went to Temple Law

```
 1                    SOCCER ARBITRATION VOL II
 2      School, graduated in 1974.
 3               Q.      And where did you go to work
 4      after that?
 5               A.      First year I clerked for a
 6      federal judge in the Federal District Court,
 7      Eastern District of Pennsylvania, principally
 8      Philadelphia, and then I started at Ballard
 9      Spahr in 1975.
10               Q.      Have you been there ever since?
11               A.      Yes.
12               Q.      And what in general was your
13      area of practice?
14               A.      So for the first couple of
15      years I was an employment lawyer, but also
16      did a good deal of commercial litigation,
17      running the gamut from securities work to
18      product liability.
19                       In 1982 I started its official
20      labor and employment group, starting with two
21      lawyers, and when I left after 29 years to be
22      head of the litigation department, it grew to
23      a little more than 50.
24               Q.      And so your practice focused
25      on --
```

Page 751

1                    SOCCER ARBITRATION VOL II

2      time was, "John, in the end, you get to

3      approve or deny, correct?"

4                    "Correct."

5                    "We've never done anything

6      without your approval, correct?"

7                    "Correct."

8                    And we went forward.  So I

9      never saw a need to change.  The idea that I

10     needed to change is bad faith.

11          Q.     Was there ever a suggestion to

12     the present that you might not have a right

13     to approve?

14          A.     Yes.

15          Q.     And when did that happen?

16          A.     A couple weeks ago.

17          Q.     Was that the first time anyone

18     from the federation had ever suggested that

19     you didn't have a right to approve?

20          A.     Yes.  They submitted something

21     to me while you're -- this is going on and

22     asked me to comment --

23          Q.     We'll get to that in a minute.

24          A.     -- as opposed to approve.

25          Q.     Would you turn to Exhibit 199.

Case: 1:16-cv-01923 Document #: 10 Filed: 02/04/16 Page 183 of 217 PageID #:415

Page 752

1                    SOCCER ARBITRATION VOL II

2          A.    Which book?

3          Q.    In your book.

4          A.    Okay.

5          Q.    And could you tell me what that

6    is?

7          A.    It looks to be my agreement

8    that just expired December 31st, 2012.

9          Q.    So how many collective

10   bargaining agreements have you had?

11         A.    We had 2000 to 2004, 2005 to

12   2012, and now 2013 till December 31st, 2016.

13               We have tried to do -- first

14   agreement was five years.  Second agreement

15   was -- first agreement was five years.

16               We've tried to cover both a

17   World Cup and an Olympics.  The second

18   agreement we covered World Cup, Olympics,

19   World Cup, Olympics.  And this agreement

20   we're covering World Cup, Olympics.

21         Q.    So one is covering five years;

22   one is covering eight years; one is covering

23   four years?

24         A.    Correct.

25         Q.    Would you turn to the

Page 858

1                   SOCCER ARBITRATION VOL II

2       correct?

3               A.      Yes.

4               Q.      The next collective bargaining

5       agreement that the players association

6       executed covered the period from 2005 through

7       the end of 2012, correct?

8               A.      Yes.

9               Q.      Okay.  And then that agreement

10      has expired, correct?

11              A.      Yes.

12              Q.      And you're now operating under

13      a memorandum of understanding, correct?

14              A.      Yes.

15              Q.      And as I understand it --

16      correct me if I'm wrong -- the memorandum of

17      understanding has certain financial -- made

18      certain financial changes, but other than

19      matters specifically identified in the

20      memorandum of understanding, the terms of the

21      expired CBA the parties have agreed will

22      continue to control?

23              A.      Yes.

24              Q.      Okay.

25              A.      But we've already agreed that

# EXHIBIT H

# REDACTED

**From:** Langel, John B. (Phila) [mailto:Langel@ballardspahr.com]
**Sent:** Monday, November 24, 2014 11:00 AM
**To:** Sunil Gulati; Dan Flynn; Lisa Levine
**Cc:** Uselton, Ruth S. (Phila); Abby Wambach ███████████████████; Christie Rampone ███████████████; Rich Nichols
**Subject:** Farewell and Existing Issues


Sunil, Dan and Lisa, I write to tell you that the Players have decided to hire Rich Nichols to represent the Players Association going forward. I'd be making a mistake if I tried to thank everyone on both the Players' side and US Soccer's side for such a great experience. Because of the collective brilliance of the players, including their play, their insights and their wisdom and the terrific work of many at US Soccer, the Women's National Team is in a great place.

Even though Ballard will no longer be representing the WNT Players' Association, US Soccer still should send the end of the year check covering sponsor appearance fees to Ballard as it has in the past. US Soccer should also send all 1099s to Ballard, again as it has in the past.

Below is a list of items and my understanding on the status of each:

1. US Soccer has determined the 18th Tier 1. Meghan Kingenberg's pay will be retroactive to when Jill Loyden's severance ended.

2. Crystal Dunn's tier moved to Tier 2 retroactive to November 1.

3. Regarding Qualifying Roster bonuses, the Players' Association's position is that, despite her injury which occurred during training before the first game, Crystal Dunn should receive a Qualifying Roster bonus. We understand that US Soccer disagrees and sees the options as: File a grievance for Crystal to get the bonus or reach an agreement to pay Crystal on the condition that, going forward, the roster bonus will be paid to the players who are on the roster for the first game of the Olympic Qualifiers and World Cup and Olympics. Because the parties are discussing the issue, they have agreed that the time limitation for the grievance is suspended.

