UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SOCCER FEDERATION, INC., | )<br>)<br>) Case No. 16-cv-1923 |
| Plaintiff, | )<br>) |
| | ) Judge Sharon Johnson Coleman |
| v. | )<br>) |
| UNITED STATES WOMEN'S NATIONAL SOCCER TEAM PLAYERS ASSOCIATION. | )<br>)<br>) |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, the United States Soccer Federation, Inc. ("USSF"), brought this action for anticipatory breach of contract and declaratory judgment against the United States Women's National Soccer Team Players Association ("the Players Association"). This case arises out of the parties' disagreement about the terms of the collective bargaining agreement that governs their relationship. Following expedited discovery, USSF and the Players Association have filed cross-motions for summary judgment. For the reasons set forth below, USSF's motion for summary judgment [36] is granted in part and denied in part and the Players Association's motion for summary judgment [41] is denied in its entirety.

**Background**

The following facts are undisputed. USSF is a New York nonprofit corporation with its principal place of business in Chicago, Illinois. (Dkt. 49 ¶ 1). Since 1914, USSF has served as the United States' National Association member of the Fédéracion Internationale de Football Association ("FIFA") and is recognized by the United States Olympic Committee as the national governing body for the sport of soccer in the United States. (*Id.*). USSF oversees and fields numerous national soccer teams, including the Women's National Soccer Team. (Dkt. 47 ¶ 1).

1

The Players Association is a labor organization that serves as the collective bargaining representative of all players on the Women's National Soccer Team. (Dkt. 49, ¶ 2). It is governed by a Constitution and By-Laws, which were enacted on March 23, 2001. (Dkt. 48, ¶ 7). Under Article IV of the Constitution and By-Laws, the Players Association is governed by three Players' Representatives and, at the discretion of the membership, one Executive Director. (Dkt. 43-2). Article IV(e) states that the Executive Director "will be appointed by a majority of the Players Representatives and shall serve for a term to be agreed upon by a majority of the Players Representatives." (*Id.*). Article IV(g), however, provides that "[i]n the event the Players Representatives do not appoint an Executive Director, this function shall be filled by the General Counsel of this Association, and the General Counsel is authorized to perform all the functions of the Executive Director during that period." (*Id.*).

Article VIII further provides that:

> (a) The Executive Director shall be responsible for negotiations with the Federation after consultation with the members and the Players Representatives. The membership, by a determination of the majority of the voting members, can direct the Executive Director's negotiation approach with the Federation, including a specific action of which issues to address or not to address with the Federation.
> (b) All Collective Bargaining Agreements between this Association and the Federation, and any amendments or modifications thereto, shall be signed by a designated Players Representative or the Executive Director and shall require the approval of a majority of the voting members.

(*Id.*). From its inception until the fall of 2014, the Players Association was represented in its interactions with USSF by its General Counsel and acting Executive Director, John B. Langel. (Dkt. 49, ¶ 7).

The USSF and the Players Association entered into their first collective bargaining agreement in March 2001, which was in effect from February 1, 2000 through December 31, 2004. (Dkt. 47, ¶ 12). A second collective bargaining agreement ("the 2005 CBA") was executed on

January 12, 2006, covering the time period from January 1, 2005 through December 31, 2012. (*Id.* at ¶ 13). Each of these agreements expressly incorporated the terms of a corresponding Uniform Player Agreement and fee schedule. (Dkt. 38-1). The 2005 CBA, as is pertinent here, contained a "no strike, no lockout" clause, which barred the Players Association from authorizing, encouraging, or engaging in any strike, work stoppage, slowdown or other concerted interference with the activities of the Federation during the term of the agreement and barred the USSF from engaging in a lockout during the term of the agreement. (*Id.*).

In the fall of 2012, the parties began negotiating a new collective bargaining agreement. (Dkt. 47, ¶ 17). The Players Association was represented in these negotiations by Langel and Ruth Uselton. USSF was represented by its president, Sunil Gulati, and its general counsel, Lisa Levine. (*Id.*). The parties' negotiations were complicated by the need to address the integration of the Women's National Team into the newly-formed National Women's Soccer League ("NWSL"). (*Id.* at ¶ 22, Dkt. 49 ¶ 25). As that deadline for the NWSL's launch approached, several issues remained unresolved. (*Id.* at ¶¶ 26, 48). Accordingly, the parties agreed to execute a Memorandum of Understanding (MOU), with the understanding that a fully integrated CBA would be executed once the remaining issues were resolved. (Dkt. 47 ¶¶ 44, 45; Dkt. 49, ¶¶ 42, 48).