4. US Soccer will provide a response to the NWSL concerns presented by the players to Sunil

5. The Players' Association and US Soccer need to resolve the difference of opinion or decide to take other action on whether FOX may produce and show what US Soccer has called a documentary without the consent of the Players.

6. There are no "creatives" in issue right now.

7.  Nicole Barnhart will not be terminated before December 31, 2014.  If she is released from her WNT contract in 2015, she will receive her full 2015 NWSL salary.

8.  Shannon Boxx will not be terminated before December 31, 2014.  Unlike Nicole, however, if she is released from her WNT contract in 2015 and before the start of the NWSL season, she is not guaranteed her full NWSL 2015 salary.

9.  The parties need to edit, where applicable, the Collective Bargaining Agreement and Uniform Player Agreement consistent with the March, 2013 Memorandum of Understanding.

10. Based on, among other things, Julie Johnston's experience, US Soccer believes that the rule governing the number of floater days needs to be modified.  The parties will discuss in good faith a modification of the existing rule.  Assuming that will be accomplished, US Soccer has agreed that that it would not seek a "pro-rata reduction in salary for the time missed" by WNT Players who played in Europe during 2014 even if it were entitled to reductions.

11. The parties will continue to work in good faith to reach an agreement on the NWSL's marketing rights.

12. The parties will discuss the proposed revisions to the Player's Handbook in accordance with paragraph 1.(f) of the Uniform Player Agreement.

I close with a sincere thanks.

**John B. Langel**
Ballard Spahr LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103-7599
Direct   215.864.8227
Mobile  609.220.9496
Fax      215.864.9754
langel@ballardspahr.com | www.ballardspahr.com

# EXHIBIT I

# *WOMEN'S NATIONAL TEAM PLAYERS ASSOCIATION*

## *Via Email & Certified U.S. Mail*

December 23, 2015

Lisa Levine
General Counsel
United States Soccer Federation
Chicago, IL
*llevine@ussoccer.org*

### National Labor Relations Act ("NLRA") Section 8(b)(3) & 8(d) Notice

Dear Lisa,

Pursuant to Sections 8(b)(3) and 8(d) of the National Labor Relations Act ("NLRA"), and the codified duty to bargain collectively, this writing shall serve as the Women' National Team Players Association's ("WNTPA") requisite written notice (the "Notice"), of the WNTPA's intent to engage in action(s) that shall serve to terminate and or modify, if applicable, the;

      (a)    collective bargaining agreement, and or, in this instance,

      (b)    Memorandum of Understanding "(MOU") entered into by and between the United States Soccer Federation ("USSF"), and the WNTPA (collectively referred to herein as the "Parties") in March 2013, the terms of which have, in the alternative, served to guide and govern the operational relationship between the Parties in the absence of a collective bargaining agreement.

Further, the serving of this Notice notwithstanding, the WNTPA reserves its inherent right to challenge the USSF's claim of the existence of a collective bargaining agreement between the Parties.

Very truly yours,
Women's National Team Players Association

Richard M. Nichols
Executive Director/General Counsel

*WNTPA NLRA Section 8(b)(3) 8(d) Notice 122315*

# EXHIBIT J

REDACTED

---

**From:** Lisa Levine
**Sent:** Monday, December 28, 2015 4:51 PM
**To:** 'Rich Nichols' <rnicholspc@gmail.com>
**Cc:** arthur.mcafee@gmail.com
**Subject:** RE: NLRA Section 8(b)(3) & 8(d) Notice

Rich, U.S. Soccer is a bit perplexed by your letter dated December 23, 2015 in which you suggest the WNTPA is providing a "NLRA Section 8(b)(3) & 8(d) Notice ." As you know, the current CBA/UPA which was extended by the MOU does not expire until December 31, 2016.  Accordingly, providing a 60 day notice more than a year before the expiration date is most unusual.  If, however,  the WNTPA disagrees with the expiration date and intends to claim that it has the right to declare an earlier termination date, please let me know.

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Thursday, December 24, 2015 12:22 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** arthur.mcafee@gmail.com
**Subject:** NLRA Section 8(b)(3) & 8(d) Notice

Lisa,

With regard to our discussions, attached please find the requisite NLRA Notice. Please confirm receipt.

Thanks,
Rich

# EXHIBIT K

| From: | Lisa Levine |
|---|---|
| To: | Rich Nichols |
| Cc: | Becky Sauerbrunn ███████████████): Carli Lloyd; Hope Stevens; Megan Rapinoe; Alex Morgan; arthur.mcafee@gmail.com; Kessler, Jeffrey L.; Feher, David G.; Cole, Eva W.; Dan Flynn; Sauer, Russ (LA) |
| Subject: | RE: WNTPA CBA Proposal |
| Date: | Wednesday, January 06, 2016 6:59:30 AM |
| Attachments: | RE NLRA Section 8(b)(3) 8(d) Notice.msg |

Rich, thank you for the note and proposal.  Given nature of the proposal, it will take significant time to review and analyze its impact.  Accordingly, we believe a meeting in mid-February would make sense, particularly since there is no urgency as the current CBA does not expire until the end of this year.  Please provide some available dates for a meeting during the second and third weeks of February.