On March 8, 2013, Langel e-mailed Gulati regarding potential topics to be addressed in the MOU. (Dkt. 40-3, ex. 19). In that e-mail, Langel wrote that "Terms from the old CBA that we have not addressed remain unchanged unless inconsistent with the memo we will sign." (*Id.*). Gulati replied that "The general principle that stuff that we have not specifically covered would remain the same (or be appropriately adjusted) as in the previous CBA seems sensible. We will of course need to address all of the specifics to make sure." (*Id.*).

According to his testimony, Langel took these e-mails and "the entire body of the discussions" to mean that the parties "were identifying issues that would be the modifications to the

3

existing Collective Bargaining Agreement and then in all other respects the Collective Bargaining Agreement would remain the same." (Dkt. 40-2, 179:2–8). Langel explained that his goal:

> was to make sure that items that were included in the 2005 to 2012 agreement, whether they appeared in the UPA, Uniform Player Agreement which was incorporated or in the term sheet which was part of the CBA carried over, and that was the purpose of what I was trying to do. I did not want there to be an argument that a financial term that existed under the term sheet of the prior agreement that was not addressed specifically in the MOU somehow evaporated, so that's what I was doing.

(*Id.* at 185:12–23). Langel further testified that he communicated this to the players "over the course of several communications both verbally and in writing." (Dkt. 40-2, 127:19–22). The MOU, however, does not contain any language expressly stating that it incorporates the unmodified terms of the 2005 CBA. (Dkt. 43-14).

On March 17, 2013, the players voted on the proposed MOU via conference call and unanimously accepted it pending the resolution of one outstanding issue—the players' ability to play in Europe instead of playing in the NWSL. (Dkt. 49, ¶¶ 34–35). The resolution of that issue was subsequently approved by a majority of Players Association members in an e-mail vote on March 18, 2013. (*Id.* at ¶ 37). That evening, Langel informed Gulati that the players had voted to approve what Gulati described as "a new four-year CBA which I understood would consist of the terms contained in the 2005 CBA/UPA as amended, modified and/or supplemented by the MOU." (Dkt. 38, ¶ 31). The parties' representatives subsequently signed the MOU on March 19, 2013. (Dkt. 49, ¶¶ 44, 45). On March 18th, just prior to the execution of the MOU, Langel e-mailed Gulati and reiterated his understanding that "[a]s we have previously agreed, the general principle we are working under is that items we have not specifically covered in the MOU would remain the same as under the prior CBA, but with appropriate increases/adjustments/changes. We will address the specifics when we get to drafting the new CBA." (Dkt. 40-3, Ex. 21).

4

Following the execution of the MOU, USSF continued to act as if it was governed by the terms of the 2005 CBA that were unmodified by the MOU, including those portions governing autograph-signing, the use of players' likenesses, and the obligation to create promotional pieces. (Dkt. 49, ¶¶ 53-55, 57). Similarly, Langel, on behalf of the Players Association, repeatedly asserted arbitration rights contained in the 2005 CBA but not in the text of the 2013 MOU. (*Id.* at ¶¶ 58–60). In 2014, Richard M. Nichols succeeded Langel as the Players Association's General Counsel. (*Id.* at ¶ 61). On December 24, 2015, Nichols provided the USSF with notice, pursuant to the National Labor Relations Act, that the Players' Association intended to engage in actions to terminate or modify the Memorandum of Understanding and that it reserved its right to challenge USSF's claim of the existence of a collective bargaining agreement between the parties. (*Id.* at ¶ 62). The Players Association represented that it believed that there was no CBA in place and that the MOU was terminable at will. (*Id.* at ¶ 64). It also refused to agree that it would not engage in a strike or other job action prior to December 2016, and during the pendency of this action represented to the media that it was possible that the players "will have to strike." (*Id.* at ¶¶ 66, 70). The USSF filed this suit, seeking damages for anticipatory breach of contract and a declaratory judgment establishing that the MOU includes the no-strike, no-lockout provision contained in the 2005 CBA.[1]

**Legal Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue

---

[1] This Court takes judicial notice of the fact that five members of the Players Association have filed an EEOC complaint against U.S. Soccer alleging wage discrimination during the pendency of this action. Although this Court recognizes that this action and the EEOC complaint likely share a common impetus, the merits of the EEOC proceeding are not before this Court and the allegations contained in the EEOC complaint are not relevant to the resolution of the questions of contract law at issue here.