And, with respect to the CBA expiration date, I have not received a response to my email to you of December 28, 2015, attached for your convenience.  Accordingly, we assume you agree that the current CBA/UPA, which was extended by the MOU, does not expire until December 31, 2016.  If you disagree, please let us know immediately.

Thanks.

Lisa

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Monday, January 04, 2016 3:11 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn ██████████████████████████; Carli Lloyd █████████████████████ >; Hope Stevens ██████████████████████>; Megan Rapinoe ██████████████████ >; Alex Morgan ██████████████████████ >; arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>
**Subject:** WNTPA CBA Proposal

Lisa,

As per our discussions last month in Chicago, and as promised, attached please find the WNTPA Collective Bargaining Agreement Proposal.  Notwithstanding the submission of this comprehensive proposal, in good-faith, we reserve the right to elicit, engage and or present for negotiation any and all ancillary issues that may arise as an outgrowth of substantive discussions of the content of the attached Proposal.

Naturally, we look forward to a timely, earnest, and fruitful, good-faith negotiation, that, as a member of your team noted during our meeting last month, will leave the WNT and the WNTPA "comfortable and satisfied".

As we've indicated, our objective is to effect a timely agreement.  Please let me know when you and your team will be prepared to discuss the Proposal.

Please confirm receipt.

Thanks,
Rich

# EXHIBIT L

| | |
|---|---|
| **From:** | Rich Nichols |
| **To:** | Lisa Levine |
| **Cc:** | Becky Sauerbrunn ▮▮▮▮▮▮▮▮▮▮▮▮▮); Carli Lloyd; Hope Stevens; Megan Rapinoe; Alex Morgan; arthur.mcafee@gmail.com; Kessler, Jeffrey L.; Feher, David G.; Cole, Eva W.; Dan Flynn; Sauer, Russ (LA) |
| **Subject:** | Re: WNTPA CBA Proposal |
| **Date:** | Wednesday, January 06, 2016 2:18:49 PM |

Lisa,

Thanks for your response to our Proposal.

As you already know, it is the position of the WNTPA that the CBA no longer exists, and further, that the MOU is terminable at will.

At this juncture, I guess I am perplexed. We have been quite clear with regard to our position that a CBA does not exist. In fact, when your counsel Mr. Sauer briefly broached the topic last month during our meeting, he prefaced his remarks by acknowledging that he knew we did not agree with his and the Federation assertion that a CBA exists. He was absolutely correct. Thus, we do not understand the reason why you claim to have doubt as to our position.

So, again to be clear, and to remove all doubt, our position is that a CBA does not exist.

Accordingly, it is simply not correct that "the current CBA does not expire until the end of this year," or as you put it in your earlier email, "the MOU does not expire until December 31, 2016." In fact, the MOU is absent any reference to the MOU having any expiration date or definite means by which the MOU can be terminated.

Further, it also is not correct that "the current CBA/UPA "was extended by the MOU." The CBA expired long ago. In these circumstances, federal labor law is clear that any claimed CBA between the parties is terminable at will. That is one of the reasons the WNTPA sent the USSF the NLRA Section 8(b)(3) & 8(d) Notice.

Given the foregoing, the Players believe a more accelerated schedule for bargaining is needed. Our goal is to determine before the start of March training camps whether the parties can reach an agreement, failing which the players will consider exercising their right to terminate the MOU.

In light of this situation, please let us know as soon as possible some days in the next two weeks when the USSF can be ready to meet.

Thanks,

Rich

On Wed, Jan 6, 2016 at 8:58 AM, Lisa Levine <LLevine@ussoccer.org> wrote:

Rich, thank you for the note and proposal.  Given nature of the proposal, it will take significant time to review and analyze its impact.  Accordingly, we believe a meeting in mid-February would make sense, particularly since there is no urgency as the current CBA does not expire until the end of this year.  Please provide some available dates for a meeting during the second and third weeks of February.

And, with respect to the CBA expiration date, I have not received a response to my email to you of December 28, 2015, attached for your convenience.  Accordingly, we assume you agree that the current CBA/UPA, which was extended by the MOU, does not expire until December 31, 2016.   If you disagree, please let us know immediately.

Thanks.

Lisa

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Monday, January 04, 2016 3:11 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn (███████████████████████>; Carli Lloyd ███████████████████████>; Hope Stevens <███████████████████████>; Megan Rapinoe ███████████████████████>; Alex Morgan <███████████████████████>; arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>
**Subject:** WNTPA CBA Proposal

Lisa,

As per our discussions last month in Chicago, and as promised, attached please find the WNTPA Collective Bargaining Agreement Proposal.  Notwithstanding the submission of this comprehensive proposal, in good-faith, we reserve the right to elicit, engage and or present for negotiation any and all ancillary issues that may arise as an outgrowth of substantive discussions of the content of the attached Proposal.

Naturally, we look forward to a timely, earnest, and fruitful, good-faith negotiation, that, as a member of your team noted during our meeting last month, will leave the WNT and the WNTPA "comfortable and satisfied".

As we've indicated, our objective is to effect a timely agreement.  Please let me know when you and your team will be prepared to discuss the Proposal.

Please confirm receipt.