5

of material fact exists, this Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, "[m]erely alleging a factual dispute cannot defeat the summary judgment motion." *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**Discussion**

USSF contends that the undisputed material facts establish that the parties entered into a collective bargaining agreement consisting of the 2005 CBA, as modified or amended by the MOU, that the parties remain bound by that CBA, and that the Players Association has therefore engaged in an anticipatory breach of that CBA. The Players Association, in turn, contends that the undisputed material facts establish that there is no collective bargaining agreement in effect incorporating the terms of the 2005 CBA because an agreement incorporating those terms was never approved by the majority of the players and executed by the Players Association.

It is undisputed that during the drafting of the MOU the parties' negotiators agreed that the MOU, and thus the subsequently envisioned CBA, would encompass all terms of the 2005 CBA that were not modified or amended by the MOU. The Players Association, however, argues that in interpreting the MOU this Court is limited to the four corners of the agreement and therefore cannot consider parole evidence incorporating the unmodified terms of the 2005 CBA.

Collective bargaining agreements are generally interpreted according to ordinary principles of contract law. *M & G Polymers USA, LLC v. Tackett*, 135 S.Ct. 926, 933, 190 L.Ed.2d 809 (2015). Under well-established rules of contract interpretation, if a contract's language is facially unambiguous and appears to be a "complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parole evidence cannot be admitted to add

6

another item to the agreement." *Sunstream Jet Express, Inc. v. Int'l Air Service Co., Ltd.*, 734 F.2d 1258, 1265 (7th Cir. 1984) (quoting *Pecora v. Szabo*, 418 N.E.2d 431, 435–36, 94 Ill.App.3d 57 (1981)). Such a contract is termed to be fully integrated, and evidence concerning prior or contemporaneous agreements cannot be used to vary or contradict its terms. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005). If a contract is intended to be a final expression of the terms that it contains but not a complete expression of all the terms agreed upon, the agreement is described as being partially integrated. *Merk v. Jewel Food Stores Div. of Jewel Cos., Inc.*, 945 F.2d 889, 892–893 (7th Cir. 1991). A partially integrated contract may be supplemented, but not contradicted, by evidence of prior or contemporaneous agreements. *Id.*

Here, the terms of the MOU demonstrate that it is a partially integrated contract. In contravention of the parties' practice in all of their prior CBAs, the MOU does not contain an "integration" clause declaring it to be a fully integrated contract. The text of the MOU, moreover, evinces substantial gaps that demonstrate that it was intended to be supplemented by external documents. The MOU, for instance, makes extensive use of the terms "floater," "tier I player," "tier II player," and "tier III player," which are not defined in the MOU (but are defined in the 2005 CBA). Similarly, the MOU provides that "US Soccer may but is not required to request an additional 5 sponsor appearances by Players per year." (Dkt. 43-14). The MOU, however, never defines what a sponsor appearance is or how many sponsor appearances a player is expected to engage in annually absent such a request. (Again, the answer to those questions may be found in the 2005 CBA). Moreover, multiple rights under the MOU are defined by the express incorporation of the 2005 CBA. For instance, the MOU obligates US Soccer to "continue to provide the same benefits as under the last CBA regarding childcare for WNT players on National Team duty," to treat WNT tickets "the same as under the prior CBA," and to abide by the "terms of relocation that

7

existed under the prior CBA for residency." Accordingly, the MOU is a partially integrated contract and extrinsic evidence may be offered to supplement its terms.

This Court is not persuaded otherwise by the Players Association's overarching argument that the agreement to incorporate the unmodified terms of the 2005 CBA could not have constituted part of the CBA because it did not take the form of a signed writing, as is required by the Players Association's Constitution and By-laws.