Thanks,

Rich

---------- Forwarded message ----------
From: Lisa Levine <LLevine@ussoccer.org>
To: Rich Nichols <rnicholspc@gmail.com>
Cc: "arthur.mcafee@gmail.com" <arthur.mcafee@gmail.com>
Date: Mon, 28 Dec 2015 22:51:01 +0000
Subject: RE: NLRA Section 8(b)(3) & 8(d) Notice

Rich, U.S. Soccer is a bit perplexed by your letter dated December 23, 2015 in which you suggest the WNTPA is providing a "NLRA Section 8(b)(3) & 8(d) Notice ." As you know, the current CBA/UPA which was extended by the MOU does not expire until December 31, 2016.  Accordingly, providing a 60 day notice more than a year before the expiration date is most unusual.  If, however,  the WNTPA disagrees with the expiration date and intends to claim that it has the right to declare an earlier termination date, please let me know.

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Thursday, December 24, 2015 12:22 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** arthur.mcafee@gmail.com
**Subject:** NLRA Section 8(b)(3) & 8(d) Notice

Lisa,

With regard to our discussions, attached please find the requisite NLRA Notice.

Please confirm receipt.


Thanks,

Rich

# EXHIBIT M

| From: | Lisa Levine |
| --- | --- |
| To: | Rich Nichols |
| Cc: | Becky Sauerbrunn [_____]; Carli Lloyd; Hope Stevens; Megan Rapinoe; Alex Morgan; arthur.mcafee@gmail.com; Kessler, Jeffrey L.; Feher, David G.; Cole, Eva W.; Dan Flynn; Sauer, Russ (LA); John Langel (langel@ballardspahr.com); Uselton, Ruth S. (Phila) |
| Subject: | RE: WNTPA CBA Proposal |
| Date: | Friday, January 15, 2016 5:01:12 AM |

Rich, in connection with your request for available negotiating session dates, we still believe that a date in mid-late February makes more sense so that U.S. Soccer will have enough time to analyze your recent proposal and meaningfully consider a response. But, since you seem to prefer an earlier date, we are available to meet on February 3, 4, 10, 11 or 18 in Chicago, recognizing, of course, that such a date is not ideal.

We continue to try to understand the factual basis for your letter dated December 23, 2015, and the statement in your January 6, 2016 email "that the CBA no longer exists, and further, that the MOU is terminable at will" – a position with which U.S. Soccer disagrees. We trust that you have received, and if you have not, that you will immediately request, the complete negotiating file from Mr. Langel and his firm in connection with the 2012-2013 negotiations as well as their subsequent communications with U.S. Soccer concerning the CBA and MOU. If you believe there are documents in those files which support the Players Association's position, please provide us with copies, as those may inform our negotiations going forward. We also assume that you have spoken with Mr. Langel and his colleague Ruth Uselton who negotiated the current agreement for the Players Association, and if not that you will speak with them promptly.

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Wednesday, January 6, 2016 4:19 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn [_____] Carli Lloyd [_____]>; Hope Stevens [_____]>; Megan Rapinoe [_____]>; Alex Morgan [_____]>; arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>; Dan Flynn <dflynn@ussoccer.org>; Russell.Sauer@lw.com
**Subject:** Re: WNTPA CBA Proposal

Lisa,

Thanks for your response to our Proposal.

As you already know, it is the position of the WNTPA that the CBA no longer exists, and further, that the MOU is terminable at will.

At this juncture, I guess I am perplexed. We have been quite clear with regard to our position that a CBA does not exist. In fact, when your counsel Mr. Sauer briefly broached the topic last month during our meeting, he prefaced his remarks by acknowledging that he knew we did not agree with his and the Federation assertion that a CBA exists. He was

absolutely correct.  Thus, we do not understand the reason why you claim to have doubt as to our position.

So, again to be clear, and to remove all doubt, our position is that a CBA does not exist.

Accordingly, it is simply not correct that "the current CBA does not expire until the end of this year," or as you put it in your earlier email, "the MOU does not expire until December 31, 2016."  In fact, the MOU is absent any reference to the MOU having any expiration date or definite means by which the MOU can be terminated.

Further, it also is not correct that "the current CBA/UPA "was extended by the MOU."  The CBA expired long ago.  In these circumstances, federal labor law is clear that any claimed CBA between the parties is terminable at will.  That is one of the reasons the WNTPA sent the USSF the NLRA Section 8(b)(3) & 8(d) Notice.

Given the foregoing, the Players believe a more accelerated schedule for bargaining is needed. Our goal is to determine before the start of March training camps whether the parties can reach an agreement, failing which the players will consider exercising their right to terminate the MOU.

In light of this situation, please let us know as soon as possible some days in the next two weeks when the USSF can be ready to meet.

Thanks,

Rich

On Wed, Jan 6, 2016 at 8:58 AM, Lisa Levine <LLevine@ussoccer.org> wrote:

> Rich, thank you for the note and proposal.  Given nature of the proposal, it will take significant time to review and analyze its impact.  Accordingly, we believe a meeting in mid-February would make sense, particularly since there is no urgency as the current CBA does not expire until the end of this year.  Please provide some available dates for a meeting during the second and third weeks of February.
>
> And, with respect to the CBA expiration date, I have not received a response to my email to you of December 28, 2015, attached for your convenience.  Accordingly, we assume you agree that the current CBA/UPA, which was extended by the MOU, does not expire until December 31, 2016.   If you disagree, please let us know immediately.
>
> Thanks.
>
> Lisa

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Monday, January 04, 2016 3:11 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn (███████████████████████████>; Carli Lloyd
███████████████████>; Hope Stevens ███████████████████>; Megan Rapinoe
███████████████>; Alex Morgan ████████████████████>; arthur.mcafee@gmail.com;
Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva
W. <EWCole@winston.com>
**Subject:** WNTPA CBA Proposal

Lisa,

As per our discussions last month in Chicago, and as promised, attached please find the
WNTPA Collective Bargaining Agreement Proposal. Notwithstanding the submission of
this comprehensive proposal, in good-faith, we reserve the right to elicit, engage and or
present for negotiation any and all ancillary issues that may arise as an outgrowth of
substantive discussions of the content of the attached Proposal.