Federal law encourages courts to be liberal in their recognition and interpretation of collective bargaining agreements, so as to lessen strife and encourage congenial relations between unions and companies. *McNealy v. Caterpillar, Inc.*, 139 F.3d 1113, 1121 (7th Cir. 1998). This Court notes that congenial relations between USSF and the Players Association were the rule of the day while Langel was general counsel. Consistent with the federal preference for recognizing collective bargaining agreements, section 8(d) of the National Labor Relations Act does not require collective bargaining agreements to be in writing unless one or both parties request that they be. *Merk,* 945 F.2d at 895. Accordingly, a collective bargaining agreement may be partly or wholly oral and a written collective bargaining agreement may be orally modified. *Id.*

Here, the Players Association's Constitution and By-laws require a signed writing when a CBA is executed or modified.[2] Nothing in that language, however, supports the inference that the signed writing must be fully integrated and contain all of the terms of the parties' agreement. Moreover, this Court is aware of, and the Players Association has provided, no legal authority supporting such an interpretation. Accordingly, and in light of the federal preference in favor of recognizing collective bargaining agreements, the Players Association's Constitution and By-laws did

---

[2] At oral arguments, the Players Association argued that the agreement to incorporate the unmodified terms of the 2005 CBA constituted an amendment or modification of the MOU, and therefore had to be separately voted on and signed. However, that agreement was reached prior to the MOU's execution and was intended to constitute part of the not-yet-executed MOU agreement. It therefore was not a subsequent amendment or modification of the MOU.

8

not require that the agreement to adopt the unmodified terms of the 2005 CBA as part of the MOU take the form of a signed writing.[3]

Nor is this Court persuaded by the Players Association's argument that the agreement to incorporate the unmodified terms of the 2005 CBA constituted an unenforceable secret side agreement. "[N]ational labor policy forbids introduction of prior or contemporaneous secret agreements to contradict fundamental terms of a ratified collective bargaining contract." *Merk*, 945 F.2d at 894. Here, however, the Players Association has offered no evidence establishing that the agreement to incorporate the unmodified terms of the 2005 CBA was concluded in secret, and therefore has provided no basis for this Court to hold it inadmissible or unenforceable on that ground.

This Court accordingly concludes that the MOU incorporates the unmodified terms of the 2005 CBA. The Players Association contends that it is not bound by the unmodified terms of the 2005 CBA because Langel did not have authority to agree that the unmodified terms of the 2005 CBA would constitute part of the MOU agreement. USSF, in response, argues that the undisputed evidence demonstrates that Langel had either actual or apparent authority and that the Players Association is therefore bound by the terms of the MOU, including the 2005 CBA's no-strike provision.

An agent possesses actual authority to bind a principal when the principal's words or actions would lead a reasonable person in the agent's position to believe that he or she was so authorized. *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 899 (N.D. Ill. 2001). Here, the Players Association's Constitution and By-laws expressly authorized Langel to negotiate CBAs with

---

[3] The Court notes that Langel sent a signed e-mail to USSF on the morning of March 18, 2013 stating that "the general principle we are working under is that items we have not specifically covered in the MOU would remain the same as under the prior CBA." *See Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002).

USSF on behalf of the Players Association, and to sign CBAs on behalf of the Players Association once they had been approved by a majority of voting members.

The Players Association argues that Langel did not have actual authority to execute the MOU, or at least that portion of it incorporating the unaltered terms of the 2005 CBA, because the players were not aware that the MOU incorporated those terms when they voted to approve it. However, Langel testified that he told the players that the MOU carried over the unaltered terms of the prior CBA "over the course of several communications both verbally and in writing." This testimony is sufficient to create a material dispute of fact regarding what the players knew when they voted to ratify the MOU. Accordingly, the undisputed material facts do not disprove Langel's actual authority to agree to the incorporation of the 2005 CBA with USSF.

Even if the Players Association is correct that Langel lacked actual authority to agree that the MOU would incorporate the unmodified terms of the 2005 CBA, USSF contends that he had apparent authority to bind the Players Association. Apparent authority arises when a principal, through words or conduct, creates a reasonable impression in a third party that the agent has the authority to perform a certain action in its behalf. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065 (7th Cir. 2000). It is "the authority that a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Hofner v. Glenn Ingram & Co.,* 489 N.E.2d 311, 316, 140 Ill.App.3d 874 (1985).

Langel was both the Players Association's general counsel and its acting executive director and was authorized, pursuant to the Players Association's Constitution and By-laws, to negotiate and execute Collective Bargaining Agreements on the Players Association's behalf. Langel's authority to execute such agreements, however, was expressly limited by the requirement that a majority of the players vote to approve any proposed collective bargaining agreement.