Naturally, we look forward to a timely, earnest, and fruitful, good-faith negotiation, that, as
a member of your team noted during our meeting last month, will leave the WNT and the
WNTPA "comfortable and satisfied".

As we've indicated, our objective is to effect a timely agreement. Please let me know when
you and your team will be prepared to discuss the Proposal.

Please confirm receipt.

Thanks,
Rich

---------- Forwarded message ----------
From: Lisa Levine <LLevine@ussoccer.org>
To: Rich Nichols <rnicholspc@gmail.com>
Cc: "arthur.mcafee@gmail.com" <arthur.mcafee@gmail.com>
Date: Mon, 28 Dec 2015 22:51:01 +0000
Subject: RE: NLRA Section 8(b)(3) & 8(d) Notice
Rich, U.S. Soccer is a bit perplexed by your letter dated December 23, 2015 in which you suggest
the WNTPA is providing a "NLRA Section 8(b)(3) & 8(d) Notice ." As you know, the current
CBA/UPA which was extended by the MOU does not expire until December 31, 2016.
Accordingly, providing a 60 day notice more than a year before the expiration date is most
unusual. If, however, the WNTPA disagrees with the expiration date and intends to claim that it
has the right to declare an earlier termination date, please let me know.

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Thursday, December 24, 2015 12:22 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** arthur.mcafee@gmail.com

**Subject:** NLRA Section 8(b)(3) & 8(d) Notice

Lisa,

With regard to our discussions, attached please find the requisite NLRA Notice. Please confirm receipt.

Thanks,
Rich

# EXHIBIT N

| From: | Lisa Levine |
| --- | --- |
| To: | Rich Nichols |
| Cc: | Becky Sauerbrunn ████████████████); Carli Lloyd; Hope Stevens; Megan Rapinoe; Alex Morgan;<br>arthur.mcafee@gmail.com; ████████ Kessler, Jeffrey L.; Feher, David G.; Cole, Eva W.; Dan Flynn; Sauer, Russ (LA) |
| Subject: | RE: WNTPA CBA Proposal |
| Date: | Tuesday, January 19, 2016 9:46:40 AM |

Rich, thank you for your note.  Let's plan on meeting on February 3, 2016.

We are fully cognizant of the legal issues and are quite familiar with the cases you cite -- neither of which have any application to the facts here.   Further, you have failed to articulate the factual basis for your suggestion that the MOU is "terminable at will."  In conjunction with the execution of the MOU, it was agreed by both U.S. Soccer and the Players Association that the new CBA would consist of terms contained in the 2005-2012 CBA as modified and amended by the MOU and expire on December 31, 2016.  Indeed, the MOU makes clear on its face that it has a definite duration of four years.

In your response you make no mention of whether you have reviewed the negotiating history in the file maintained by your predecessor or whether you have spoken with John Langel and his colleague who actually negotiated the agreement.  Given your position, we can only assume that you have not yet done so and, therefore, once again request that you do so promptly.

Further, while U.S. Soccer will participate in the meeting on February 3, understand that by doing so, U.S. Soccer is reserving all of its rights and remedies should the Players Association pursue the path you are suggesting.

---

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Monday, January 18, 2016 3:51 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn ███████████████████████; Carli Lloyd ███████████████████████>; Hope Stevens ████████████████████████>; Megan Rapinoe ████████████████████>; Alex Morgan ████████████████████████>; arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>; Dan Flynn <dflynn@ussoccer.org>; Russell.Sauer@lw.com
**Subject:** Re: WNTPA CBA Proposal

Lisa,

Thanks for your response.

We would like to meet on February 3rd and or February 4th.

With regard to your insistence that a CBA exists, and or that the  MOU expires on December 31, 2016, I'd like to direct you to some labor case law that provides in pertinent part that, as per the current status of the MOU, the MOU is terminable "at will".

Specifically, labor law clearly provides that, "[l]abor contracts of indeterminate duration or ones that do not provide a manner of termination are terminable at will."See, *Montgomery*

*Mailers' Union No. 127 v. Advertiser Co.*, 827 F.2d 709, 715 (11th Cir. 1987); see also *Int'l Union of Operating Engineers, Local Union No. 542 v. Allied Erecting & Dismantling Co.*, 556 F. App'x 109, 112-13 (3d Cir. 2014)

I'd also like to reiterate that unless significant progress is made in these negotiations by or before March 1st, the WNT Players will very seriously consider whether or not to exercise that right to terminate the MOU.

Accordingly, time is of the essence.  Thus, please confirm which of the aforementioned meeting dates is acceptable.