The undisputed facts demonstrate that Langel informed Gulati that the players had voted to approve the MOU agreement and that, from this communication, it was Gulati's understanding that the players' vote encompassed the agreement to continue the unmodified terms of the 2005 CBA. There is no evidence indicating that USSF knew, or had reason to know, that the players might not have been informed that the MOU agreement incorporated all unmodified terms of the 2005 CBA. Accordingly, Langel had apparent authority to execute the MOU (with the unmodified terms of the 2005 CBA constituting part of the MOU) and to thereby bind the Players Association. *See Moreau v. Local Union No. 247, Int'l Bhd. of Fireman and Oilers,* 851 F.2d 516, 521 (1st Cir. 1988) (approving of the district court's observation that "[a]n agreement entered into by a union representative with apparent authority to bind the union is valid and binding even if actual authority, such as through membership ratification, is lacking."; *N.L.R.B. v. Truckdrivers Local Union No. 100,* 532 F.2d 569, 571 (6th Cir. 1976) ("As to the Union's contention that ratification by its membership was a condition precedent to conclusion of an agreement, while a Union's [actions] may require ratification by the membership . . . an employer may rely upon the apparent authority of the Union representatives to conclude an agreement, where there is a basis for such reliance."); *cf. Merk,* 945 F.2d at 896 (recognizing that an unratified CBA may be invalidated when the employer knew that the CBA required member ratification and that ratification had not occurred).

For the reasons previously set forth, this Court is not persuaded otherwise by the Players Association's contention that Langel lacked apparent authority because the agreement to incorporate the unmodified terms of the 2005 CBA did not constitute a signed writing. Because the undisputed material facts establish that the MOU incorporates the unmodified terms of the 2005 CBA, including the no-strike, no lockout provision, and that Langel had apparent authority to execute the MOU, this Court will grant summary judgment on USSF's declaratory judgment claim.

USSF also seeks summary judgment on its claim against the Players Association for anticipatory breach of contract. Anticipatory breach of contract occurs when a party to a contract manifests a clear, unequivocal intent not to perform under that contract when performance is due. *Arlington LF, LLC v. Arlington Hospitality, Inc.*, 637 F.3d 706, 713 (7th Cir. 2011). The repudiation must "render unattainable" the point of the contract in order to be actionable. *Id.* (citing *In re Marriage of Olsen*, 528 N.E.2d 684, 686, 124 Ill.2d 19 (1988)). "Doubtful and indefinite statements that performance may or may not take place are not enough to constitute anticipatory repudiation." *In re Marriage of Olsen*, 529 N.E.2d at 686. Rather, the statement must manifest "a definite and unequivocal intent" not to perform in order to be actionable. *Leazzo v. Dunham,* 420 N.E.2d 851, 854, 95 Ill.App.3d 847 (1981). Whether an anticipatory repudiation has occurred is a question of fact. *Arlington LF, LLC*, 637 F.3d at 713.

Here, USSF's anticipatory breach claim is premised on the Players Associations "CBA termination notice", which provided statutory notice of the Players Association's "intent to engage in action(s) that shall serve to terminate and or modify . . . the . . . Memorandum of Understanding." The Players Association subsequently clarified that it was threatening to terminate the MOU "unless significant progress is made in these negotiations by or before March 1st" and that it was rejecting USSF's assertion that the MOU contained a no-strike provision.

On these facts, and with the Olympics approaching, it is understandable why USSF took these statements seriously. The record before this Court, however, does not establish beyond dispute that the Players Association's conditional threats to terminate the MOU manifested "clear, unequivocal intent not to perform." Nor does the evidence establish that the Players Association's repudiation of the no-strike clause rendered the underlying purpose of the parties' contract

12

unattainable.  Accordingly, USSF is not entitled to summary judgment on its anticipatory repudiation claims.[4]

**Conclusion**

For the foregoing reasons, USSF's motion for summary judgment is denied as to Count I and granted as to Count II, and the Players Association's motion for summary judgment is denied in its entirety.

IT IS SO ORDERED.

Date:   June 3, 2016

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge

---

[4] Because the Players Association's motion for summary judgment did not seek summary judgment on or substantively address USSF's claim of anticipatory breach, it is not necessary for this Court to determine whether USSF's claim is supported by sufficient evidence to survive a motion for summary judgment.