Thanks,
Rich

Sent from Rich's iPhone

On Jan 15, 2016, at 7:00 AM, Lisa Levine <LLevine@ussoccer.org> wrote:

> Rich, in connection with your request for available negotiating session dates, we still believe that a date in mid-late February makes more sense so that U.S. Soccer will have enough time to analyze your recent proposal and meaningfully consider a response. But, since you seem to prefer an earlier date, we are available to meet on February 3, 4, 10, 11 or 18 in Chicago, recognizing, of course, that such a date is not ideal.
>
> We continue to try to understand the factual basis for your letter dated December 23, 2015, and the statement in your January 6, 2016 email "that the CBA no longer exists, and further, that the MOU is terminable at will" – a position with which U.S. Soccer disagrees.  We trust that you have received, and if you have not, that you will immediately request, the complete negotiating file from Mr. Langel and his firm in connection with the 2012-2013 negotiations as well as their subsequent communications with U.S. Soccer concerning the CBA and MOU.  If you believe there are documents in those files which support the Players Association's position, please provide us with copies, as those may inform our negotiations going forward.  We also assume that you have spoken with Mr. Langel and his colleague Ruth Uselton who negotiated the current agreement for the Players Association, and if not that you will speak with them promptly.
>
> **From:** Rich Nichols [mailto:rnicholspc@gmail.com]
> **Sent:** Wednesday, January 6, 2016 4:19 PM
> **To:** Lisa Levine <LLevine@ussoccer.org>
> **Cc:** Becky Sauerbrunn (████████████████████>; Carli Lloyd ███████████████████>; Hope Stevens <████████████████████>; Megan Rapinoe <███████████████>; Alex Morgan <████████████████>; arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>; Dan Flynn <dflynn@ussoccer.org>; Russell.Sauer@lw.com
> **Subject:** Re: WNTPA CBA Proposal

Lisa,

Thanks for your response to our Proposal.

As you already know, it is the position of the WNTPA that the CBA no longer exists, and further, that the MOU is terminable at will.

At this juncture, I guess I am perplexed. We have been quite clear with regard to our position that a CBA does not exist. In fact, when your counsel Mr. Sauer briefly broached the topic last month during our meeting, he prefaced his remarks by acknowledging that he knew we did not agree with his and the Federation assertion that a CBA exists. He was absolutely correct. Thus, we do not understand the reason why you claim to have doubt as to our position.

So, again to be clear, and to remove all doubt, our position is that a CBA does not exist.

Accordingly, it is simply not correct that "the current CBA does not expire until the end of this year," or as you put it in your earlier email, "the MOU does not expire until December 31, 2016." In fact, the MOU is absent any reference to the MOU having any expiration date or definite means by which the MOU can be terminated.

Further, it also is _not_ correct that "the current CBA/UPA" "was extended by the MOU." The CBA expired long ago. In these circumstances, federal labor law is clear that any claimed CBA between the parties is terminable at will. That is one of the reasons the WNTPA sent the USSF the NLRA Section 8(b)(3) & 8(d) Notice.

Given the foregoing, the Players believe a more accelerated schedule for bargaining is needed. Our goal is to determine before the start of March training camps whether the parties can reach an agreement, failing which the players will consider exercising their right to terminate the MOU.

In light of this situation, please let us know as soon as possible some days in the next two weeks when the USSF can be ready to meet.

Thanks,

Rich

On Wed, Jan 6, 2016 at 8:58 AM, Lisa Levine <LLevine@ussoccer.org> wrote:

Rich, thank you for the note and proposal.   Given nature of the proposal, it will take significant time to review and analyze its impact.  Accordingly, we believe a meeting in mid-February would make sense, particularly since there is no urgency as the current CBA does not expire until the end of this year.  Please provide some available dates for a meeting during the second and third weeks of February.

And, with respect to the CBA expiration date, I have not received a response to my email to you of December 28, 2015, attached for your convenience.  Accordingly, we assume you agree that the current CBA/UPA, which was extended by the MOU, does not expire until December 31, 2016.   If you disagree, please let us know immediately.

Thanks.

Lisa

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Monday, January 04, 2016 3:11 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn ███████████████████████>; Carli Lloyd ████████████████████>; Hope Stevens ███████████████████████; Megan Rapinoe ████████████████; Alex Morgan ███████████████████>; arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>
**Subject:** WNTPA CBA Proposal

Lisa,

As per our discussions last month in Chicago, and as promised, attached please find the WNTPA Collective Bargaining Agreement Proposal.  Notwithstanding the submission of this comprehensive proposal, in good-faith, we reserve the right to elicit, engage and or present for negotiation any and all ancillary issues that may arise as an outgrowth of substantive discussions of the content of the attached Proposal.

Naturally, we look forward to a timely, earnest, and fruitful, good-faith negotiation, that, as a member of your team noted during our meeting last month, will leave the WNT and the WNTPA "comfortable and satisfied".

As we've indicated, our objective is to effect a timely agreement.  Please let me know when you and your team will be prepared to discuss the Proposal.

Please confirm receipt.

Thanks,
Rich

---------- Forwarded message ----------
From: Lisa Levine <LLevine@ussoccer.org>
To: Rich Nichols <rnicholspc@gmail.com>
Cc: "arthur.mcafee@gmail.com" <arthur.mcafee@gmail.com>
Date: Mon, 28 Dec 2015 22:51:01 +0000
Subject: RE: NLRA Section 8(b)(3) & 8(d) Notice
Rich, U.S. Soccer is a bit perplexed by your letter dated December 23, 2015 in which
you suggest the WNTPA is providing a "NLRA Section 8(b)(3) & 8(d) Notice ." As you
know, the current CBA/UPA which was extended by the MOU does not expire until
December 31, 2016.  Accordingly, providing a 60 day notice more than a year
before the expiration date is most unusual.  If, however,  the WNTPA disagrees with
the expiration date and intends to claim that it has the right to declare an earlier
termination date, please let me know.


**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Thursday, December 24, 2015 12:22 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** arthur.mcafee@gmail.com
**Subject:** NLRA Section 8(b)(3) & 8(d) Notice

Lisa,

With regard to our discussions, attached please find the requisite NLRA
Notice. Please confirm receipt.

Thanks,
Rich

# EXHIBIT O

| | |
|---|---|
| **From:** | Rich Nichols |
| **To:** | Lisa Levine |
| **Cc:** | Becky Sauerbrunn ███████████████████; Carli Lloyd; Hope Stevens; Megan Rapinoe; Alex Morgan; arthur.mcafee@gmail.com; Kessler, Jeffrey L.; Feher, David G.; Cole, Eva W.; Dan Flynn; Sauer, Russ (LA) |
| **Subject:** | Re: WNTPA CBA Proposal |
| **Date:** | Tuesday, January 19, 2016 2:16:57 PM |

Lisa,

Thank you for your response.

I am pleased that you acknowledge and understand our position.

Further, we understand and hereby acknowledge that US Soccer and the WNTPA reserve their respective legal rights and remedies in these matters.

Accordingly, please let me know the time and location of our February 3rd meeting.

Thanks,
Rich

Sent from Rich's iPhone

On Jan 19, 2016, at 11:46 AM, Lisa Levine <LLevine@ussoccer.org> wrote:

Rich, thank you for your note.  Let's plan on meeting on February 3, 2016.

We are fully cognizant of the legal issues and are quite familiar with the cases you cite -- neither of which have any application to the facts here.   Further, you have failed to articulate the factual basis for your suggestion that the MOU is "terminable at will."  In conjunction with the execution of the MOU, it was agreed by both U.S. Soccer and the Players Association that the new CBA would consist of terms contained in the 2005-2012 CBA as modified and amended by the MOU and expire on December 31, 2016.  Indeed, the MOU makes clear on its face that it has a definite duration of four years.

In your response you make no mention of whether you have reviewed the negotiating history in the file maintained by your predecessor or whether you have spoken with John Langel and his colleague who actually negotiated the agreement.  Given your position, we can only assume that you have not yet done so and, therefore, once again request that you do so promptly.

Further, while U.S. Soccer will participate in the meeting on February 3, understand that by doing so, U.S. Soccer is reserving all of its rights and remedies should the Players Association pursue the path you are suggesting.

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Monday, January 18, 2016 3:51 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn ███████████████████████████>; Carli Lloyd

██████████████████████ >; Hope Stevens ██████████████████ >; Megan
Rapinoe < ████████████████ >; Alex Morgan < ████████████████ >;
arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David
G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>; Dan Flynn
<dflynn@ussoccer.org>; Russell.Sauer@lw.com
**Subject:** Re: WNTPA CBA Proposal

Lisa,

Thanks for your response.

We would like to meet on February 3rd and or February 4th.

With regard to your insistence that a CBA exists, and or that the MOU
expires on December 31, 2016, I'd like to direct you to some labor case law that
provides in pertinent part that, as per the current status of the MOU, the MOU is
terminable "at will".

Specifically, labor law clearly provides that, "[l]abor contracts of indeterminate
duration or ones that do not provide a manner of termination are terminable at
will."See, *Montgomery Mailers' Union No. 127 v. Advertiser Co.*, 827 F.2d 709,
715 (11th Cir. 1987); see also *Int'l Union of Operating Engineers, Local Union
No. 542 v. Allied Erecting & Dismantling Co.*, 556 F. App'x 109, 112-13 (3d Cir.
2014)

I'd also like to reiterate that unless significant progress is made in these
negotiations by or before March 1st, the WNT Players will very seriously
consider whether or not to exercise that right to terminate the MOU.

Accordingly, time is of the essence. Thus, please confirm which of the
aforementioned meeting dates is acceptable.

Thanks,
Rich

Sent from Rich's iPhone

On Jan 15, 2016, at 7:00 AM, Lisa Levine <LLevine@ussoccer.org> wrote:

> Rich, in connection with your request for available negotiating session
> dates, we still believe that a date in mid-late February makes more sense
> so that U.S. Soccer will have enough time to analyze your recent proposal
> and meaningfully consider a response. But, since you seem to prefer an
> earlier date, we are available to meet on February 3, 4, 10, 11 or 18 in
> Chicago, recognizing, of course, that such a date is not ideal.
>
> We continue to try to understand the factual basis for your letter dated
> December 23, 2015, and the statement in your January 6, 2016 email
> "that the CBA no longer exists, and further, that the MOU is terminable at

will" — a position with which U.S. Soccer disagrees. We trust that you have received, and if you have not, that you will immediately request, the complete negotiating file from Mr. Langel and his firm in connection with the 2012-2013 negotiations as well as their subsequent communications with U.S. Soccer concerning the CBA and MOU. If you believe there are documents in those files which support the Players Association's position, please provide us with copies, as those may inform our negotiations going forward. We also assume that you have spoken with Mr. Langel and his colleague Ruth Uselton who negotiated the current agreement for the Players Association, and if not that you will speak with them promptly.

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Wednesday, January 6, 2016 4:19 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn (███████████████████ Carli Lloyd <████████████████>; Hope Stevens ██████████████████████; Megan Rapinoe ████████████████████>; Alex Morgan ████████████████████>; arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>; Dan Flynn <dflynn@ussoccer.org>; Russell.Sauer@lw.com
**Subject:** Re: WNTPA CBA Proposal

Lisa,

Thanks for your response to our Proposal.

As you already know, it is the position of the WNTPA that the CBA no longer exists, and further, that the MOU is terminable at will.

At this juncture, I guess I am perplexed. We have been quite clear with regard to our position that a CBA does not exist. In fact, when your counsel Mr. Sauer briefly broached the topic last month during our meeting, he prefaced his remarks by acknowledging that he knew we did not agree with his and the Federation assertion that a CBA exists. He was absolutely correct. Thus, we do not understand the reason why you claim to have doubt as to our position.

So, again to be clear, and to remove all doubt, our position is that a CBA does not exist.

Accordingly, it is simply not correct that "the current CBA does not expire until the end of this year," or as you put it in your earlier

email, "the MOU does not expire until December 31, 2016." In fact, the MOU is absent any reference to the MOU having any expiration date or definite means by which the MOU can be terminated.

Further, it also is <u>not</u> correct that "the current CBA/UPA "was extended by the MOU." The CBA expired long ago. In these circumstances, federal labor law is clear that any claimed CBA between the parties is terminable at will. That is one of the reasons the WNTPA sent the USSF the NLRA Section 8(b)(3) & 8(d) Notice.

Given the foregoing, the Players believe a more accelerated schedule for bargaining is needed. Our goal is to determine before the start of March training camps whether the parties can reach an agreement, failing which the players will consider exercising their right to terminate the MOU.

In light of this situation, please let us know as soon as possible some days in the next two weeks when the USSF can be ready to meet.

Thanks,

Rich

On Wed, Jan 6, 2016 at 8:58 AM, Lisa Levine <LLevine@ussoccer.org> wrote:

> Rich, thank you for the note and proposal. Given nature of the proposal, it will take significant time to review and analyze its impact. Accordingly, we believe a meeting in mid-February would make sense, particularly since there is no urgency as the current CBA does not expire until the end of this year. Please provide some available dates for a meeting during the second and third weeks of February.
>
> And, with respect to the CBA expiration date, I have not received a response to my email to you of December 28, 2015, attached for your convenience. Accordingly, we assume you agree that the current CBA/UPA, which was extended by the MOU, does not expire until December 31, 2016. If you disagree, please let us know immediately.
>
> Thanks.
>
> Lisa

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Monday, January 04, 2016 3:11 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** Becky Sauerbrunn (████████████████████████>; Carli Lloyd ████████████████>; Hope Stevens <████████████████████>; Megan Rapinoe <████████████████>; Alex Morgan ████████████████>; arthur.mcafee@gmail.com; Kessler, Jeffrey L. <jkessler@winston.com>; Feher, David G. <DFeher@winston.com>; Cole, Eva W. <EWCole@winston.com>
**Subject:** WNTPA CBA Proposal

Lisa,

As per our discussions last month in Chicago, and as promised, attached please find the WNTPA Collective Bargaining Agreement Proposal. Notwithstanding the submission of this comprehensive proposal, in good-faith, we reserve the right to elicit, engage and or present for negotiation any and all ancillary issues that may arise as an outgrowth of substantive discussions of the content of the attached Proposal.

Naturally, we look forward to a timely, earnest, and fruitful, good-faith negotiation, that, as a member of your team noted during our meeting last month, will leave the WNT and the WNTPA "comfortable and satisfied".

As we've indicated, our objective is to effect a timely agreement. Please let me know when you and your team will be prepared to discuss the Proposal.

Please confirm receipt.

Thanks,
Rich


---------- Forwarded message ----------
From: Lisa Levine <LLevine@ussoccer.org>
To: Rich Nichols <rnicholspc@gmail.com>
Cc: "arthur.mcafee@gmail.com" <arthur.mcafee@gmail.com>
Date: Mon, 28 Dec 2015 22:51:01 +0000
Subject: RE: NLRA Section 8(b)(3) & 8(d) Notice
Rich, U.S. Soccer is a bit perplexed by your letter dated December 23, 2015 in which you suggest the WNTPA is providing a "NLRA Section 8(b)(3) & 8(d) Notice ." As you know, the current CBA/UPA which was extended by the MOU does not expire until December 31, 2016. Accordingly, providing a 60 day notice more than a year before the

expiration date is most unusual.  If, however,  the WNTPA disagrees with the expiration date and intends to claim that it has the right to declare an earlier termination date, please let me know.

**From:** Rich Nichols [mailto:rnicholspc@gmail.com]
**Sent:** Thursday, December 24, 2015 12:22 PM
**To:** Lisa Levine <LLevine@ussoccer.org>
**Cc:** arthur.mcafee@gmail.com
**Subject:** NLRA Section 8(b)(3) & 8(d) Notice

Lisa,

With regard to our discussions, attached please find the requisite NLRA Notice. Please confirm receipt.

Thanks,
Rich